UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALL PLAINTIFFS REPRESENTED BY JOHN DRISCOLL )<br><br>Plaintiffs, )<br><br>v. )<br><br>ISLAMIC REPUBLIC OF IRAN )<br><br>Defendant. ) | No. 1:20-cv-00622-EGS |

**PLAINTIFFS' THIRD MOTION FOR THE COURT TO TAKE JUDICIAL NOTICE OF FACTS PREVIOUSLY LITIGATED IN THIS DISTRICT**

COME NOW Plaintiffs, by and through their attorneys, The Driscoll Firm, P.C., and The Driscoll Firm, LLC, and for their above-referenced Third Motion for the Court to Take Judicial Notice of Facts Previously Litigated in this District, state as follows:

1. Pursuant to Federal Rules of Evidence 201, the Court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b).

2. Under this Rule, the Court may take judicial notice on its own or *must* take such notice if a party requests it and the Court is supplied with the necessary information. Fed. R. Evid. 201(c) (italics added).

3. As one Court in this District has described the efficacy of the judicial notice concept: "The proper approach is one that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation...without necessitating the formality of having the evidence reproduced." *Ovessi v. Islamic Republic of Iran,* 879 F.Supp. 2d 44, 49 (D.D.C. 2012).

4. A simple check of this Court's Pacer system demonstrates that this Court has litigated hundreds of Foreign Sovereign Immunities Act ("FSIA") cases with the Islamic Republic of Iran as the chief, if not singular, defendant.

5. Although a canvassing of this Court's Pacer system demonstrates several pending FSIA lawsuits concerning Iranian-sponsored-and-funded Explosively Formed Penetrator ("EFP") and other types of attacks on United States Armed Forces personnel in Iraq during the approximate 2005-2011 time frame, it does not appear that the United States District Court for the District of Columbia had made previous judicial findings of fact about or concerning Iran's direct involvement in EFP detonation attacks on U.S. Soldiers and other terror activities through Hezbollah and Special Groups in post-Saddam Hussein Iraq until recently in *Fritz v. Islamic Republic of Iran,* 320 F. Supp.3d 48, 57-65 (D.D.C. 2018) and *Karcher v. Islamic Republic of Iran,* 396 F.Supp.3d 12, 22-30 (D.D.C. 2019).

6. In *Fritz*, the plaintiffs were the estates and family members of four United States Soldiers who were abducted and then murdered while serving in post-Saddam Hussein Iraq. Just like the Plaintiffs in this lawsuit, the *Fritz* plaintiffs sued the Islamic Republic of Iran (and its Islamic Revolutionary Guard Corps ("IRGC")) under the "terrorism exception" to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §1605A. *Fritz*, 320 F. Supp.3d at 55. Just like the Plaintiffs in this lawsuit, the *Fritz* plaintiffs further alleged that Iran and its IRGC provided "material support" to Shia proxy groups on the ground in Iraq which, in turn, committed "extrajudicial killings" of the four Soldiers in question. *Id.* at 55. The Honorable Randolph D. Moss' findings of fact in the *Fritz* case are the subject of Plaintiffs' Second Motion for the Court to Take Judicial Notice of Facts Previously Litigated in this District [Martinez ECF 35].

7. In *Karcher*, just like in this lawsuit, the plaintiffs were United States Army

Soldiers who were injured or killed while performing peacekeeping and security services for the United States and Coalition forces in post-Saddam Hussein Iraq from 2004-2011. *Karcher*, 396 F.Supp.3d at 14-15.

8. In *Karcher*, the Honorable Colleen Kollar-Kotelly conducted a three-day hearing concerning the plaintiffs' motion for default judgment. *Id.* at 17. After that extensive hearing, Judge Kollar-Kotelly made the following factual findings, findings which the Plaintiffs in this lawsuit are respectfully requesting that this Court consider adopting as findings of fact pursuant to Fed. R. Evid. 201(b) (the page references are to the *Karcher* opinion where the individual findings of fact were recited):

**Iran's Material Support for Hezbollah and Other Proxies in Iraq**

9. Shortly after Ayatollah Ruhollah Khomeini came to power as Supreme Leader in 1979, he instituted what became known as the Islamic Revolutionary Guard Corps ("IRGC") to forestall any "backsliding in implementing [his] vision for an Islamic theocratic government" in the Islamic Republic of Iran (22);

10. While the Iranian armed forces would protect the borders of Iran, the IRGC with its "parallel" military structure was tasked with protecting the revolution. The IRGC has its own army, navy, and air force (22);

11. A subsidiary of the IRGC—the Qods Force, or IRGC-QF—is responsible for its international operations, including training Muslim groups to support the revolution through insurgency and terrorism. That subsidiary was led by General Qasem Soleimani, a direct report of the second Supreme Leader of Iran, Ayatollah Sayyid Ali Hosseini Khamenei (22);

12. As a result of Iran's "support for acts of international terrorism," the United States designated Iran as a state sponsor of terrorism on January 19, 1984. State Sponsors of Terrorism,

U.S. Dep't of State (Dec. 20, 2017). That designation has not been discontinued. (22);

13. The IRGC and IRGC-QF have been designated more recently as terrorist organizations: the IRGC-QF on October 25, 2007; and the IRGC on October 13, 2017 (22);

14. Among Iran's foreign activities, its campaign in Iraq figures prominently. Dating at least to the Iran-Iraq War in the 1980s, the Shia Muslim regime in Iran sought to undermine Saddam Hussein's largely Sunni Muslim government by supporting Shia political groups in Iraq. These efforts escalated after the United States' Second Iraq War (22);

15. By forcing the collapse of Saddam Hussein's regime, Operation Iraqi Freedom removed Iran's greatest enemy and longtime nemesis. The 2003 invasion therefore provided Iran with a historic opportunity to reshape its relationship with Iraq and, in the process, increase its influence in the region. To that end Iran employed an "all elements of national power" approach in exploiting the outcome of this seminal event. This included both soft and hard power, from the use of political, economic, religious, and cultural leverage to the support of militant proxies (22-23);

16. The United States' post-invasion presence in Iraq threatened Iran's opportunities, however, only reinforcing the long-held Iranian desire to push the United States out of the Gulf region. Iran accordingly pursued a Shia-dominated and unified Iraq while causing the United States continued setbacks in [its] efforts to promote democracy and stability there. Annual Threat Assessment of the Director of National Intelligence for the Senate Select Committee on Intelligence (Feb. 2, 2006) ("Annual Threat Assessment") (23);

17. Meanwhile, Iran had long exerted its influence in Lebanon, as well. Beginning in the early 1980s, IRGC shaped the development and military capabilities of Lebanese Hezbollah ("Hezbollah"), a militant Shia political party that wanted to oust Israeli forces from Southern

Lebanon. As the relationship between IRGC and Hezbollah grew, Hezbollah reciprocated by executing terrorist missions against Israeli and American targets at Iran's request, offering Iran "reasonable deniability" after the fact (23);

### Iran's Network of Influence in Post-Invasion Iraq

18. In order to bolster its influence in Iraq, and counter American efforts there, Iran continued to sponsor Shia political movements—now vying for control of the post-Hussein government—while funding and facilitating the training of Shia militia groups, with Hezbollah's help (23);

19. In the political sphere, the Da'wa Party, the Supreme Council for the Islamic Revolution in Iraq ("SCIRI"), and Muqtada al-Sadr's Office of the Martyr Sadr ("OMS") filled varying niches but each benefitted from Iranian support. The armed wings of SCIRI and OMS—the Badr Corps and Jaysh al-Mahdi ("JAM"), respectively—were likewise closely affiliated with IRGC-QF (23)

20. Among the downstream effects of that Iranian support was militia infiltration of the Iraqi police and security forces, resulting in widespread corruption and "death squads" targeting at least Sunnis, if not Western officials as well (23);

21. Iranian arms, funding, and operatives flowed into Iraq through the Sheibani Network and other smuggling operations, while some Iraqi allies made the reverse trip to Iran for training (23);

22. There was a level of complicity with Iraqi ministers tied to the Shi'a Da'wa Party that went after American allies in the Sunni community and the Kurdish community and also Shia nationalists. These connections benefitted Shia militia members, who gained access to government vehicles, government waivers to travel during curfews, and official ministerial

paperwork and permissions that enabled them to develop targeting packets against opposition leaders and also Sunnis (24);

23. Iranian allies threatened American military interests in Iraq in part because they had saturated the security ministries and the intelligence apparatus (24);

24. As for the hard power, the IRGC-QF spearheaded a closely coordinated campaign to equip the Shia militia for proxy warfare. That campaign is well attested to in U.S. Government documents. In 2007, the Qods Force earned its Treasury Department designation under E.O. 13224 in part because it "provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shia militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians." IRGC-QF Designation (24);

25. The State Department found that in 2011, Iran was responsible for the increase of lethal attacks on U.S. forces in Iraq and provided militants with the capability to assemble explosives designed to defeat armored vehicles. The IRGC-QF, in concert with Lebanese Hizballah, provided training outside of Iraq as well as advisors inside Iraq for Shia militants in the construction and use of sophisticated improvised explosive device technology and other advanced weaponry. U.S. Dep't of State, Country Reports on Terrorism 2011 (July 2012) (24);

26. The threat from Shia militia continued to evolve under Iranian direction or support. After American and Iraqi forces inflicted tremendous casualties on JAM in the battle of Najaf in 2004, Mr. al-Sadr permitted the formation of JAM "Special Groups" with enhanced capabilities to attack American and Coalition forces, while the remainder of JAM would focus on anti-Sunni violence and other criminal activities. This resulted in a realignment of leadership, where local commanders of JAM Special Groups operated with some autonomy from Mr. al-Sadr and received their training, weapons and operational direction directly from Hezbollah and

the IRGC-QF. IRGC-QF funding and equipment for Special Groups reached an estimated $750,000 to $3 million per month by August 2007 (24);

27. Qais Khazali, who commanded one or more JAM Special Groups, traveled to Iran in 2006 and met with IRGC-QF leadership as well as Supreme Leader Ayatollah Khamenei. Declassified military intelligence indicates that the Supreme Leader asked Mr. Khazali to start Asa'ib Ahl al-Haq ("AAH") or the K2 network, a further special group outside of Mr. al-Sadr's auspices and awareness (24-25);

28. The AAH initiative demonstrated Iran's effort to foster dependence on its aid for Iraqi militia to carry out attacks on Coalition Forces. Although AAH was later deprived for some time of the leadership of Qais Khazali and his brother, Layth, during their detention by U.S. forces, the group was able to maintain a fairly high-level offensive tempo and operated as Iran's direct terror proxy targeting U.S. personnel at the direction of Hezbollah and the IRGC-QF from 2006 through 2011. AAH was funded, directed, trained and equipped by the IRGC-Qods Force and Lebanese Hezbollah (25);

29. Perhaps Iran sought an even closer ally, or simply to multiply its options for proxy attacks on U.S. and Coalition forces. Whatever the reason, Iran directed the formation of still another militia group—Kata'ib Hezbollah ("KH" or "Hezbollah Brigades")—in 2007. This group would be led by Abu Mahdi al Muhandis, a senior advisor to the IRGC's Qasem Soleimani with both Da'wa Party and Badr Corps credentials. Since 2007, Kata'ib Hezbollah ("KH") had been "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq," the U.S. Department of State noted when it designated the group as a Foreign Terrorist Organization in June 2009. U.S. Dep't of State, Designation of Kata'ib Hizballah (June 26, 2009) (25);

30. Mr. al-Sadr's militant activity against U.S. and Coalition forces came full circle.

Whereas previously he had ceded those kinds of initiatives to the JAM Special Groups, in July 2008 Mr. al-Sadr announced the formation of the Promised Day Brigades ("PDB"), which could be called a JAM Special Group of his own. This group too was supported by the IRGC-QF and Hezbollah in keeping with the IRGC's long-time policy of investing in all Shia factions. And it was responsible for its own string of attacks on U.S. and Coalition forces (25);

### Explosively Formed Penetrators ("EFPS") as a Signature Weapon

31.  Iran supplied or bankrolled a number of types of weapons used by Shia militia groups in Iraq (26);

32.  An EFP typically consists, in pertinent part, of a short metal pipe loaded with high-energy explosive ("HE" explosive) and capped with a concave copper disk. "HE explosives" are defined in part as chemical compounds or mixtures that are capable of supporting or sustaining a detonation wave. Detonation of the EFP forces the inverted center of the disk outwards into a molten slug capable of traveling 2,000 meters per second or more. That speed is sufficient to puncture an "up-armored" Humvee's "rolled homogenous armor" ("RHA"), which is the hardest steel that [the U.S. Army] can manufacture and is intentionally deployed in layers on such vehicles to prevent penetration (26);

33.  The combination of RHA and ballistic glass windows is enough to thwart other types of weapons, such as truly-improvised explosive devices ("IEDs") and small arms fire. After an EFP pierces even an up-armored Humvee, the slug disperses shards of the Humvee's steel and Teflon, potentially blows the vehicle's doors off of their hinges due to the pressure wave, and possibly ignites the vehicle's fuel (26);

34.  Inflicting this damage requires precision craftsmanship of the EFP. This is apparent in the specifications for the copper disk. This disk must be milled to a specific thickness

and angle. If the depth of the disk is too thick or too thin, or if the curvature of the disk is incorrect, then the slug may be unable to form or may split into multiple pieces during flight. As a result, the slug may be unable to penetrate the target or may miss it entirely. Moreover, the disk must consist of copper, rather than other metals whose melting points are not conducive to proper formation of an effective slug. The explosive too must be of a certain type and strength in order to shape and propel the slug fast enough to cut through RHA (26);

35. Detonating an EFP relies on a "two-step arming and triggering process" akin to that of other explosive weapons. At least for EFPs in the Iraqi theater, the operator typically would arm the EFP using either a command wire ("CW") or remote frequency ("RF"). Whereas the CW approach had a range of 100 meters or less, the RF approach enabled the operator to arm the EFP from more than 300 meters away. Often a spotter closer to the site of the EFP would alert the operator when the target vehicle approached. The operator of an RF-equipped EFP would then send the signal using something as simple as a key-fob or as complex as a dual-tone multi-function reference board found inside a cell phone. The cell phone method permitted the EFP maker to incorporate a safety system requiring the operator to enter a four- to ten-digit PIN into the cell phone in order to arm the device. After arming the EFP, the operator did not need to take any further action. Upon moving from passive into active mode, the armed device awaits only a triggering event in order to detonate. An approaching vehicle would generate enough heat to cause a passive infra-red device ("PIR") attached to the EFP to send an electrical current to the EFP, thereby triggering detonation (27);

36. Effectively deploying an EFP called for a further layer of technical know-how combined with substantial strategic planning. Identifying precisely the right directional focus, distance from the target, and timing of the PIR-enabled weapon would require an extensive "trial

and error" process. The EFP emplacers were also adept, for example, at camouflaging the weapon to avoid tipping off U.S. forces. EFPs could be embedded in piles of trash, trash barrels, concrete street curbing, or synthetic rocks made out of foam and covered with dirt. The sophistication of EFP attacks also evolved in step with the U.S. military's countermeasures (27);

37. The average Iraqi Shia militia member could not reasonably be expected to construct an EFP on his own. Due to the unique components of the EFP, the tactics through which it is effectively deployed, and the extensive expertise necessary to overcome U.S. countermeasures, the EFPs encountered in Iraq were traced back to Iran and Hezbollah (27);

38. EFPs were first seen in combat when Hezbollah attacked one or more Israeli Humvees in Southern Lebanon on October 5, 1998. But even before Hezbollah used EFPs, it had been developing increasingly effective IEDs by honing tactics, techniques, and procedures ("TTP") (27-28);

39. Each time the Israeli military devised countermeasures, Hezbollah's engineers would adapt TTP accordingly. For example, Hezbollah developed synthetic rock camouflage for their IEDs, turned from CW to RF methods of arming those weapons, and added PIR for a trigger. And those hallmarks of Hezbollah's TTP appeared in the Iraqi theater as well, where camouflage, RF-armament, and PIR-triggering were keys to EFPs' success (28);

40. Although Hezbollah appears to have developed the first EFPs, both Iran and Hezbollah were instrumental to their use in Iraq, beginning in 2004. The evidence shows that Iran supplied EFPs that were fired in Iraq (28);

41. The U.S. Department of Defense established the Joint Improvised Explosive Device Defeat Organization ("JIEDDO") to coordinate all of the defense activities to understand IEDs, including EFPs, how U.S. institutions might mitigate the effects from a materials solution

or from training, and furthermore to understand the intelligence components associated with the networks that were being used against Coalition Forces with these devices (28);

42. While JIEDDO coordinated counter-IED efforts from Washington, D.C., Task Force Troy was the operational force on the ground in Iraq, bringing together intelligence, explosive ordnance expertise and engineering expertise. Task Force Troy and domestic U.S. intelligence conducted extensive forensic analysis after EFP attacks, as well as when EFP components were found in caches. The principal source of the materials and the completed munitions, the EFP, was Iran (28);

43. One of Iran's primary forms of material support to the JAM Special Groups was financing, manufacturing and deploying EFPs. The U.S. military traced much of the machinery used to manufacture the EFPs, high explosives and PIR devices deployed in Iraq to Iran and its illicit supply chain. At a minimum, the metal, the HE explosive, and some degree of EFP manufacturing have each been attributed to Iran. It appeared that Iran facilitated the smuggling of these components into Iraq along well-established, yet clandestine supply lines for assembly into the finished weapons (28-29);

44. IRGC-QF and Hezbollah conducted training in a combination of Iraq, Iran, and Lebanon for Iraqi Shia militant leaders in the effective use of EFPs. Compared with Iranian instructors, Hezbollah instructors were reportedly more effective, in part because they shared a language (Arabic) and culture (tribal relationships and other networks) with Iraqi Shia that Iranians coming from a Persian, cosmopolitan culture generally did not. Whatever their nationality, the trainers offered critical assistance that, for example, enabled Shia militia groups to understand how to position EFPs' PIR triggers based on the likely speed of a moving target vehicle (29);

45. The training was further evidenced in the Iraqi Shia militia's ability to respond so rapidly and effectively to the U.S. military's sophisticated countermeasures. For example, the U.S. military attached several more inches of RHA and ballistic glass to up-armored Humvees using "door kits," such as the Level 5 Interim Fragmentary Armor Kit ("Frag 5 Kit"). That was not enough to stop EFPs. The military also began attaching appendages, called "Rhinos," to the front of Humvees to trigger early detonation of EFPs ahead of the vehicle or into the engine, but the Shia militia responded by offsetting and angling the EFPs' PIRs so that the EFP would still hit the crew cabin (29);

46. The U.S. military determined that many thousands of copies of a device used to thwart U.S. countermeasure technologies had passed through Iran and thereafter into EFPs used in Iraq (30).

WHEREFORE, the Plaintiffs Represented by John Driscoll respectfully request that the Court take judicial notice of and incorporate as established facts in this lawsuit the *Karcher* Findings of Fact as set forth in Paragraphs 8 through 45 of this Motion without the necessity of having such evidence reproduced in this lawsuit.

Respectfully Submitted,

Dated: December 29, 2020

_/s/ Paul W. Johnson_____
Paul W. Johnson, #34554 (MO)
Christopher J. Quinn, #41883 (MO)
THE DRISCOLL FIRM, P.C.
211 N. Broadway, 40th Floor
St. Louis, Missouri 63102
314-932-3232 telephone
314-932-3233 facsimile

    paul@thedriscollfirm.com
    chris@thedriscollfirm.com

    John J. Driscoll, MO0003
    THE DRISCOLL FIRM, LLC
    1311 Avenida Juan Ponce de Leon, 6th Floor
    San Juan, PR 00907
    Phone (618) 444-6049
    Fax: (314) 932-3233
    john@jjlegal.com

    *Attorneys for Plaintiffs*