# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ALL PLAINTIFFS REPRESENTED BY JOHN DRISCOLL, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CAUSE NO.: 1:20-cv-00622-EGS |
| ISLAMIC REPUBLIC IRAN, | ) ) | |
| Defendant. | ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR DEFAULT JUDGMENT AS TO LIABILITY ISSUES PURSUANT TO FRCP 55(b)(2)

COMES NOW All Plaintiffs Represented by John Driscoll, by and through their attorneys, and in support of their Motion for Default Judgment in the matter of 88 American Soldiers killed and/or maimed in Iranian state sponsored terrorist attacks state the following;

## I.    OVERVIEW

This is a civil action brought pursuant to the Foreign Sovereign Immunities Act (hereinafter "FSIA"), 28 U.S.C. §1602 *et seq*., for personal injury, wrongful death, and related torts brought by victims and the estates (and supporting family members, or "solatium plaintiffs") of 88 United States "nationals" and "Armed Forces" members, 55 living and 23 deceased (hereinafter collectively as "Soldiers"), who were injured or killed in a series of 63 terrorist attacks sponsored by Iran and/or its agents and proxies while the Soldiers were stationed in post-Saddam Hussein Iraq performing peacekeeping, stabilization and security functions from 2006 through 2011. [Martinez ECF 48].

1

All of the Soldiers' personal injuries and/or deaths were caused by Iranian-manufactured and supplied weapons, the overwhelming percentage of which were "Explosively Formed Penetrators", or "EFPs", and which were used by Iranian-sponsored groups and agents in post-Saddam Hussein Iraq operating under the supplying, encouragement, funding, direction and training of Iran and its agents and government subdivisions.  [*Martinez* ECF 48, ¶¶23-71].  The EFPs are different from and much more lethal than the crudely-put-together "improvised explosive devices", or "IEDs", which also were present and used by various groups in the post-2003 Iraqi theater.

Iran's aforementioned agents and subdivisions included the Iranian Revolutionary Guard Corps ("IRGC"); a subdivision of the IRGC known as the Qods Force ("QF"); Hezbollah; and other terrorist agents that included several Iraqi Shia terror groups referred to collectively as "Special Groups."  [*Martinez* ECF 48, ¶¶2-9].

The IRGC is a branch of, but is not identical to, the Iranian Armed Forces founded after the Iranian Revolution in 1979 to protect the country's Islamic nature and order. The IRGC believes that its role is to protect the Islamic system by preventing foreign interference in its region of influence. Throughout the years of the Iraqi attacks in question, 2006-2011, the Secretary of State's Annual State Sponsors of Terror Overview (www.state.gov) repeatedly listed Iran as "the most active state sponsor of terrorism…" with the IRGC being "increasingly involved in supplying lethal assistance to Iraqi militant groups, which destabilizes Iraq."  Those same Annual State Sponsors of Terrorism Overviews pegged Iran and the IRGC as being linked to production of EFPs. In addition, Iran and the IRGC provided training and technology to select Special Groups with regard to EFPs and their manufacture and use in Iraq.  [Martinez ECF 48, ¶¶2-9; 17-19; 23-43].

The Qods Force ("QF") is a special forces unit of the IRGC and is responsible for the IRGC's extraterritorial operations. The QF reports directly to the current Iranian leader, Ayatollah Ali Khamenei.  According to the State Department's Annual State Sponsors of Terror Overview from 2006-2011, the QF in conjunction with the IRGC were responsible for attacks on American Armed Forces personnel in Iraq, and continued to provide Iraqi Shia militant groups with EFPs, other weaponry, and, in conjunction with Lebanese Hezbollah forces, training on how to use such weapons against American and Coalition forces in Iraq.  QF was designated by President Bush as a "supporter of terrorism" on September 23, 2007.  [Executive Order No. 13224, 66 Fed. Reg. 49079-82, September 23, 2001; Fact Sheet: Designation of Iranian Entities and Individual for Proliferation Activities and Support for Terrorism, www.treasury.gov/press-center (October 25, 2007)].

Hezbollah, or "Hizbullah", is an Arabic word meaning "the party of God". It is also a Shia Islamist militant group and political party based in Lebanon.  Hezbollah was founded in the early 1980s when the Iranian government sought to radicalize the Lebanese Shi'ite community. Hezbollah was conceived by Muslim clerics and funded by Iran to harass Israel with regard to the ongoing Palestinian conflict.  Its leaders were followers of the Ayatollah Khomeini and its followers were trained and organized by a contingent of 1,500 IRGC personnel.  Hezbollah's manifesto listed as its objectives the expulsion of Americans and any colonial entity from its [perceived] lands.  Hezbollah was designated by President Clinton as a "terrorist organization" by Executive Order 12947 dated January 23, 1995, and was further designated as a "Foreign Terrorist Organization" by the Secretary of State on October 8, 1997, with findings that the QF had a long history of funding (to the tune of $100-200 million annually) Hezbollah militant activities.

[Martinez ECF 48, ¶¶2-9; 15-46; 51-63; Executive Order No. 12947, 60 Fed. Reg. 5079-5081, January 25, 1995; Foreign Terrorist Organizations, U.S. Department of State, www.state.gov].

Since its formulation in 1979, the Islamic Republic of Iran has been an enemy of and antagonistic to the United States. Following the 1979 revolution spearheaded by the Ayatollah Ruhollah Khomeini, the nation of Iran was transformed into an Islamic theocracy. The new government promptly drafted a constitution, which is still in effect today. The preamble to the 1979 constitution sets forth the mission of the post-revolutionary Iranian state:

> "The mission of the constitution is to realize the ideological objectives of the movement and to create conditions conducive to the development of man in accordance with the noble and universal values of Islam. With due attention to the Islamic content of the Iranian Revolution, the Constitution will strive with other Islamic and popular movements to prepare the way for the formation of a single world community…to assure the continuation of the struggle for the liberation of all deprived and oppressed peoples of the world."

After the overthrow of Saddam Hussein in April of 2003, President Bush declared that "major combat operations in Iraq have ended…". In the fall of 2003 and thereafter, the United Nations Security Council authorized the post-conflict occupation of Iraq by Coalition Forces to maintain security and stability. [Martinez ECF 48, ¶¶2-9; 15-43; U.N. Security Council Resolutions 1483, at preamble, ¶¶ 1, 4 (May 22, 2003); 1500, at ¶2 (Aug. 14, 2003); 1511, ¶13 (Oct. 13, 2004); and 1546 (June 7, 2004)].

Iran viewed the United States' efforts to build peace and stability in Iraq as a potential threat to its regime. Rather than engage in direct conflict with the U.S. and other Coalition forces, Iran chose to undermine U.S. peace-keeping and stabilization efforts by supporting terrorism and sectarian violence in Iraq. [Martinez ECF 48, ¶¶23-43]. Since that time, and throughout the time frames of the subject attacks in Iraq from 2005-2011, Iran implemented a plan and policy of

terrorism and murder against the Soldiers and United States Armed Forces personnel in Iraq designed to thwart the Coalition and U.S. efforts to stabilize the Iraqi situation, and to simultaneously increase the Iranian influence in that country. These very coordinated efforts of extrajudicial killings and material support and resources that facilitated EFP and other terrorist attacks against the peacekeeping Soldiers directly caused their personal injuries and deaths. [Martinez ECF 48, ¶¶44-92].

## II.    THE COURT'S JURISDICTION UNDER THE FSIA

The FSIA provides the sole legal means by which a plaintiff may bring a suit against a foreign state. *Reed v. Islamic Republic of Iran,* 845 F.Supp.2d 204, 209 (D.D.C. 2012). The FSIA protects the dignity of foreign states as a matter of international law, while providing a forum for justice and legitimate grievances by providing narrow exceptions to immunity. *See Murphy v. Islamic Republic of Iran,* 778 F.Supp.2d 70, 71 (D.D.C.2011); *see also* 28 U.S.C. §1602. This is consistent with Congress' intent to hold state sponsors of terrorism responsible for their crimes. *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1049 (D.C.Cir. 2014).

In 2008, Congress repealed §1605(a)(7) of FSIA and replaced it with §1605A, which broadened the jurisdiction of federal courts and created a federal statutory cause of action for those victims and their legal representatives against state sponsors of terrorism for terrorist acts committed by the State, its agents, or employees. *Owens v. Republic of Sudan*, 826 F.Supp.2d 128, 147 (D.D.C. 2011) (internal citations omitted).

### A.    This Court Has Subject Matter Jurisdiction Under the FSIA

The FSIA must be applied in every action involving a foreign state defendant. *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 489; 28 U.S.C §1330. United States district courts

have original jurisdiction over non-jury civil personal injury claims against a foreign state provided that the foreign state is not entitled to immunity under §§ 1605-1607 of the FSIA or under any applicable international agreement.  28 U.S.C. §1330(a); 28 U.S.C. §1602 et seq.; *Bluth v. Islamic Republic of Iran,* 203 F. Supp. 3d 1, 18-19 (D.D.C. 2016).

First, it has been clearly established that Iran is considered a "foreign state" as defined by FSIA.  *See* 28 U.S.C. §1330(a); *Worley,* 75 F. Supp. 3d 311 (D.D.C. 2014). This District has taken a "categorical approach" to defining foreign government-related entities as a "foreign state" if the core functions of the entity are governmental. *Id.* (citing *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C.Cir. 2003)). This action is against Iran as a legal entity, by and through itself as a nation state, and through its IRGC and QF, and not against property, and therefore the claims seek relief *in personam*. *See id.* And, Plaintiffs have not demanded a jury trial [Martinez ECF 48].

The sole bases for subject matter jurisdiction in an action against a foreign state defendant are the FSIA's enumerated exceptions to immunity. *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434 (1989).  Therefor "Even if the foreign state does not enter an appearance to assert an immunity defense, a District Court must determine that immunity is unavailable under this act." *Verlinden B.V. v. Vent. Bank of Nigeria,* 461 US 480, 495 n. 20 (1983). The instant matter does fall under one of the enumerated exceptions, specifically, this case falls under the "Terrorism Exception" , which provides:

> "A foreign state shall not be immune from the jurisdiction of the United States in any case…in which money damages are sought against a foreign state for personal injury or death that was caused by an act of…extrajudicial killing…or the provision of material support or resources for such act if such act or provision of material support or resources is engaged in by an official, employee or agent of such foreign state…"

28 U.S.C. §1605A(a)(1).

According to FSIA's "Terrorism Exception", courts shall hear claims thereunder if: (1) the foreign state was designated as a state sponsor of terrorism at the time the act occurred and remained so designated at least six months prior to the filing of the subject lawsuit; and (2) the claimants were either United States nationals or members of the Armed Forces at the time of the act.[1] 28 U.S.C. §1605A(a)(2). Pursuant to §1605A(c), a designated state sponsor of terrorism and/or its agents shall be liable to a national of the United States and/or members of the Armed Forces, and the legal representatives of both, for personal injury or death caused by the acts of that foreign state and/or its agents.

As set forth below, Plaintiffs satisfy both requirements of the terrorism exception to foreign sovereign immunity, and this court should properly assert subject matter jurisdiction over this matter.

## 1.   Iran Has Been Designated as a State Sponsor of Terrorism Since 1984 and Through the Present.

Pursuant to 28 U.S.C. §1605A(h)(6), the term "state sponsor of terrorism" means a country the government of which the Secretary of State has determined, for purposes of [various cited statutes or regulations], is a government that has repeatedly provided support for acts of international terrorism.

Iran was formally designated a "state sponsor of terrorism" on January 19, 1984, in accordance with §6 of the Export Administration Act of 1979, 50 U.S.C. App. 2405(j). *See also* 49 Fed. Reg. 2836-02 (Statement of then-Secretary of State George P. Schultz, Jan 23, 1984,

---

[1] There is a third element for the court to hear a claim, that being that the foreign state have had an opportunity to arbitrate the claim if the act occurred in the foreign state. Since none of the terrorist attacks which are the subject of this lawsuit occurred within Iran, there is no requirement that Iran be afforded the opportunity to arbitrate any of the claims herein.

finding that: "Iran is a country which has repeatedly provided support for acts of international terrorism."); 22 C.F.R. §126.1(d) (2006) (stating it was the policy of the United States to deny licenses for imports or exports of defense-related articles and services from various countries determined by the Secretary of State to have been State Sponsors of Terrorism, including specifically Iran); 31 C.F.R. §596.201 (2006) (prohibiting any "financial transaction" with any government which had been determined by the Secretary of State to have been a "country supporting terrorism"); State Sponsors of Terrorism, U.S. Dep't of State, http://www.state.gov/j/ct/list/c14151.htm (last visited Jan. 22, 2018); *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 65 fn. 7 (D.D.C. 2015); *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 8 (D.D.C. 2016). Iran continues to this day to be designated as a state sponsor of terrorism.

Once a country has been designated as a state sponsor of terrorism, the designation cannot be rescinded unless the President submits to Congress a proper report, as described in the Export Administration Act ("EAA"), 50 U.S.C. App. §2405(j)(4). Iran has never been taken off the list of "state sponsors of terrorism." Therefore, this court must consider Iran a state sponsor of terrorism within the meaning of the FSIA. *State Sponsors of Terrorism*, U.S. Dep't of State, state.gov/state-sponsors-of-terrorism (last visited Dec. 28, 2020)

## 2. Plaintiffs' Claims are for Monetary Damages for Personal Injuries and/or Wrongful Death Against Iran and/or Its Agents for 'Extrajudicial Killings' and/or the 'Provision of Material Support' for Terrorist Attacks on United States Armed Forces Personnel in Iraq from 2006-2011.

Immunity under the FSIA is not appropriate where, as here, Plaintiffs, who are or were United States nationals[2] and/or members of the United States Armed Forces, or the legal

---

[2] 28 U.S.C. §1605A(h)(5): "(5) the term "national of the United States" has the meaning given that term in §1101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22))." §1101(a)(22) provides that the term ''national of the United States'' means (A) a citizen of the United States, or (B) a person who, though not a citizen

representatives thereof, have asserted their right to monetary damages for personal injuries or wrongful death against State Sponsor of Terrorism Iran and/or its agents, the IRGC, QF, Hezbollah, and the Special Groups in Iraq for their extrajudicial killings in and/or provision of material support or resources for the subject 63 terrorist attacks in Iraq from 2005-2011.  [Martinez ECF 48, ¶¶99-869; 28 U.S.C. §1605A(c)].

Pursuant to §1605A(h)(7), which in turn gets its definition from 28 U.S.C. §1350, "extrajudicial killings" means "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all of the judicial guarantees which are recognized as indispensable by civilized peoples."  Section 1605A(h)(3), which in turn gets its definition from 18 U.S.C. §2339A(b), defines "material support or resources" as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, or personnel."

Plaintiffs have alleged in their Second Amended Complaint that State Sponsor of Terrorism Iran and its proxies/agents participated in, planned, ordered, funded, directed, instructed, and/or provided material support or resources for the 63 terrorist attacks against the Soldiers in Iraq from 2006-2011 which killed 55 of the Soldiers ("extrajudicial killings"), seriously injured and maimed 23 of the Soldiers, and intentionally inflicted emotional distress and other solatium-related damages on the 259 family member Plaintiffs.  This Court has held on multiple occasions that for a Plaintiff to recover under the FSIA they need only establish that the subject attacks were unauthorized, deliberate, and that there were casualties.  It is not necessary for one of the plaintiffs

---

of the United States, owes permanent allegiance to the United States. All 88 of the injured or killed Soldiers were citizens of the United States and members of the Armed Forces.

to have died in a particular attack in order for the state-sponsor-of-terrorism exception to apply. *Cohen v. Islamic Republic of Iran*, 2017 WL 818208, *5 (D.D.C. 2017); *Haim v. Islamic Republic of Iran,* 784 F. Supp. 1, 11 (D.D.C. 2011) (finding that a bus bombing was an extrajudicial killing under 28 U.S.C. §1350 even though the plaintiff survived the attack).

### B.     This Court Has Personal Jurisdiction Under 28 U.S.C. §1608(a)(4)

Federal courts have personal jurisdiction over a foreign state if (1) the court has jurisdiction pursuant to §1330(a) and (2) service has been properly made under §1608 of the FSIA.  28 U.S.C. §1330(b). As established above, the requirements of jurisdiction under §1330(a) are met in this case.  As will be established below, Plaintiffs have effected proper and appropriate service of process on the Islamic Republic of Iran pursuant to §1608(a)(4) and thus this Court properly possesses personal jurisdiction over the Defendants in these actions.

The FSIA sets forth the necessary elements of service of process to establish personal jurisdiction in 28 U.S.C. §1608, and gives the methods in numerical order of preference.  *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 327 (D.D.C. 2014).  When a method of service is unavailable or unsuccessful, a plaintiff may attempt the next method available. *Id.*

The first preference for service is according to "any special arrangement[s]" for service between the plaintiff and the foreign state (i.e., a contractual provision).  *See,* 28 U.S.C. §1608(a)(1).  If no special arrangement exists, the second option is service "in accordance with an applicable international convention on service of judicial documents."  28 U.S.C. §1608(a)(2). The United States and Iran do not have a "special arrangement," nor is there an applicable international convention for service of process with Iran.  *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008); *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 18

(D.D.C. 2016).  In addition, Iran does not typically accept service through its Ministry of Foreign Affairs in Tehran, Iran.  See, *Worley*, 75 F. Supp. at 327.

Therefore, Plaintiffs attempted service of process on Iran in this matter pursuant to 28 U.S.C. §1608(a)(3) via parcel delivery through the United States Postal Service [ECF 6]. This section requires that "one copy of the summons, complaint, and notice of suit, together with a translation of each document into the language of the foreign state" (in this case, Farsi) be sent through any form of mail that requires a signed receipt by "the clerk of the court to the head of the ministry of foreign affairs of the foreign State concerned."  28 U.S.C. §1608(a)(3).  On June 13, 2020, the Plaintiffs notified the District of Columbia Clerk's Office that their attempts at (a)(3) parcel delivery service to the Iranian Foreign Ministry had been returned unexecuted, therefore prompting Plaintiffs to seek the last of the four sequential means of effecting service of process on a foreign state under the FSIA, "diplomatic channels" service through the United States Embassy in Bern, Switzerland, pursuant to §1608(a)(4).  [ECF 7, 7-1].

On December 2, 2020, Plaintiffs were notified that the "diplomatic pouch" of service of process materials were attempted to be handed over to the Iranian Embassy representative in Bern, Switzerland, but were refused.  Pursuant to §1608(c)(2), service is deemed to have been made on Iran as of the date of the delivery of the "diplomatic pouch" through the United States Embassy in Bern, Switzerland, pursuant to §1608(a)(4), in this case, on October 27, 2020.  [ECF 13-1, 13-3 and 14].  Pursuant to §1608(d), Iran had 60 days from October 27, 2020, or up through and including December 26, 2020, within which to enter an appearance and file a responsive pleading, which it failed to do.  When this default status was brought before this Court, the Clerk of Court entered its Entry of Default on December 29, 2020.  [ECF 17].  Iran has failed to enter an appearance or file a responsive pleading up through the date of the filing of

this Motion. Accordingly, Plaintiffs have satisfied the statutory requirements for service of process, and personal jurisdiction is proper in this matter.

### III.   PLAINTIFFS ARE ENTITLED TO DEFAULT JUDGMENT PURSUANT TO RULE 55(b)(2) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Under §1608(e), no judgment by default shall be entered by the Court unless the Plaintiffs establish their claims and rights to relief by evidence satisfactory to the Court.  As the Court of Appeals for the District of Columbia Circuit has recognized in the default setting against a foreign sovereign nation:

> The district court also has an unusual degree of discretion over evidentiary rulings in an FSIA case against a defaulting state sponsor of terrorism.  For example, we have allowed plaintiffs to prove their claims using evidence that might not be admissible in a trial.  *See, Han Kim v. Democratic People's Republic of Korea,* 774 F.3d 1044, 1048-51 (D.C. Cir. 2014) (noting "courts have the authority---indeed, we think, the obligation---to adjust evidentiary requirements to differing situations" and admitting affidavits in an FSIA default proceeding) (internal alterations and quotation marks removed).  This broad discretion extends to the admission of expert testimony, which, even in the ordinary case, "does not constitute an abuse of discretion merely because the factual bases for an expert's opinion are weak."  *Joy v. Bell Helicopter Textron, Inc.,* 999 F.2d 549, 567 (D.C. Cir. 1993).  §1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion. This is part of the risk a sovereign run when it does not appear and alert the court to evidentiary problems.

*Owens v. Republic of Sudan,* 864 F.3d 751, 785-86 (D.C.C. 2017).

FSIA "imposes tight constraints on courts required to decide whether an act satisfies the terrorism exception's substantive elements," but when the foreign state fails to appear and the plaintiff seeks a default judgment, FSIA leaves discretion to the courts to decide the standard.

*Han*, 774 F.3d at 1046–47. In considering whether to enter default judgment, courts in FSIA cases look to various sources of evidence to satisfy their statutory obligation. Courts may, for example, rely upon plaintiff's " 'uncontroverted factual allegations, which are supported by...documentary and affidavit evidence.' " *Valore v. Islamic Republic of Iran,* 700 F.Supp.2d 52, 59 (D.D.C.2010) (alteration in original; quoting *Int'l Road Fed'n v. Democratic Republic of the Congo,* 131 F.Supp.2d 248, 252 n. 4 (D.D.C.2001)). In addition to more traditional forms of evidence— testimony and documentation—plaintiffs in FSIA cases may also submit evidence in the form of affidavits. *Blais v. Islamic Republic of Iran,* 459 F.Supp.2d 40, 53 (D.D.C.2006) (citing *Bodoff v. Islamic Republic of Iran,* 424 F.Supp.2d 74, 82 (D.D.C.2006)). Finally, an FSIA court may " 'take judicial notice of related proceedings and records in cases before the same court.' " *Valore,* 700 F.Supp.2d at 59 (quoting *Brewer v. Islamic Republic of Iran,* 664 F.Supp.2d 43, 50–51 (D.D.C.2009)).

Before the court can enter a default judgment under the FSIA, a plaintiff must establish his or her claims "by evidence satisfactory to the court." 28 U.S.C. §1608(e). This "satisfactory to the court" standard is "identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e)." *Owens*, 826 F.Supp.2d at 134. Therefore, the Court cannot "unquestioningly accept a complaint's unsupported allegations as true." *Moradi*, 77 F.Supp.3d at 64 (citing *Reed*, 845 F.Supp.2d at 211–12).  The court determines how much and what kinds of evidence the plaintiff must provide to meet the threshold. *Id.* at 65. As previously mentioned, a plaintiff may establish proof by affidavit, and an evidentiary hearing is not required. *See supra; see also Moradi*, 77 F.Supp.3d at 65; *Weinstein v. Islamic Republic of Iran*, 184 F.Supp.2d 13, 19 (D.D.C. 2002).

A court making a determination about the evidence required must bear in mind Congress's statutory purpose in enacting a private right of action in §1605A of the FSIA: to "compensate[ ] the victims of terrorism [and thereby] punish foreign states who have committed or sponsored such acts and deter them from doing so in the future." *Id.* at 1048 (quoting *Price v. Socialist People's Libyan Arab Jamahiriya,* 294 F.3d 82, 88–89 (D.C. Cir. 2002)). In parsing the evidence that plaintiffs offer, "[c]ourts may rely on uncontroverted factual allegations that are supported by affidavits." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) (citing *Rimkus*, 750 F. Supp. 2d at 171). "Uncontroverted factual allegations that are supported by admissible evidence are taken as true." *Braun*, 228 F. Supp. 3d at 74–75 (citing *Roth*, 78 F. Supp. 3d at 386; *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 56 (D.D.C. 2008), *aff'd*, 646 F.3d 1 (D.C. Cir. 2011)); *see also Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*, 510 F. Supp. 2d 101, 103 (D.D.C. 2007) (citing <u>Greenbaum v. Islamic Republic of Iran,</u> 451 F. Supp. 2d 90, 94–95 (D.D.C. 2006)).

In *Han Kim v. Democratic People's Republic of Korea,* 774 F.Supp. 1044, 1049-1051 (D.C.Cir. 2014), the District of Columbia Court of Appeals overturned a district court finding concerning what "evidence satisfactory to the court" means in an FSIA default setting.  In a lawsuit involving the disappearance and later *presumed* kidnapping and murder of a prominent North Korean religious and political dissident, the District of Columbia Court of Appeals held that plaintiffs had in fact presented "evidence satisfactory to the court" in their motion for default judgment through two expert witness reports which concluded that with there being evidence of North Korea's responsibility for the original abduction of that dissident, the absence of any direct evidence of North Korean government involvement in the alleged torture and murder of the leader

14

still created an inference that the leader was likely tortured and killed by or on behalf of the North Korean government.  *Han Kim*, 774 F.Supp. at 1049-1050.

In *Owens v. Republic of Sudan,* 864 F.3d 751, 785 (D.C. Cir. 2017), the District of Columbia Court of Appeals noted that while both §1608(e) and Rule 55(d) give an unresponsive sovereign some protection against an unfounded default judgment, neither provision relieves the sovereign from the duty to defend cases (internal citations omitted). Moreover, §1608(e) does not "require the court to demand more or different evidence than it would ordinarily receive," *cf. Marziliano v. Heckler*, 728 F.2d 151, 158 (2d Cir. 1984) (applying Rule 55(d)); indeed, "the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Alameda v. Sec'y of Health, Ed. & Welfare*, 622 F.2d 1044, 1048 (1st Cir. 1980) (applying Rule 55(d)).  *Id.* at 785.

The district court also has an unusual degree of discretion over evidentiary rulings in an FSIA case against a defaulting state sponsor of terrorism.  For example, this Court of Appeals has allowed plaintiffs to prove their claims using evidence that might not be admissible in a trial. *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048-51 (D.C. Cir. 2014) (noting "courts have the authority—indeed, we think, the obligation—to adjust evidentiary requirements to differing situations" and admitting affidavits in a FSIA default proceeding).  *Id.* at 785.

In the present case, Plaintiffs have submitted evidence through the Reports of three retained experts---Dr. Daniel Byman, a long-time Middle East security expert; Michael Pregent, a counter-intelligence expert who worked on-the-ground in Iraq working against the Shia Militia Groups and Iranian and Hezbollah influence in Iraq; and Stafford Melerine, a weapons expert with vast knowledge about the characteristics and properties of Explosively Formed Penetrators

("EFPS"), to properly support the allegations that Iran and its IRGC and QF, along with its terror proxy and ally, Hezbollah, manufactured, distributed, supplied, trained, and supported the Shia Militia Groups ("Special Groups") in Iraq with regard to the 63 subject EFP (and in limited attacks other weapons) attacks which injured or killed the 88 Soldiers.  [Martinez ECF 48].

In addition, Plaintiffs have filed three separate Motions for the Court to Take Judicial Notes of Facts Previously Litigated in this District.  The facts which the Plaintiffs are requesting be "judicially noticed and established" for purposes of this Motion for Default Judgment very much overlap with the FRCP 26 Reports of Plaintiffs' experts Byman, Pregent, and Melerine. That is to say, the Byman, Pregent and Melerine Reports, like the previous District of Columbia District Court factual findings with regard to this exact type of EFP weapon in the post-Saddam Hussein Iraq scenario, establish a terrorism network which starts with the Islamic Republic of Iran and its IRGC and QF; extends through the IRGC and QF to Hezbollah; and further extends into and on the ground in Iraq through various Shia Militia Groups ("Special Groups") which were sponsored, trained and financed by Iran and which actually perpetrated the 63 subject attacks in this lawsuit.

WHEREFORE, Plaintiffs respectfully submit that for the reasons set forth above, that it be SO ORDERED that a default judgment as to Liability, be entered against the Islamic Republic of Iran in this matter.

Respectfully Submitted,

Dated: December 29, 2020

 /s/ Paul W. Johnson
Paul W. Johnson, #34554 (MO)
Christopher J. Quinn, #41883 (MO)
THE DRISCOLL FIRM, P.C.
211 N. Broadway, 40th Floor

St. Louis, Missouri 63102
314-932-3232 telephone
314-932-3233 facsimile
paul@thedriscollfirm.com
chris@thedriscollfirm.com

John J. Driscoll, MO0003
THE DRISCOLL FIRM, LLC
1311 Avenida Juan Ponce de Leon,
6th Floor
San Juan, PR 00907
Phone (618) 444-6049
Fax: (314) 932-3233
john@jjlegal.com

*Attorneys for Plaintiffs*