**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ALL PLAINTIFFS REPRESENTED BY JOHN DRISCOLL, | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:20-cv-00622-EGS |
| | ) | |
| ISLAMIC REPUBLIC OF IRAN, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' MOTION FOR PRE-ADMISSION OF EXHIBITS**

COME NOW All Plaintiffs Represented by John Driscoll, by and through their

undersigned attorneys, and for their Motion for Pre-Admission of Exhibits, state as follows.

1.      In furtherance of judicial economy by avoiding a possible evidentiary hearing to

determine Federal Sovereign Immunities Act ("FSIA") liability on the part of the Islamic

Republic of Iran[1], or to otherwise shorten any such hearing deemed necessary by this Court,

Plaintiffs seek here the pre-admission of 177 Exhibits under the broad auspices of Federal Rules

of Evidence 803(8), the so-called "public records exception" to the hearsay rule.

2.      Federal Rule of Evidence 803(8) provides a broad approach to admissibility,

whereby "[a] record or statement of a public office" is "not excluded by the rule against hearsay,

regardless of whether the declarant is available as a witness," if:

    (A) it sets out:

        (i) the office's activities;
        (ii) a matter observed while under a legal duty to report…; or

---

[1] In FSIA default judgment proceedings, the plaintiffs may establish proof by affidavit. *Campuzano v. Islamic Republic of Iran*, 281 F.Supp.2d 260, 268 (D.D.C. 2003).

> (iii) in a civil case…, factual findings from a legally authorized investigation; and

> (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

3.      As the court stated in *Owens v. Republic of Sudan*, an FSIA lawsuit litigated in this District and Circuit*:* "[P]ursuant to the 'broad approach to admissibility' under Rule 803(8), a court may also admit 'conclusion[s] or opinion[s]' contained within a public record." *Owens v. Republic of Sudan*, 864 F.3d 751, 792 (D.C. Cir. 2017) (*citing Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988)).  Once proffered, as in this Motion, a public record is presumptively admissible, and the opponent---in this case the defaulting Islamic Republic of Iran---bears the burden of showing it is unreliable.  *Owen*, 864 F.3d at 792 (citing *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000)).

4.      Drawing further from the *Owens* D.C. Circuit Court of Appeals opinion:

> "The district court also has an unusual degree of discretion over evidentiary rulings in an FSIA case against a defaulting state sponsor of terrorism. For example, we have allowed plaintiffs to prove their claims using evidence that might not be admissible in a trial. *See, Han Kim v. Democratic People's Republic of Korea,* 774 F.3d 1044, 1048-51 (D.C. Cir. 2014) (noting "courts have the authority---indeed, we think, the obligation---to adjust evidentiary requirements to differing situations" and admitting affidavits in an FSIA default proceeding) (internal alterations and quotation marks removed). This broad discretion extends to the admission of expert testimony, which, even in the ordinary case, "does not constitute an abuse of discretion merely because the factual bases for an expert's opinion are weak." *Joy v. Bell Helicopter Textron, Inc.,* 999 F.2d 549, 567 (D.C. Cir. 1993). §1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion. This is part of the risk a sovereign runs when it does not appear and alert the court to evidentiary problems."

*Owens v. Republic of Sudan,* 864 F.3d 751, 785-86 (D.C.C. 2017).

5.      As demonstrated below, in Plaintiffs' Memorandum of Law in Support, as well as

the supporting Declaration of Michael P. Pregent, the information contained in Plaintiffs'

proffered evidence is authentic, reliable, and trustworthy, and ***Iran has not appeared in this***

***action to argue otherwise.*** Accordingly, the proposed Exhibits should be pre-admitted in their

entirety.

6.      Further, a report is admissible even if it contains a layer of hearsay from

unidentified witnesses. *Ambrosini v. Labarraque,* 966 F. 2d 1464, 1466-67 (D.D.C. 1992). An

agency investigator's reliance on hearsay evidence does not render the report itself

untrustworthy. *See id. See also Moss v. Ole S. Real Estate, Inc.*, 933 F.2d 1300, 1309-10 (5th Cir.

1991) ("Many government reports, as with many expert witnesses, have to rely in part on

hearsay evidence, and the reports are not generally excluded for this reason.").  This conclusion

is guided by Fed. R. Evid. 703, which allows experts to rely on otherwise inadmissible facts to

reach their opinions if experts in that field would reasonably rely on those facts in forming an

opinion on that subject. Accordingly, "[t]here is no reason that government officials preparing

reports do not have the same latitude." *Holliday*, 2013 WL 2395333, at *5, *citing Moss*, 933 F.2d

at 1310.

7.      Plaintiffs incorporate herein by reference as if fully set forth herein Exhibit A, the

Declaration of Michael Pregent, one of their Middle East and counter-insurgency expert

witnesses in this lawsuit.  Pregent declares that in the performance of his job duties on-the-

ground in Iraq from 2005 through 2011, he would regularly see, review, and use the types of

investigative reports Plaintiffs are seeking to pre-admit in this lawsuit.  He also declares that

insofar as the preparation of his Declaration/Report in this matter is concerned, it is standard for

counter-insurgency and Middle East experts such as himself to review and rely upon the very

same type and form of designations, government reports, investigative reports, and public domain documents that are the subject matter of this Motion.  [Exhibit A].

8.     In addition to the categories of public records identified and discussed below, Pregent declares in Exhibit A that counter-insurgency and Middle East policy experts like himself will reasonably and typically read, analyze and rely upon other "public domain" publications, articles, studies and transcripts not only in the day-to-day activities of being a counter-insurgency and Middle East expert and keeping up with all trustworthy and available information in that niche, but also in the formulating of opinions and conclusions on the subject of Iranian influence in post-Saddam Hussein Iraq in this and other FSIA lawsuits in this District. [Exhibit A].

The "public domain" publications, articles, studies and transcripts relied upon and cited in Plaintiffs' counter-insurgency and Middle East expert witnesses' Declarations in this lawsuit are reliable, trustworthy, and were reasonably relied upon by them in the formulation of their opinions and conclusions in this lawsuit.[2]  **[EXHIBIT A; PX-252; PX-741; PX-742].**

---

[2] Plaintiffs' liability expert witnesses include: Michael Pregent; Dr. Daniel L. Byman, a Middle East and terrorism/counter-terrorism expert; and Stafford Melerine, a trained bomb technician and post-blast investigator who has previously worked with the U.S. Department of Defense Joint Improvised Device Defeat Organization ("JIEDDO").  Because of the Court's Order to file this cause under a new cause number [Minute Order dated March 2, 2020], Plaintiffs retender their experts' Declarations in this litigation as Exhibits PX-742; PX-741; and PX-252, respectively, in support of Plaintiffs' Motion for Default Judgment As to Liability Pursuant to FRCP 55(b)(2) [ECF 19].  The Byman and Melerine Declarations are identical from to when submitted in the *Martinez* case. The Second Amended Declaration/Report of Michael Pregent has been slightly amended to reflect additional research findings concerning the subject attacks. The Byman and Melerine curricula vitae are submitted as Exhibits 1 and 253, respectively.

**CATEGORIES OF PUBLIC RECORDS PLAINTIFFS SEEK TO PRE-ADMIT**

**A.  Treasury and State Department Designations and Accompanying Executive Orders Are Admissible Under FRE 803(8)**

Plaintiffs seek pre-admission of lists of individuals and entities designated by the Treasury Department and State Department under several Executive Orders and statutes[3] as having links to international terrorism, weapons proliferation, and the sponsorship of violence in post-Saddam Hussein Iraq. For instance, Executive Order 13224 (Sept. 23, 2001) authorizes both the Secretary of State and the Secretary of the Treasury to designate individuals and entities as "Specially Designated Global Terrorists" if the agencies make certain factual findings. These agencies publish lists identifying designated individuals and entities, which set forth the agencies' "activities," and are the result of "factual findings from a legally authorized investigation" and are therefore admissible under Fed. R. Evid. 803(8).[4]

An example of such a designation is attached hereto and incorporated herein by reference as **Exhibit B**.  Plaintiffs seek to pre-admit the following Exhibits that fit within this category of U.S. Government agency and department terrorism designations:

- **Executive Order 12947**, dated January 25, 1995: Includes an Annex designating Hezbollah as a Specially Designated Terrorist ("SDT"). [PX-156].
- **Executive Order 13224,** dated September 25, 2001: Executive Order – Blocking Property and Prohibiting Transactions with Persons who… Support Terrorism. [PX-862].
- **Executive Order 13382,** dated July 1, 2005: Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters. [PX-865].

---

[3] These include, but are not limited to, Executive Orders 13224, 13382 and 13438, and Section 6(j) of the Export Administration Act, Section 40 of the Arms Export Control Act, Section 620A of the Foreign Assistance Act, and Section 219 of the Immigration and Nationality Act.

[4] The lists are also judicially noticeable. *See Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 68 (D.D.C. 2014) ("Judicial notice is taken, too, of the Treasury publication in the Federal Register, *i.e.,* the designation of Anwar Al–Aulaqi as a Specially Designated Global Terrorist due to the fact that he was a key leader of AQAP.").

- **Executive Order 13438**, dated July 19, 2007: Executive Order authorizing designation of persons or entities that committed, or provided support for, acts of violence in Iraq. [PX-173].
- **Executive Order 13553,** dated October 1, 2010: Blocking Property of Certain Persons with Respect to Serious Human Rights Abuses by the Govt. of Iran. [PX-866].
- **Executive Order 13599,** dated February 8, 2012: Blocking Property of the Government of Iran and Iranian Financial Institutions. [PX-867].

### B.  Treasury Department Press Releases Are Admissible Under FRE 803(8)

When the U.S. Treasury Department or State Department make a designation described above, they frequently issue a press release announcing the designation and providing some of the underlying factual findings that form the predicate for the designation. These press releases set forth the agencies' "activities" and present "factual findings" from an authorized investigation.

Governmental press releases that "contain factual findings from an investigation" "satisfy the criteria of Rule 803(8)." *Moses v. Westchester Cty. Dep't of Corr.*, No. 10-cv-9468 (ER), 2017 WL 4386362 (S.D.N.Y. Sept. 29, 2017), *aff'd*, 739 F. App'x 66 (2d Cir. 2018). *See also Washington v. Beard*, No. 08-1688, 2013 WL 706194, at \*4 (W.D. Penn. Feb. 26, 2013) ("the [Dep't of Justice] press release falls under the hearsay exception set out in Federal Rule of Evidence 803(8) for public records[.]"); *General Mills Operations, LLC v. Five Star Custom Foods, Ltd.*, 703 F.3d 1104, 1109-10 (8th Cir. 2013) (Dep't of Agriculture press release as to beef safety admissible as it set out findings pursuant to authority granted by law); *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93 (D.D.C. 2015) (relying on both agency press releases and State Department reports in a "terrorism exception" case under the FSIA).

An example of such a press release is attached hereto and incorporated herein by reference as **Exhibit C**.  Plaintiffs seek to pre-admit the following Exhibits that fit within this category of U.S. Government agency and department terrorism designations:

- **U.S. State Department Designation of Iran as State Sponsor of Terrorism**, current: State Department list of four designated State Sponsors of Terrorism, including Iran, as of January 19, 1984. [PX-837].
- **U.S. State Department Notification**, current: State Department list of Foreign Terrorist Organizations ("FTOs"), including Hezbollah as of October 8, 1997. [PX-155].
- **U.S. Treasury Department Designation List**, dated October 12, 2001: Notification of the designation of Imad Mughniyeh as an SDGT. [PX-842].
- **U.S. Treasury Department Press Notification**, dated November 2, 2001: Notification of designation of Hezbollah as a Specially Designated Global Terrorist ("SDGT"). [PX-838].
- **U.S. Department of the Treasury**. "Treasury Designates Individuals, Entity Fueling Iraqi Insurgency." January 9, 2008. [PX-806].
- **U.S. Treasury Department Press Notification**, dated September 16, 2008: Press notification of the designation by the Treasury Department of certain individuals, some of whom are based in Iran or Iraq, who planned or provided support for attacks against Coalition forces in Iraq. [PX-178].
- **U.S. State Department Notification**, dated June 26, 2009: Notification that on June 24, 2009, the State Department designated Kata'ib Hezbollah as an FTO and SDGT. [PX-166].
- **U.S. Department of the Treasury,** "Treasury Designates Individual, Entity Posting Threat to Stability in Iraq." July 2, 2009. [PX-807].
- **U.S. Treasury Department Press Notification**, dated June 16, 2010: Notification of the designation of Ali Jafari under Executive Order 13382. [PX-840].
- **U.S. Treasury Department Press Notification**, dated August 3, 2010: Notification of Executive Order 13224 designations targeting four IRGC-QF senior officers and other Iranian actors for providing support to Hezbollah. [PX-839].
- **U.S. Treasury Department Press Notification**, dated October 11, 2011: Notification of the designation of Qasem Soleimani and Abdul Reza Shahlai as SDGTs. [PX-841].
- **U.S. Treasury Department Press Notification,** dated November 19, 2012: Designates Hizballah Commander Responsible for American Death in Iraq - U.S Department of the Treasury. [PX-172].

### C.  State Department Country Reports on Terrorism Are Government Records Admissible Under Rule 803(8)

The State Department submits Country Reports on Terrorism to Congress in compliance with 22 U.S.C. §2656f, which requires the Department of State to provide Congress a full and complete annual report on terrorism for those countries and groups meeting the criteria of the Act, to include detailed assessments with respect to each foreign country which is involved in or

which sponsors acts of international terrorism. The Annual Reports must be submitted before April 30 of each year.  [Exhibit A].

Courts have repeatedly found State Department County Reports admissible as government records. "[T]here is little doubt that the Country Reports constitute 'factual findings.' Moreover, the Reports are certainly gathered pursuant to legal authority: federal law requires that the State Department submit the Reports annually to Congress." *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000) (internal citations omitted). *See also Owens*, 864 F.3d at 792 (holding that the "reports fit squarely within the public records exception" and were therefore admissible under Rule 803(8)); *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1411 (9th Cir. 1995) (admitting a State Department Country Report on terrorism that stated that Iran was a continuing state sponsor of terror).

An example of such a Country Report is attached hereto and incorporated herein by reference as **Exhibit D**.  Plaintiffs seek to pre-admit the following Exhibits that fit within this category of Country Reports:

- Country Reports on Terrorism 2005, Ch 6 - United States Department of State Office of Counterterrorism. [PX-179].
- Country Reports on Terrorism 2005, Ch 8 - United States Department of State Office of Counterterrorism. [PX-180].
- Country Reports on Terrorism 2006, Ch 3 - United States Department of State Office of Counterterrorism. [PX-181].
- Country Reports on Terrorism 2006, Ch 6 - United States Department of State Office of Counterterrorism. [PX-182].
- Country Reports on Terrorism 2007, Ch 3 - United States Department of State Office of Counterterrorism. [PX-183].
- Country Reports on Terrorism 2007, Ch 6 - United States Department of State Office of Counterterrorism. [PX-184].
- Country Reports on Terrorism 2008, Ch 3 - United States Department of State Office of Counterterrorism. [PX-185].
- Country Reports on Terrorism 2008, Ch 6 - United States Department of State Office of Counterterrorism. [PX-186].

- Country Reports on Terrorism 2009, Ch 3 - United States Department of State Office of Counterterrorism. [PX-187].
- Country Reports on Terrorism 2009, Ch 6 FTO - United States Department of State Office of Counterterrorism. [PX-188].
- Country Reports on Terrorism 2009, Ch 6 FTO2 - United States Department of State Office of Counterterrorism. [PX-189].
- Country Reports on Terrorism 2010, Ch 3- United States Department of State Office of Counterterrorism. [PX-190].
- Country Reports on Terrorism 2010, Ch 6 FTO- United States Department of State Office of Counterterrorism. [PX-191].
- Country Reports on Terrorism 2010, Ch 6 FTO2- United States Department of State Office of Counterterrorism. [PX-192].
- Country Reports on Terrorism 2011, Ch 3- United States Department of State Office of Counterterrorism. [PX-193].
- Country Reports on Terrorism 2011, Ch 6 FTO- United States Department of State Office of Counterterrorism. [PX-194].
- Country Reports on Terrorism 2011, Ch 6 FTO2- United States Department of State Office of Counterterrorism. [PX-195].
- Country Reports on Terrorism 2012, Ch 3- United States Department of State Office of Counterterrorism. [PX-196].
- Country Reports on Terrorism 2012, Ch 6 FTO - United States Department of State Office of Counterterrorism. [PX-197].
- Country Reports on Terrorism 2012, Ch 6 FTO2 - United States Department of State Office of Counterterrorism. [PX-198].
- Chapter 3-State Sponsors of Terrorism Overview - U.S Department of State Office of the Coordinator for Counterterrorism. [PX-199].

### D.  U.S. Military Personnel Investigative Reports Setting Forth the Activities of, and Factual Findings Concerning, the U.S. Military in Iraq from 2005-2011 Are Government Records Admissible Under Rule 803(8).

Plaintiffs seek pre-admission of various types of post-attack incident investigation reports generated by U.S. Army personnel in post-Saddam Hussein Iraq from 2005-2011.  These reports were created after incidents occurred in Iraq in which a U.S. Army service member was killed or injured and/or when an Explosively Formed Penetrator ("EFP") or Improvised Explosive Device ("IED") was involved in a roadside attack.  [Exhibit A].

1.      **Significant Action Reports ("SIGACT" Reports)**

SIGACT Reports are official reports and compilations of evidence of incidents occurring while Military units performed operations in post-Saddam Hussein Iraq. On missions, whenever a unit observes or participates in a SIGACT, the platoon leader notifies his or her company's headquarters via the platoon's radio transmission officer ("RTO"). In response, the battalion battle captain or battle non-commissioned officer ("NCO") reports the SIGACT up the chain of command, conducts some kind of action (such as launch a Quick Reaction Force), and/or records the event in a SIGACT After-Action Report ("SIGACT Report"). Accordingly, SIGACT Reports contain, among other things, information recorded contemporaneously, or nearly contemporaneously, to an insurgent attack. They were prepared by actual Military units on the ground in the relevant time frame in Iraq.  These units include Multinational Force in Iraq ("MNF-I") and the United States Forces-Iraq ("USF-I").  Plaintiffs' Middle East counter-insurgency expert witness, Michael Pregent, has seen the SIGACT documents Plaintiffs are seeking to pre-admit through this Motion and affirms their authenticity, reliability, and trustworthiness. [Exhibit A].

On October 22, 2010, WikiLeaks famously "dumped" 391,832 SIGACT Reports, commonly referred to as "The Iraq War Logs", into the public domain.  These SIGACT Reports were dated from January 1, 2004, through December 31, 2009.  Pregent's Declaration in support of this Motion and Plaintiffs' Memorandum of Law explain: "The Iraq War Logs" SIGACT reports are indeed what they purport to be; the reasons they are "reliable"; that Plaintiffs and their attorneys and experts played no role in the "dumping" of these SIGACT reports; that there are no indications of lack of trustworthiness in these reports; that Pregent, while on the ground performing counter-insurgency duties for the U.S. Army in Iraq during the same time frame,

actually routinely observed and relied upon such Reports; and that this Court should pre-admit into evidence the attack-specific SIGACT Reports concerning many of the U.S. Soldier and Estate Soldier Plaintiffs in this lawsuit. [Exhibit A].

On May 23, 2019, the United States of America filed its superseding indictment against Julian Paul Assange, the public face of "WikiLeaks," a website he allegedly founded with others as an "intelligence agency of the people."  The case was filed in the United States District Court for the Eastern District of Virginia (Alexandria Division), and styled *United States of America v. Julian Paul Assange,* Case No. 1:18-cr-111 (CMH). (Dkt. 31).

At paragraph 12 of the superseding indictment, the government alleged, in part, that "[b]etween in or around January 2010 and May 2010, consistent with WikiLeaks's 'Most Wanted Leaks' solicitation of bulk databases and military and intelligence categories, Manning downloaded four nearly complete databases from departments and agencies of the United States. These databases contained approximately…400,000 Iraq war-related significant activities reports…"  These admissions by the government further substantiate the accuracy and reliability of these SIGACT Reports which Plaintiffs seek to pre-admit.

An example of such a SIGACT Report is attached hereto and incorporated herein by reference as **Exhibit E**.  Plaintiffs seek to pre-admit the following Exhibits that fit within this category of SIGACT Reports:

- SIGACT Report concerning R. Calderon. [PX-201].
- SIGACT Report concerning T. Torres. [PX-204].
- SIGACT Report concerning N. Paupore and B. Saaristo. [PX-205].
- SIGACT Report concerning J. Ford. [PX-207].
- SIGACT Report concerning J. Gage. [PX-210].
- SIGACT Report concerning J. Cope. [PX-211].
- SIGACT Report concerning S. Martinez and B. Stephens. [PX-217].
- SIGACT Report concerning J. Altman. [PX-219].
- SIGACT Report concerning L. Dahlman and J. Schumann. [PX-220].
- SIGACT Report concerning J. Adair and J. Takai. [PX-223].

- SIGACT Report concerning J. Ahearn and K. Kline. [PX-225].
- SIGACT Report concerning E. Lill. [PX-227].
- SIGACT Report concerning J. Wells [PX-237].
- SIGACT Report concerning J. Rubio-Hernandez. [PX-238].
- SIGACT Report concerning D. Bennett. [PX-239].
- SIGACT Report concerning J. Mixon. [PX-240].
- SIGACT Report concerning J. Plocica. [PX-241].
- SIGACT Report concerning J. Blickenstaff and G. Henry. [PX-243].
- SIGACT Report concerning S. Diamond. [PX-244].
- SIGACT Report concerning J. Donaldson. [PX-254].
- SIGACT Report concerning A. Butler. [PX-257].
- SIGACT Report concerning J. Tollefson. [PX-260].
- SIGACT Report concerning M. Wendling. [PX-262].
- SIGACT Report concerning B. Anderson. [PX-266].
- SIGACT Report concerning R. Schild. [PX-269].
- SIGACT Report concerning B. Teeters. [PX-275].
- SIGACT Report concerning W. Thorne. [PX-283].
- SIGACT Report concerning J. Botts. [PX-287].
- SIGACT Report concerning E. Perez. [PX-289].
- SIGACT Report concerning B. Beem. [PX-293].
- SIGACT Report concerning N. Sowinski. [PX-297].
- SIGACT Report concerning B. Byers. [PX-303].
- SIGACT Report concerning L. White. [PX-307].
- SIGACT Report concerning D. Morris. [PX-311].
- SIGACT Report concerning A. Nelson and A. Preston. [PX-315].
- SIGACT Report concerning D. Gagne. [PX-317].
- SIGACT Report concerning B. Stout. [PX-319].
- SIGACT Report concerning M. Wager. [PX-321].
- SIGACT Report concerning T. Vendela. [PX-324].
- SIGACT Report concerning B. Harris, B. Mayo, and R. Russell. [PX-328].
- SIGACT Report concerning J. Hancock. [PX-339].
- SIGACT Report concerning S. Gajdos. [PX-341].
- SIGACT Report concerning C. Payne. [PX-344].
- SIGACT Report concerning J. Modgling and W. Zapfe. [PX-349].
- SIGACT Report concerning L. Wilson. [PX-362].
- SIGACT Report concerning Z. Gonzalez. [PX-367].
- SIGACT Report concerning D. Wakeman. [PX-369].
- SIGACT Report concerning E. Cottrell. [PX-371].
- SIGACT Report concerning J. Edds. [PX-372].
- SIGACT Report concerning D. Crookston. [PX-376].
- SIGACT Report concerning L. Marciante. [PX-380].
- SIGACT Report concerning B. Wagner. [PX-383].
- SIGACT Report concerning D. Knapp. [PX-385].
- SIGACT Report concerning N. Forbes. [PX-388].

- SIGACT Report concerning M. Rosenberg. [PX-391].
- SIGACT Report concerning J. Richard, III. [PX-393].
- SIGACT Report concerning A. Pearson. [PX-397].
- SIGACT Report concerning J. Ulloa. [PX-406].
- SIGACT Report concerning C. Wilcox. [PX-412].
- SIGACT Report concerning J. Tollefson and A. Butler. [PX-471].
- SIGACT Report concerning J. Gage. [PX-538].
- SIGACT Report concerning J. Wells. [PX-672].

### 2.    AR-15-6 Reports

Following the death of an active duty soldier, the Army typically commissions an investigation, known as an AR 15-6 Investigation, so-named because the investigation is authorized pursuant to Army Regulation 15-6.[5]  Once an investigation is commissioned, the Army will appoint an investigation officer, whose responsibilities include: (a) ascertaining and considering the evidence on all sides of an issue; (b) being thorough and impartial; (c) issuing findings and recommendations warranted by the facts and complying with the instructions of the appointing authority; and (d) reporting the findings and recommendations to the appointing authority.[6]  [Exhibit A].

An example of such an AR-15-6 Report is attached hereto and incorporated herein by reference as **Exhibit F**.  Plaintiffs seek to pre-admit the following Exhibits that fit within this category of AR-15-6 Reports:

---

[5] An AR 15-6 is sometimes referred to as an "informal" investigation, but this term does not mean that the investigation is not thorough or rigorous. Formal Army investigations usually involve due process hearings for a designated respondent (a court martial, e.g.). Informal Army investigations are not intended to provide a hearing for persons who may have an interest in the subject of the investigation, but the investigating officer may make any relevant findings or recommendations concerning individuals, even where those findings or recommendations are adverse to the individual or individuals concerned. See, e.g., the U.S. Army's Investigative Guide for Informal Investigations, https://usacac.army.mil/sites/default/files/documents/sja/15_6investigation.pdf.

[6] *Id.*

- AR 15-6 Report concerning I. Weikel. [PX-202].
- AR 15-6 Report concerning J. Ford. [PX-206].
- AR 15-6 Report concerning G. Henry and J. Blickenstaff. [PX-242].
- AR 15-6 Report concerning M. Anaya. [PX-245].
- AR 15-6 Report concerning O. Vazquez. [PX-247].
- AR 15-6 Report concerning J. Rzepa and N. Beyers. [PX-251].
- AR 15-6 Report concerning A. Nelson and A. Preston. [PX-314].
- AR 15-6 Report concerning J. Schumann and L. Dahlman. [PX-336].
- AR 15-6 Report concerning C. Payne. [PX-343].
- AR 15-6 Report concerning A. Tong. [PX-374].
- AR 15-6 Report concerning L. Marciante. [PX-379].
- AR 15-6 Report concerning A. Pearson. [PX-396].
- AR 15-6 Report concerning J. Plocica. [PX-403].
- AR 15-6 Report concerning B. Stephens and S. Marinez. [PX-588].
- AR 15-6 Report concerning J. Schumann and L. Dahlman. [PX-602].
- AR 15-6 Report concerning C. Payne. [PX-628]
- AR 15-6 Report concerning J. Modgling and W. Zapfe. [PX-630].
- AR 15-6 Report concerning E. Lill. [PX-647].
- AR 15-6 Report concerning J. Edds. [PX-656].
- AR 15-6 Report concerning D. Bennett. [PX-692].
- AR 15-6 Report concerning J. Ulloa. [PX-717].
- AR 15-6 Report concerning S. Diamond. [PX-719].
- AR 15-6 Report concerning C. Wilcox. [PX-724].
- AR 15-6 Report concerning Z. Gonzalez. [PX-844].

### 3.  Combined Explosive Exploitation Cell Reports ("CEXC Reports")

These are reports of the Combined Joint Task Force Troy's ("CJTF Troy") "Combined Explosive Exploitation Cell" ("CEXC") prepared by various Military explosive specialists, law enforcement bomb technicians and investigators, reflecting the initial examinations of IEDs, technical triage of all devices, including the first documentation of the exploitation process.  One key responsibility of CJTF Troy and CEXC is neutralizing the improvised explosive devices' threat through collection and exploitation of IED evidence and related intelligence.  [Exhibit A].

An example of such a CEXC Report is attached hereto and incorporated herein by reference as **Exhibit G**.  Plaintiffs seek to pre-admit the following Exhibits that fit within this category of U.S. Government agency and department terrorism designations:

- CEXC Report concerning R. Calderon. [PX-486].
- CEXC Report concerning N. Paupore and B. Saaristo. [PX-497].
- CEXC Report concerning W. Thorne. [PX-511].
- CEXC Report concerning J. Botts. [PX-514].
- CEXC Report concerning B. Stephens and S. Martinez. [PX-587].
- CEXC Report concerning J. Adair and J. Takai. [PX-637].
- CEXC Report concerning J. Ahearn and K. Kline. [PX-642].
- CEXC Report concerning E. Lill. [PX-649].
- CEXC Report concerning J. Mixon. [PX-706].
- CEXC Report concerning M. Anaya. [PX-722].
- CEXC Report concerning C. Wilcox. [PX-725].
- CEXC Report concerning O. Vazquez. [PX-733].

### 4. Explosive Ordnance Disposal Reports ("EOD Reports")

These are reports of Explosive Ordnance Disposal ("EOD") personnel in the U.S. Army. The reports are prepared by the U.S. Army's preeminent tactical and technical explosives experts, who are properly and highly trained, equipped and integrated to attack, defeat and exploit unexploded ordnance, improvised explosive devices and weapons of mass destruction.[7] [Exhibit A].

An example of such an EOD Report is attached hereto and incorporated herein by reference as **Exhibit H**.  Plaintiffs seek to pre-admit the following Exhibits that fit within this category of EOD Reports:

- EOD Report concerning C. Kube. [PX-365].
- EOD Report concerning J. Modgling and W. Zapfe. [PX-631].
- EOD Report concerning D. Bennett. [PX-693].
- EOD Report concerning J. Richard. [PX-701].
- EOD Report concerning J. Plocica. [PX-708].
- EOD Report concerning S. Diamond. [PX-720].

---

[7] http://www.goarmy.com/careers-and-jobs/browsecareer-and-job-categories/intelligence-and-combat-support/explosive-ordnance-disposal-specialist.html.

### 5. Weapons Intelligence Team ("WIT Reports")

These are also reports of the Combined Joint Task Force Troy ("CJTF Troy"). The WIT is comprised of Air Force, Army, and Navy personnel, and the joint environment is what drives the mission success in bomb and explosion forensics. Sailors, soldiers and airmen comprised the Weapons Intelligence Teams, which served as battlefield crime scene investigators. Five military individuals from specialty careers including EOD, intelligence analysis, military police and photography, generally comprised the teams. A team lead, usually an EOD technician, was responsible for educating the team on all aspects of the disposal actions. [Exhibit A].

An example of such a WIT Report is attached hereto and incorporated herein by reference as **Exhibit I**. Plaintiffs seek to pre-admit the following Exhibits that fit within this category of Weapons Investigation Team Reports:

- WIT Report concerning B. Stout. [PX-560].
- WIT Report concerning T. Vendela. [PX-572].
- WIT Report concerning J. Altman. [PX-596].

### E. Director of National Intelligence Worldwide Threat Assessment of the US Intelligence Community f/k/a Annual Threat Assessments Are Government Records Admissible Under Rule 803(8)

Pursuant to 50 U.S.C. §3023(a)(1)(D), the Director of National Intelligence ("DNI") shall be responsible for ensuring that national intelligence is provided to the Senate and House of Representatives and the committees thereof. "The Worldwide Threat Assessment of the US Intelligence Community," originally called the "Annual Threat Assessment," is a hearing of the U.S. Senate Select Intelligence Committee that has occurred each year since 2006, until 2020. Each hearing includes at least one "open" or unclassified session and the release of a document that details the high level unclassified assessments of the US intelligence community for a given year. The Worldwide Threat Assessment is an annual report to the U.S. Senate Select

Intelligence Committee consisting of 17 different intelligence agencies throughout the U.S. Government.  [Exhibit A].

According to Mike Pregent, such DNI Worldwide Threat Assessments are authentic, reliable, mandated by enabling legislation, and constitute the broad policy consensus of the entire U.S. Intelligence Community.  Such DNI Worldwide Threat Assessments are typically and routinely relied upon by counter-insurgency and Middle East experts such as himself trying to evaluate whether various nation-states, or agents of nation-states, were involved in terrorist activities in various locations around the globe.  [Exhibit A].

An example of such a DNI Worldwide Threat Assessment is attached hereto and incorporated herein by reference as **Exhibit J**.  Plaintiffs seek to pre-admit the following Exhibits that fit within this category of DNI Worldwide Threat Assessment:

- Annual Threat Assessment of the Director of National Intelligence for the Senate Select Committee on Intelligence; John D. Negroponte: dated February 2, 2006. [PX-849].
- Negroponte, John D. "Annual Threat Assessment of the Director of National Intelligence for the Senate Armed Services Committee." February 28, 2006. [PX-771]
- Annual Threat Assessment of the Director of National Intelligence; John D. Negroponte: dated January 11, 2007. [PX-744].
- Annual Threat Assessment of the Director of National Intelligence for the Senate Select Committee on Intelligence; J. Michael McConnell: dated February 5, 2008. [PX-850].
- Annual Threat Assessment of the Intelligence Community for the House Permanent Select Committee on Intelligence: dated February 25, 2009. [PX-851].
- Annual Threat Assessment of the US Intelligence Community for the Senate Select Committee on Intelligence; Dennis C. Blair: dated February 2, 2010. [PX-852].
- Statement for the Record on the Worldwide Threat Assessment of the U.S. Intelligence Community for the House Permanent Select Committee on Intelligence; dated February 10, 2011. [PX-853].
- Statement for the Record on the Worldwide Threat Assessment of the U.S. Intelligence Community for the Senate Select Committee on Intelligence; dated March 10, 2011. [PX-854].

- Unclassified Statement for the Record on the Worldwide Threat Assessment of the U.S. Intelligence Community for the Senate Select Committee on Intelligence; dated February 16, 2012. [PX-855].

## F. Congressional Committee Reports Are Government Records Admissible Under Rule 803(8)

It is axiomatic to state that United States Congressional Committees---in both the House of Representatives and the Senate---undertake investigations on various subject matters and then prepare copious Committee Reports upon the conclusion of such investigations.  Moreover, it is also the case that the U.S. Armed Forces have ongoing periodic reporting responsibilities to various United States Congressional Committees which have oversight responsibilities for the Armed Forces.  [Exhibit A].  Pregent also declares that counter-insurgency and Middle East policy experts like himself will reasonably and typically read, analyze and rely upon Congressional Committee Reports and Armed Forces Reports to Congressional Committees not only in the day-to-day activities of being a counter-insurgency and Middle East expert and keeping up with all trustworthy and available information in that niche, but also in the formulating of opinions and conclusions on the subject of Iranian influence in post-Saddam Hussein Iraq in this and other FSIA lawsuits in this District.  [Exhibit A].

Examples of such a Congressional Committee Report and a Report to a Congressional Committee are attached hereto and incorporated herein by reference as **Exhibits K and L**. Plaintiffs seek to pre-admit the following Exhibits that fit within this category of Congressional Committee Reports and Reports to Congressional Committees:

- Current and Projected National Security Threats to the United States. Hearing before the Select Committee on Intelligence of the U.S. Senate. January 11, 2007. [PX-749].
- Hearing on National Defense Authorization Act for Fiscal Year 2009 and Oversight of Previously Authorized Programs. Committee on Armed Services, House of Representatives. March 5, 2008. [PX-760].

- Impacts of the Joint Comprehensive Plan of Action (JCPOA) on the United States Interests and the Military Balance in the Middle East Hearings before the Committee on Armed Services United States Senate, July 29, August 5, and August 5, 2015. [PX-761].
- Security Issues Relating to Iraq. Hearing before the Committee on Armed Services United States Senate, November 15, 2011. [PX-781].
- Statement of LTG Ronald L. Burgess, USA, Director of the Defense Intelligence Agency, in the hearing entitled "U.S. Policy Towards the Islamic Republic of Iran, before the Committee on Armed Services, United States Senate, April 14, 2010. [PX-785].
- U.S. Policy Towards the Islamic Republic of Iran, before the Committee on Armed Services, United States Senate, April 14, 2010. [PX-808]
- The U.S. Strategy in Afghanistan and Iraq. Hearing before the Committee on Armed Services United States Senate. September 22, 2011. [PX-809].

## G. Tactical Interrogation Reports Are Government Records Admissible Under Rule 803(8)

Plaintiffs' experts reviewed and relied upon various "Tactical Interrogation Reports," including those from captured Hezbollah leader, DaqDuq, and Qays Khazali of Asaib Ahl al-Haq ("AAH"), a Shia Militia Group operating in Iraq, in the course of preparing their Declarations in this litigation.  [PX-741, PX-742].  In fact, Pregent actually participated in the preparations leading up to the actual interrogations of Khazali, DaqDuq, and other Hezbollah captured personnel in post-Saddam Hussein Iraq as part of his assigned duties there.  [Exhibit A].

Pregent also declares that counter-insurgency and Middle East policy experts like himself will reasonably and typically read, analyze and rely upon such Tactical Interrogation Reports not only in the day-to-day activities of being a counter-insurgency and Middle East expert and keeping up with all trustworthy and available information in that niche, but also in the formulating of opinions and conclusions on the subject of Iranian influence in post-Saddam Hussein Iraq in this and other FSIA lawsuits in this District. [Exhibit A].

Examples of such a Tactical Interrogation Reports are attached hereto and incorporated herein by reference as **Exhibit M**.  Plaintiffs seek to pre-admit the following Exhibits that fit within this category of Tactical Interrogation Reports:

- U.S. Central Command. "Tactical Interrogation Report of Qayis Al-Khazali." March 21, 2007 (1st report). [PX-789].
- U.S. Central Command. "Tactical Interrogation Report of Qayis Al-Khazali." March 23, 2007 (4th report). [PX-790].
- U.S. Central Command. "Tactical Interrogation Report of Qayis Al-Khazali." March 24, 2007 (6th report). [PX-791].
- U.S. Central Command. "Tactical Interrogation Report of Qayis Al-Khazali." March 24, 2007 (7th report). [PX-792].
- U.S. Central Command. "Tactical Interrogation Report of Qayis Al-Khazali." March 25, 2007 (9th report). [PX-793].
- U.S. Central Command. "Tactical Interrogation Report of Qayis Al-Khazali." March 26, 2007 (10th). [PX-794].
- U.S. Central Command. "Tactical Interrogation Report of Qayis Al-Khazali." March 28, 2007 (14th report). [PX-795].
- U.S. Central Command. "Tactical Interrogation Report of Qayis Al-Khazali." March 28, 2007 (15th report). [PX-796].
- U.S. Central Command. "Tactical Interrogation Report of Qayis Al-Khazali." March 29, 2007 (16th report). [PX-797].
- U.S. Central Command. "Tactical Interrogation Report of Qayis Al-Khazali." March 30, 2007 (18th report). [PX-798].
- U.S. Central Command. "Tactical Interrogation Report of Qayis Al-Khazali." April 18, 2007 (54th report). [PX-799].
- U.S. Central Command. "Tactical Interrogation Report of Qayis Al-Khazali." May 10, 2007 (78th report). [PX-800].
- U.S. Central Command, "Tactical Interrogation Report of Qayis Al-Khazali," May 14, 2007 (87th report). [PX-801].
- U.S. Central Command. "Tactical Interrogation Report of Qayis Al-Khazali." June 18, 2007. No report number. [PX-802].
- U.S. Central Command. "Tactical Interrogation Report of Qayis Al-Khazali." July 1, 2007. No report number. [PX-803].

WHEREFORE, All Plaintiffs Represented by John Driscoll respectfully move that this Court enter its Order granting Plaintiffs' Motion for Pre-Admission of Exhibits and for such other and further relief as this Court deems equitable and just.

Respectfully Submitted,

Dated: March 12, 2021

 /s/ Paul W. Johnson
Paul W. Johnson, #34554 (MO)
Christopher J. Quinn, #41883 (MO)
THE DRISCOLL FIRM, P.C.
211 N. Broadway, 40th Floor
St. Louis, Missouri 63102
314-932-3232 telephone
314-932-3233 facsimile
paul@thedriscollfirm.com
chris@thedriscollfirm.com

John J. Driscoll, MO0003
THE DRISCOLL FIRM, LLC
1311 Avenida Juan Ponce de Leon,
6th Floor
San Juan, PR 00907
Phone (618) 444-6049
Fax: (314) 932-3233
john@jjlegal.com

*Attorneys for Plaintiffs*