UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALL PLAINTIFFS REPRESENTED BY JOHN DRISCOLL, <br><br> Plaintiffs, <br><br> v. <br><br> ISLAMIC REPUBLIC OF IRAN, <br><br> Defendant. | CAUSE NO.: 1-20-cv-00622-EGS |

**DECLARATION OF MICHAEL PREGENT IN SUPPORT OF PLAINTIFFS' MOTION FOR PRE-ADMISSION OF EXHBIITS**

I, Michael P. Pregent, pursuant to 28 U.S.C. §1746, declare as follows:

1.  I am over 18 years of age, am legally competent, and submit this Declaration in support of Plaintiffs' Motion for Pre-Admission of Exhibits. If called upon to testify concerning the facts set forth in this Declaration, I could and would testify competently thereto since the facts set forth herein are personally known to me to be true.

2.  I have been retained by The Driscoll Firm, P.C. to be an expert witness in this Foreign Sovereign Immunities Act ("FSIA") litigation filed on behalf of American Armed Forces personnel catastrophically injured or killed in peacekeeping duties in post-Saddam Hussein Iraq from 2005-2011. I have prepared a Declaration/Report in this lawsuit pursuant to Rule 26 of the Federal Rules of Civil Procedure. I am a former intelligence officer with over 30 years of experience working in the fields of security, terrorism, counter-insurgency, and policy issues in the Middle East, North Africa, and Southwest Asia.

3.  Between 2006 and 2011, I worked as a Subject Matter Expert ("SME") on Malign Iranian Influence in Iraq as both an embedded policy advisor in Prime Minister Maliki's

extraconstitutional Office of the Commander-in-Chief---an office set up to ensure Iranian-backed Shia Militia party control of Iraq's security and political process---and as a Defense Intelligence Agency ("DIA")-contracted SME on Islamic Revolutionary Guard Corps ("IRGC")-backed militias in Iraq. I served two tours as a member of the Force Strategic Engagement Cell ("FSEC"), an organization set up to deal with the Sunni insurgency and curb Iran's growing influence within the Government of Iraq. I am an expert on IRGC-Qods Force ("QF") militias in Iraq and I served five tours in Iraq from 2005 to 2010.

4. As an SME, I prepared analysts, U.S. State Department Officers, and coalition general officers for detainee questioning of Qays Khazali of the Shia Militia Group, Asaib Ahl al-Haqq ("AAH"), and DaqDuq of Hezbollah. I put together the arguments against their release---a "no vote" ---with the warning that each had "American blood on his hands and will return to violence." I worked on identifying Iran's support for and direction of IRGC- and QF- backed Shia Militias in Iraq to target Americans. I was an SME for the Multi-National Forces-Iraq ("MNF-I") and United States Forces Iraq ("USF-I") on the IRGC-QF, Kata'ib Hezbollah ("KH", AAH, the Badr Organization, and Jaysh al-Mahdi ("JAM"). These various groups were generally referred to as "Special Groups." I have firsthand intelligence knowledge of AAH Leader, Qays Khazali; Lebanese Hezbollah operative, DaqDuq; JAM Special Group, Sheibani's Network, JAM Special Group leader, Abu Dura; IRGC-QF Commander, Qassem Soleimani; Badr Organization Commander, Hadi al-Ameri; and the KH Leader, Abu Mehdi al-Muhandis.

5. I was brought on as an expert at the National Defense University in 2014 at the request of then-Army Chief of Staff, General Ray Odierno, to contribute to the Department of the Army's History of the Iraq War. I provided my input on Malign Iranian influence in Iraq to include IRGC-QF training, arming, funding, and directing Iraqi Shia Militias to target

Americans. I had access to declassified Secretary of Defense exchanges with Generals Petraeus and Odierno. I am currently a Senior Fellow at Hudson Institute.

6. I am a Senior Middle East analyst, a former adjunct lecturer for the College of International Security Affairs ("CISA"), and currently a visiting fellow at the Institute for National Strategic Studies ("INSS") at the National Defense University.

7. Insofar as previous testimony in the District of Columbia District Court concerning Iranian and Special Group influence in and nefarious activities against U.S. Armed Forces personnel in post-Saddam Hussein Iraq is concerned, I have already been qualified as an expert witness on four occasions:

> *Karcher v. Islamic Republic of Iran,* 396 F. Supp.3d 12, 18-19 (D.D.C. Aug. 26, 2019) (qualified as an expert regarding intelligence matters, including attribution of terror attacks and also evidence collection and analysis in the intelligence field in post-Saddam Hussein Iraq);
>
> *Hamen v. Islamic Republic of Iran,* 401 F.Supp.3d 85, 91-92 (D.D.C. Aug. 7, 2019) (qualified as an expert regarding the IRGC-Qods Force and Iranian efforts to influence political activity in, among other countries, post-Saddam Hussein Iraq);
>
> *W.A. v. Islamic Republic of Iran,* 427 F.Supp.3d 117, 124-25 (D.D.C. Dec. 16, 2019) (qualified as an expert regarding Shia militias in Iraq, including the Badr Organization; and Iranian influence within the Iraqi government following the fall of Saddam Hussein in 2003)**;**
>
> *Frost v. Islamic Republic of Iran*, 383 F.Supp.3d 33, 38 (D.D.C. May 31, 2019) (qualified as an expert regarding, among other things, Iranian influence in post-Saddam Hussein Iraq).

8. In these retentions and in the present litigation, the attorneys marked as Exhibits various types of documents, including the following, to support the allegation that Iran sponsored, coordinated, directed, funded and at times participated in the extrajudicial killings of U.S. Army personnel in post-Saddam Hussein Iraq:

(A) submitted **SIGACT Reports** ("Significant Action Reports"), which are reports and compilations of evidence of incidents occurring while Military units performed mission operations.  On missions, whenever a unit observes or participates in a SIGACT, the platoon leader notifies his or her company's headquarters via the platoon's radio transmission officer ("RTO"). In response, the battalion battle captain or battle non-commissioned officer ("NCO") reports the SIGACT up the chain of command, conducts some kind of action (such as launch a Quick Reaction Force), and/or records the event in a SIGACT After-Action Report ("SIGACT Report"). Accordingly, SIGACT Reports contain, among other things, information recorded contemporaneously, or nearly contemporaneously, to an insurgent attack. They were prepared by actual Military units on the ground in the relevant time frame in Iraq. These units include Multinational Force in Iraq ("MNF-I") and the United States Forces-Iraq ("USF-I").  See below for further elaboration on SIGACT Reports.

(B) **AR-15-6 Investigative Reports** prepared pursuant to U.S. Army Regulation 15-6. Following the death of an active duty soldier, the Army typically commissions an investigation, known as an AR 15-6 Investigation, so-named because the investigation is authorized pursuant to Army Regulation 15-6.[1]  Once an investigation

---

[1] An AR 15-6 is sometimes referred to as an "informal" investigation, but this term does not mean that the investigation is not thorough or rigorous. Formal Army investigations usually involve due process hearings for a designated respondent (a court martial, e.g.). Informal Army investigations are not intended to provide a hearing for persons who may have an interest in the subject of the investigation, but the investigating officer may make any relevant findings or recommendations concerning individuals, even where those findings or recommendations are adverse to the individual or individuals concerned. See, e.g., the U.S. Army's Investigative Guide for Informal Investigations, https://usacac.army.mil/sites/default/files/documents/sja/15_6investigation.pdf.

is commissioned, the Army will appoint an investigation officer, whose responsibilities include: (a) ascertaining and considering the evidence on all sides of an issue; (b) being thorough and impartial; (c) issuing findings and recommendations warranted by the facts and complying with the instructions of the appointing authority; and (d) reporting the findings and recommendations to the appointing authority.[2]

(C) **CEXC Reports** (Combined Joint Task Force Troy's "Combined Explosive Exploitation Cell" Reports). These are reports of the Combined Joint Task Force Troy's ("CJTF Troy") "Combined Explosive Exploitation Cell" ("CEXC") prepared by various Military explosive specialists, law enforcement bomb technicians and investigators/scientists, reflecting the initial examination of IEDs, technical triage of all devices, including the first documentation of the exploitation process and related intelligence. One key responsibility of CJTF Troy and CEXC is neutralizing the improvised explosive devices' threat through collection and exploitation of IED evidence and related intelligence.

(D) **EOD Reports** ("Explosive Ordinance Disposal" Reports). These are reports of Explosive Ordnance Disposal ("EOD") personnel in the U.S. Army. The reports are prepared by the U.S. Army's preeminent tactical and technical explosives experts, who are properly and highly trained, equipped and integrated to attack, defeat and exploit unexploded ordnance, improvised explosive devices and weapons of mass destruction.

---

[2] *Id.*

(E) **WIT Reports** (Combined Joint Task Force Troy "Weapons Intelligence Team" Reports). These are also reports of the Combined Joint Task Force Troy ("CJTF Troy"). The WIT is comprised of Air Force, Army, and Navy personnel, and the joint environment is what drives the mission success in bomb and explosion forensics.

(F) **U. S. Treasury Department and State Department Designations** of terrorist states, organizations, and actors from various Presidential Executive Orders and press releases regarding same as authorized by 8 U.S.C.A. §1189, among other statutes. Both the Treasury Department and State Department designate individuals and organizations under several Executive Orders and statutes[3] as having links to international terrorism, weapons proliferation, and the sponsorship of violence in Iraq. For instance, Executive Order 13224 (Sept. 23, 2001) authorizes both the Secretary of State and the Secretary of the Treasury to designate individuals and entities as "Specially Designated Global Terrorists" if the agencies make certain factual findings. These agencies publish lists identifying designated individuals and entities.

When the U.S. Treasury Department or State Department make a designation described above, they frequently issue a press release announcing the designation and providing some of the underlying factual findings that form the predicate for the designation. These press releases set forth the agencies' "activities" and present "factual findings" from an authorized investigation.

---

[3] These include, but are not limited to, Executive Orders 13224, 13382 and 13438, and Section 6(j) of the Export Administration Act, Section 40 of the Arms Export Control Act, Section 620A of the Foreign Assistance Act, and Section 219 of the Immigration and Nationality Act.

(G) **U.S. State Department Annual Country Reports on Terrorism** from the U.S. Secretary of State to Congress as mandated by 22 U.S.C.A. §2656f, which requires the Department of State to provide Congress a full and complete annual report on terrorism for those countries and groups meeting the criteria of the Act, to include detailed assessments with respect to each foreign country which is involved in or which sponsors acts of international terrorism. The Annual Reports must be submitted before April 30 of each year. (Exemplar attached as Exhibit 7).

(H) **Director of National Intelligence Worldwide Threat Assessment of the US Intelligence Community f/k/a Annual Threat Assessments**. Pursuant to 50 U.S.C. §3023(a)(1)(D), the Director of National Intelligence ("DNI") shall be responsible for ensuring that national intelligence is provided to the Senate and House of Representatives and the committees thereof.  "The Worldwide Threat Assessment of the US Intelligence Community," originally called the "Annual Threat Assessment," is a hearing of the U.S. Senate Select Intelligence Committee that has occurred each year since 2006, until 2020.  Each hearing includes at least one "open" or unclassified session and the release of a document that details the high level unclassified assessments of the US Intelligence Community for a given year.  The Worldwide Threat Assessment is an annual report to the U.S. Senate Select Intelligence Committee consisting of 17 different intelligence agencies throughout the U.S. Government.

(I) **Congressional Committee Reports** from both the House of Representatives and Senate are generated after investigations on various subject matters.  Moreover, it is also the case that the U.S. Armed Forces have ongoing periodic reporting

responsibilities to various United States Congressional Committees which have oversight responsibilities for the Armed Forces. Counter-insurgency and Middle East policy experts will reasonably and typically read, analyze and rely upon Congressional Committee Reports and Armed Forces Reports to Congressional Committees not only in the day-to-day activities of being a counter-insurgency and Middle East expert and keeping up with all trustworthy and available information in that niche, but also in the formulating of opinions and conclusions on the subject of Iranian influence in post-Saddam Hussein Iraq in this and other FSIA lawsuits in this District.

(J) **Tactical Interrogation Reports** were generated in Iraq after high-ranking Hezbollah operatives, including most notably Qayis Al-Khazali, were captured, detained and interrogated. As part of my duties in Iraq, I prepared analysts, State Department officers, and Coalition general officers for detainee questioning of such operatives. Counter-insurgency and Middle East policy experts will reasonably and typically read, analyze and rely upon such Tactical Interrogation Reports not only in the day-to-day activities of being a counter-insurgency and Middle East expert and keeping up with all trustworthy and available information in that niche, but also in the formulating of opinions and conclusions on the subject of Iranian influence in post-Saddam Hussein Iraq in this and other FSIA lawsuits in this District.

9. In my background, experience, and expertise, I am very familiar with and have extensive background and knowledge concerning each category of documents and reports listed above. I reviewed, used and relied upon SIGACT Reports, AR-15-6 Reports, CEXC Reports, EOD Reports, and WIT Reports in the course of my duties and responsibilities being carried out

in Iraq from 2006 through 2011.  And I actually participated in and prepared questions for Tactical Interrogations of Hezbollah and Shia Militia Group detainees during the time frame of 2005-2011.  In my academic career and current career, I am very familiar with and rely upon U.S. Government designations of rogue countries and entities which purportedly support international terrorism; annual Country Reports on Terrorism; Director of National Intelligence Annual Threat Assessments; Congressional Committee Reports; and Tactical Interrogation Reports.   I reviewed, analyzed and relied upon all of the listed categories of documents above in the course of preparing my Report in this lawsuit.  In my experience as a counter-insurgency and Middle East expert, it is standard, necessary and reasonable for such experts to review, use, and rely upon all the categories of documents and reports referenced, and I have done so in my previous four FSIA retentions and testimonies in this District.

10. The "public domain" publications, articles, studies and transcripts relied upon and cited by Plaintiffs' counter-insurgency and Middle East expert witnesses in this lawsuit are reliable, trustworthy, and were reasonably relied upon by them in the formulation of their opinions and conclusions in this lawsuit.  This includes my Declaration and that of Dr. Daniel Byman and Stafford Melerine, both of whose reports were provided to and reviewed by me.  I specifically noted the authors and subject matter of each such citation. I am not representing that each and every article, study, report or transcript published in the foregoing sources is reliable and trustworthy, only that the actual articles, studies, reports and transcripts cited by the experts in their Declarations in this lawsuit are reliable, trustworthy, and reasonably relied upon by them.

11. Having been provided with the Plaintiffs' Exhibits Lists and expert Declarations in this litigation, I can unequivocally affirm and declare that all Exhibits being offered that fall within the categories listed above are in fact what they purport to be; are documents prepared

according to legal requirements of the respective governmental departments, agencies or offices where they were generated; are public records from the governmental department, agency or office where such types or kinds of items are kept; are reports from the governmental department, agency or office with a duty to report on the subject matters of the reports, including factual findings; and are legitimate and reliable sources of information on the subject matter(s) of my retention in this and the other four listed FSIA litigation matters, and which have no indications of lack of trustworthiness.

12. Moreover, I have been provided with so-called "SIGACT" Reports concerning attacks which are the subject matter of this lawsuit and which I am told are being used as Exhibits in this lawsuit. Like all Iraq-related SIGACT Reports, these Reports detail events as seen and heard by the U.S. Military troops on the ground in Iraq.

13. On October 22, 2010, WikiLeaks infamously "dumped" 391,832 Iraq SIGACT Reports into the public domain spanning from January 1, 2004, through December 31, 2009. These have come to be known as The Iraq War Logs. Some of the Exhibits provided to me are from the so-called "Iraq War Logs." After reviewing the sixty-two (62) SIGACT Reports provided to me in this lawsuit that were part of The Iraq War Logs, I can declare that they are accurate; reliable; are what they purport to be; and have no indications of lack of trustworthiness.

14. From my Iraq experience, I can corroborate the general format of such WikiLeaks SIGACT Reports. The Reports have a body and presentation consistent with reports communicated over Military Intelligence Reserve Command ("MIRC") or "military chatroom" media. The Reports have the Military grid reference system ("MGRS") coordinates consistent with what a Military SIGACT report would contain. They refer to specific Military units by their proper designations. They refer to specific maneuver elements as "QRF" ("Quick Reaction

Forces") and others as "Explosive Ordnance Disposal" ("EOD"). All of these examples are corroborators one would expect to observe in authentic SIGACT reports.

15. Some of the WikiLeaks SIGACT Reports have the battle roster numbers for the Soldiers involved in the attacks. All the WikiLeaks SIGACT Reports provided to me are consistent with my overall knowledge and experience with and concerning Special Groups and their perpetration of such attacks in the areas and at the times indicated in the Reports. Finally, all such provided WikiLeaks SIGACT Reports in this matter described actual incidents which occurred in Iraq while I was performing my counter-insurgency duties there. I confirmed this to be the case by comparing the WikiLeaks SIGACT Reports provided to me by retaining counsel with the actual SIGACT Reports. In none of the Reports did I find anything that was inconsistent with declaring them all to be valid, authentic, genuine, and reliable, and with no indication of lack of trustworthiness.

16. On May 23, 2019, the United States of America filed its superseding indictment against Julian Paul Assange, the public face of "WikiLeaks," a website he allegedly founded with others as an "intelligence agency of the people." The case was filed in the United States District Court for the Eastern District of Virginia (Alexandria Division), and styled *United States of America v. Julian Paul Assange,* Case No. 1:18-cr-111 (CMH). (Dkt. 31).

17. At paragraph 12 of the superseding indictment, the government alleged, in part, that "[b]etween in or around January 2010 and May 2010, consistent with WikiLeaks's 'Most Wanted Leaks' solicitation of bulk databases and military and intelligence categories, Manning downloaded four nearly complete databases from departments and agencies of the United States. These databases contained approximately…400,000 Iraq war-related significant activities

reports…" These admissions by the government further substantiate the accuracy and reliability of these SIGACT Reports which Plaintiffs seek to pre-admit.

18. Moreover, the injured Plaintiffs' and family members' declarations provided to me in this lawsuit further corroborate the trustworthiness of their corresponding SIGACT Reports. The SIGACT Reports corresponding to the claims of killed-in-action-Soldiers are similarly corroborated by the declarations of family members and spouses—namely, when they were informed that their loved one was killed; what unit their loved one was in; when and where the attack and death occurred; and the like. Many of these claims are further substantiated by arguably admissible autopsy reports and certificates of death that in many instances reported machined fragments or copper retrieved from the bodies of these Soldiers. In summary, there exists a plethora of surrounding circumstances indicating the trustworthiness of these SIGACT Reports originally obtained in the so-called WikiLeaks "Iraq War Logs."

19. These Wikileaks SIGACT Reports (and all SIGACT Reports) in question were generated by troops reporting to their higher headquarters while conducting mission operations during Operation Iraqi Freedom from 2005-2011. The troops who generated these Reports had a legal duty, under Army regulations, to report these significant actions in accordance with the theater commander's critical information requirements ("CCIR") listed on the bottom of these reports, namely, that a serious incident or significant action resulting in the deaths or wounding of soldiers occurred.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 12th day of February, 2021.

Michael P. Pregent