**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ALL PLAINTIFFS REPRESENTED BY JOHN DRISCOLL,** | |
| **Plaintiffs,** | |
| **v.** | **No. 20-cv-622-EGS-ZMF** |
| **ISLAMIC REPUBLIC OF IRAN,** | |
| **Defendant.** | |

## REPORT AND RECOMMENDATION

From 2006 to 2011, a series of sixty-three terrorist attacks on United States military service members and civilians in Iraq killed fifty-five soldiers and severely injured twenty-three soldiers. The attack victims, their estates, and their family members (collectively "Plaintiffs") bring this action seeking compensation for their economic and psychological injuries from Defendant, the Islamic Republic of Iran, under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"). *See* 28 U.S.C. § 1605A. Central to this case is Plaintiffs' argument that each of the sixty-three attacks was a consequence of Iran's proxy war against the United States in Iraq.

After Defendant failed to appear, the Clerk of Court entered default. *See* Clerk's Entry of Default, ECF No. 17. Plaintiffs then moved for default judgment as to liability. *See* Mem. in Supp. Mot. for Default J. 16, ECF No. 20. Plaintiffs later filed a supplemental briefing containing their proposed findings of fact and conclusions of law as well as their exhibit list.[1] *See* Pls.' Proposed Findings of Fact & Conclusions of Law ("Proposed Findings"), ECF No. 27. Judge Sullivan

---

[1] On September 30, 2022, the Court denied Plaintiffs' motion to preadmit certain exhibits into evidence. *See* Min. Order (Sept. 30, 2022).

subsequently referred this case to the undersigned for full case management, including the preparation of this report and recommendation. *See* Min. Order (Oct. 5, 2021). For the reasons stated below, the Court recommends GRANTING Plaintiffs' motion for default judgment as to liability.

## I.    BACKGROUND

On November 2, 2016, Plaintiffs filed their original complaint against Iran together with a larger group of litigants. *See* Compl., *Neiberger v. Islamic Republic of Iran*, No. 16-cv-2193 (D.D.C. Nov. 2, 2016), ECF No. 1. On September 23, 2019, the plaintiffs in that case filed a joint motion to sever their claims "in order to efficiently facilitate the administration of justice and better serve the interests of the two groups of Plaintiffs, whose factual circumstances, legal theories, attorneys, experts, and case strategies differ in ways that would make continued case coordination difficult for the parties and the Court." Mot. to Sever 1, *Neiberger*, No. 16-cv-2193 (D.D.C. Sept. 23, 2019), ECF No. 43. On February 27, 2020, Judge Sullivan severed the claims of the plaintiffs represented by The Driscoll Firm, P.C. ("Driscoll Plaintiffs") from the claims of the plaintiffs represented by Willkie Farr & Gallagher LLP ("Willkie Plaintiffs"), *see* Order 1, *Neiberger*, No. 16-cv-2193 (D.D.C. Feb. 27, 2020), ECF No. 52, and directed the Clerk of Court to open a new case number, *see* Min. Order, *Neiberger*, No. 16-cv-2193 (D.D.C. Mar. 2, 2020).

On March 2, 2020, the newly severed Driscoll Plaintiffs filed their amended complaint in the above-captioned matter seeking judgment against Iran pursuant to 28 U.S.C. § 1605A(c) and relief in the form of compensatory damages, including for economic losses and pain and suffering, solatium damages, punitive damages, costs and expenses, attorney's fees, and such other relief as the Court finds just and equitable. *See* Second Am. Compl. ("Compl.") ¶¶ 870–885, ECF No. 2. On March 17, 2023, Plaintiffs filed a brief supplementing their motion for default judgment. *See*

Suppl. Br. Resp. Court's Order of February 8, 2023 ("Pls.' Suppl. Br."), ECF No. 33. On April 10, 2023, Plaintiffs filed a second brief supplementing their motion for default judgment. *See* Pls.' Suppl. Br. Resp. Court's Order March 28, 2023 ("Pls.' 2d Suppl. Br."), ECF No. 36.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 55 establishes a "two-step process" for obtaining a default judgment. *Cong. Hunger Ctr. v. Gurey*, 308 F. Supp. 3d 223, 227–28 (D.D.C. 2018). First, when a party has "failed to plead or otherwise defend" itself against the suit, the plaintiff seeks an entry of default by the Clerk of Court. Fed. R. Civ. P. 55(a). After entry of default, the factual allegations in the complaint are to be taken as true. *See Crabtree v. Env't Reclamation Sols., LLC*, No. 20-cv-1266, 2021 WL 1634532, at *3 (D.D.C. Apr. 27, 2021).

Second, the plaintiff moves for default judgment by the court. *See* Fed. R. Civ. P. 55(b)(2). "The law is clear that a defendant's failure to appear and the Clerk's subsequent entry of default against it do not automatically entitle plaintiff to a default judgment. Indeed, a default is not an absolute confession by the defendant of his liability and of the plaintiff's right to recover." *Harris v. U.S. Dep't of Just.*, 600 F. Supp. 2d 129, 136 (D.D.C. 2009) (cleaned up) (quoting *Jackson v. Correctional Corp. of Am.*, 564 F. Supp. 2d 22, 26–27 (D.D.C. 2008)). To succeed, plaintiffs must establish their claims "by evidence satisfactory to the court." 28 U.S.C. § 1608(e). "[T]he FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide[.]" *Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014).

"[A]n evidentiary hearing is not required; a plaintiff may establish proof by affidavit," *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 65 (D.D.C. 2015), "declarations," *Saberi v. Islamic Republic of Iran*, 541 F. Supp. 3d 67, 77 (D.D.C. 2021), or "other written materials as

[plaintiffs] can otherwise obtain" *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005). "Indeed, cases in this Circuit and in others have repeatedly sustained jurisdiction or liability or both under the terrorism exception to the FSIA . . . based solely upon expert testimony." *Owens v. Republic of Sudan*, 864 F.3d 751, 788 (D.C. Cir. 2017), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

Furthermore, the Court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Thus, "[a] court may take judicial notice of related proceedings and records in cases before the same court." *Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 263 (D.D.C. 2006) (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 109 n.6 (D.D.C. 2005)); *see also Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009) ("[r]elying on the pleadings and the . . . findings of other judges in this jurisdiction"). "[T]aking notice of another court's finding of fact does not necessarily denote adoption or finding of that fact." *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012), *vacated and remanded on other grounds*, 139 S. Ct. 1048 (2019). Rather, "courts in subsequent related cases" must still "reach their own, independent findings of fact in the cases before them." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010).

To enter a default judgment, the Court must first "satisfy itself that it has subject matter jurisdiction over the claims and personal jurisdiction over the defendants." *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 56 (D.D.C. 2018) (citing *Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014)). Generally, the FSIA grants "subject matter and personal jurisdiction . . . over any claim against a foreign state as to which the state is not entitled to immunity." *Hegna*

*v. Islamic Revolutionary Guard Corps*, 908 F. Supp. 2d 116, 118 (D.D.C. 2012) (quoting *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1159 n.5 (D.C. Cir. 2002)).

Next, "it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law." *Cong. Hunger Ctr.*, 308 F. Supp. 3d at 227–28 (D.D.C. 2018) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 2688.1 (4th ed.)). "[U]nless the complaint states a claim upon which relief may be granted as to the defendants who have defaulted, default judgment is not justified." *Harris*, 600 F. Supp. 2d at 136–37; *see also City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 n.23 (2d Cir. 2011) (collecting cases). "Conceptually, . . . a motion for default judgment is like a reverse motion to dismiss for failure to state a claim." *United States v. $1,071,251.44 of Funds Associated with Mingzheng Int'l Trading Ltd.*, No. 17-cv-1166, 2018 WL 3949962, at *3 (D.D.C. June 29, 2018) (quoting *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015)).

## III.   ANALYSIS

### A.   Subject Matter Jurisdiction and Liability for § 1605A(c) Claims

This action is brought under 28 U.S.C. § 1605A, the so-called "terrorism exception" to the FSIA. *See Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 352 (D.C. Cir. 2018). The terrorism exception nullifies a foreign state's immunity and affords federal courts with subject matter jurisdiction over suits when

> [(1)] money damages are sought against a foreign state [(2)] for personal injury or death [(3)] that was caused by [(4)] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act [(5)] if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

5

28 U.S.C. § 1605A(a)(1). In addition, the foreign state must have been designated as a state sponsor of terrorism at the time of the attack, and the claimant or victim must have been a "national of the United States," "member of the armed forces," or federal employee at the time of the attack.[2] *Id.* § 1605A(a)(2)(A)(ii). "The Court must satisfy itself that an FSIA plaintiff has cleared each of these hurdles, even if the defendant fails to appear." *Fritz*, 320 F. Supp. 3d at 76.

Most of these conditions are easily met. First, Plaintiffs seek money damages and attorneys' fees. *See* Compl. ¶¶ 870–85. Second, Plaintiffs seek recovery "personal injury" or "death." *Id.* ¶¶ 870–79. Third, the United States has designated Iran as a state sponsor of terrorism since 1984.[3] Fourth, at the time each attack occurred, the attack victims were U.S. nationals and members of the U.S. armed forces or the U.S. government.[4] *See generally* Compl. ¶¶ 93–859 (recounting the circumstances under which members of the U.S. armed forces and government employees were killed between 2005 and 2011).

Thus, the only outstanding questions concern whether the injuries and deaths were "caused by an act of . . . extrajudicial killing . . . or the provision of material support or resources for such an act" by an "official, employee, or agent of [Iran]." 28 U.S.C. § 1605A(a)(1). The Court analyzes these issues in their component parts.

---

[2] Because these attacks did not "occur[] in the foreign state against which the claim has been brought," but rather took place in Iraq, the final requirement that "the claimant []afford[] the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration," does not apply here. 28 U.S.C. § 1605A(a)(2)(A)(iii).

[3] *See State Sponsors of Terrorism*, U.S. DEP'T OF STATE (last visited June 22, 2023), https://www.state.gov/state-sponsors-of-terrorism/.

[4] The FSIA defines the term "national of the United States" by cross-reference to the Immigration and Nationality Act. *See* 28 U.S.C. §1605A(h)(5). The term "national of the United States" includes (i) a citizen of the United States, and (ii) a person who, though not a citizen of the United States, owes permanent allegiance to the United States. *See* 8 U.S.C. 1101(a)(22).

1.    *Extrajudicial Killing*

An "extrajudicial killing"—as defined by cross-reference to Section 3 of the Torture Victim Protection Act ("TVPA")—is "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court." *Id.* § 1605A(h)(7) (citing Torture Victim Protection Act, Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992)). As detailed below, subject matter expert Michael Pregent[5] provided evidence that each of the sixty-three attacks was carried out by a violent non-state actor. *See* Second Am. Decl./Report of Michael Pregent in Supp. Pls.' Default J. as to Liability Pursuant to FRCP 55(b)(2) ("Pregent Report") 13, ECF No. 26. Thus, none of these attacks were authorized by a previous judgment from a regularly constituted court. *See Schwartz v. Islamic Republic of Iran*, No. 18-cv-1349, 2020 WL 7042842, at *12 (D.D.C. Nov. 30, 2020).

"A 'deliberated' killing is simply one undertaken with careful consideration, not on a sudden impulse." *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 363 (D.D.C. 2020) (quoting *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 263 (D.D.C. 2016) (citations omitted), *rev'd on other grounds by Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020)). In interpreting the FSIA, "courts resolve statutory 'ambiguities flexibly and capaciously' in light of the text, history, and remedial purpose of the statute to compensate those injured in terrorist attacks." *Force*, 464 F.

---

[5] The Court's findings rely on the testimony and expert reports of Michael Pregent, a former intelligence officer focused on militias in Iraq backed by the Iranian military, and Daniel Byman, "a long-time Middle East security expert[.]" Mem. in Supp. Mot. for Default J. at 15. Courts in this district have previously qualified Pregent as an expert on Iranian efforts to influence political activity in Iraq. *See, e.g.*, *Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 92 n.1 (D.D.C. 2019); *Roberts v. Islamic Republic of Iran*, 581 F. Supp. 3d 152, 158 (D.D.C. 2022); *Pennington v. Islamic Republic of Iran*, No. 19-cv-796, 2021 WL 2592910, at *2 (D.D.C. June 24, 2021). Courts in this district have also previously adopted the expert findings of Byman. *See, e.g.*, *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 97 (D.D.C. 2015); *Pennington*, 2021 WL 2592910, at *2. After considering the requirements of Federal Rule of Evidence 702 and having reviewed the reports of Byman and Pregent, this Court reaffirms their qualifications to offer the opinions relied upon herein as experts.

Supp. 3d at 360 (quoting *Van Beneden v. Al-Sanusi*, 709 F.3d 1165, 1167 & n.4 (D.C. Cir. 2013)).

Consequently, the consensus among courts is that "material support for an attack that

extrajudicially killed someone other than the injured servicemember represented in this case is

sufficient for jurisdictional purposes." *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 58

(D.D.C. 2019); *see Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017) ("It

is not necessary, however, for one of the plaintiffs to have died in the attack in order for the state-

sponsor-of-terrorism exception to apply."); *Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 9

(D.D.C. 2011) (plaintiff's "tremendous pain and a loss of vision" from injuries caused by the attack

sufficient to meet FSIA's jurisdictional requirement); *Schertzman Cohen v. Islamic Republic of

Iran*, No. 17-cv-1214, 2019 WL 3037868, at *1 (D.D.C. July 11, 2019) (plaintiffs consisting of

injured victims of attacks resulting in extrajudicial killings sufficient to meet FSIA's jurisdictional

requirement).

> a. Explosively Formed Penetrator ("EFP") Attacks

Plaintiffs have established by satisfactory evidence that fifty-five of the sixty-three attacks

are attributable to an EFP.[6] An EFP is a type of lethal improvised explosive device ("IED") that is

---

[6] *See* Proposed Findings ¶ 30 (Sergeant Jonathan Cadavero), 94 (Specialist Michael Wendling), ¶¶
103–05 (Sergeant Bryan Anderson), 113 (Sergeant First Class Richard Schild), 127 (Specialist
Roland Calderon), 140 (Captain Ian Weikel), 148 (Sergeant Brandon Teeters), 158 (Private First
Class Teodoro Torres), 167 (Specialist Nicholas Paupore), ¶¶ 178–80 (Sergeant Brian Saaristo),
192 (Specialist Joshua Ford), 201 (Private First Class William Thorne), 218 (Second Lieutenant
Emily Perez), 229 (Staff Sergeant Brian Beem), 240 (Sergeant Nicholas Sowinski), 248 (Senior
Airman Brandon Byers), 260 (Staff Sergeant Joseph Gage), 278 (Sergeant Joshua Cope), 291
(Sergeant Daniel Morris), 301 (Private First Class Andrew Nelson), 307 (Specialist Aaron
Preston), 313 (Specialist Derek Gagne), 320 (Specialist Brandon Stout), 328 (Sergeant Michelle
Wager), 371 (Private First Class Saul Martinez), 378 (Sergeant Blake Stephens), 385 (Specialist
Jake Altman), 398 (Private First Class Louis Dahlman), 409 (Sergeant Jason Schumann), 418
(Specialist Jerral Steele Hancock), 429 (Specialist Shawn Gajdos), 435 (Private First Class
Cameron Payne), 461 (Specialist James Adair), 467 (Corporal John Takai), 481 (Major James
Ahearn), 488 (Sergeant Keith Kline), 496 (Specialist Eric Lill), 513 (Private Christopher Kube),

used to target and defeat armored vehicles. *See* Proposed Findings, ECF No. 27-1 (referencing Decl. of Expert Stafford A. Melerine ("Melerine Decl.") as Exhibit 252): *see also* Attachment 5 to Status Report at 2 in *Neiberger*, No. 16-cv-2193 (D.D.C. Jan. 15, 2019), ECF No. 37-5. EFPs consist of a pipe or tube packed with explosives, a detonator, and a concave copper disk that forms the projectile when detonated. *See id.* at 3; *see also Karcher*, 396 F. Supp. 3d at 26. "Detonation of the EFP forces the inverted center of the disk outwards into a molten slug capable of traveling 2,000 meters per second or more," which "is sufficient to puncture an 'up-armored' Humvee's rolled homogenous armor." *Karcher*, 396 F. Supp. 3d at 26. EFPs can be triggered from a remote "firing position" or by a victim-operated trigger. Melerine Decl. at 3. Evidence of an EFP includes

---

643 (Specialist Justin Mixon), 709 (Corporal Michael Anaya); *see also* Melerine Decl. 4–6 (analyzing explosion evidence and concluding that the deaths and injuries of Senior Airman Brandon Byers, Staff Sergeant Brian Beem, Sergeant Nicholas Sowinski, Private Christopher Kube, Josh Craven, and James Donaldson were linked to EFPs); Pls.' Suppl. Br. at 4–5 (Specialist Michael Wendling), 5–8 (Sergeant Richard Schild), 8–9 (Sergeant Brandon Teeters), 9–10 (Private Teodoro Torres), 11 (Second Lieutenant Emily Perez); 11–13 (Sergeant Joshua Cope), 13 (Sergeant Jonathan Cadavero), 13–15 (Sergeant Saul Martinez & Sergeant Blake Stephens), 15–16 (Specialist Jake Altman), 16–18 (Specialist Jerral Steele Hancock), 18–19 (Specialist Shawn Gajdos), 19 (Private First Class Cameron Payne), 19–21 (Specialist James Adair & Corporal John Takai), 21–22 (Major James Ahearn & Sergeant Keith Kline), 22–23 (Sergeant Eric Lill), 24–25 (Specialist Zachariah Gonzalez), 25–26 (First Lieutenant Jonathan Edds), 2–4 (Specialist Bryan Wagner), 26–27 (Captain Andrew Tong), 27–28 (Specialist Duncan Crookston), 28–29 (Specialist Joshua Wells), 29–30 (Specialist David A. Knapp), 30–31 (Sergeant Norman Forbes, IV), 31–32 (Corporal Jose Rubio-Hernandez), 32–34 (Specialist Durrell Bennett), 35 (Major Mark Rosenberg), 35–36 (Sergeant Joseph Richard, III), 36–37 (Captain Andrew R. Pearson), 37–39 (Specialist Joshua Plocica), 39–40 (Specialist John Blickenstaff & Sergeant Gary Henry), 40–41 (Sergeant Jose E. Ulloa), 41–42 (Staff Sergeant Sean Diamond), 42–45 (First Lieutenant Omar Vazquez), 45–46 (Staff Sergeant Jason Rzepa & Sergeant Nathan Beyers) (providing additional analysis that the deaths and injuries of the aforementioned servicemembers were caused by EFPs); Pls.' 2d Suppl. Br. at 5 (Private First Class William Thorne) (citing *Pennington,* 2021 WL 2592910, at *), 6–7 (Sergeant John Botts), 7–8 (Sergeant Lucas T. White) (citing *Pennington*, 2021 WL 2592910, at *4), 10–11 (Private First Class LeRon Wilson) (citing *Karcher*, No. 16-cv-232, 2021 WL 133507, at *14 (D.D.C. Jan. 14, 2021)) (same).

a circular pattern left by the points of impact or penetration and the presence of copper residue on the penetrations and impacted area. *See id.*

The sophistication of an attack and the prior planning required to carry it out—*i.e.*, "with intelligence-gathering, by selecting the site; with logistics, by purchasing the [weapon]; [or] operationally, by training to commit the attack"—are indicative of deliberation. *Schwartz*, 2020 WL 7042842, at *12; *see also Roberts v. Islamic Republic of Iran*, No. 20-cv-1227, 2022 WL 203540, at *13 (D.D.C. Jan. 24, 2022) ("[T]he thought and consideration required to conduct an EFP attack are hallmarks of deliberation."). The level of sophistication and expertise required to detonate EFPs "[i]s beyond the capacity of individuals with basic training in IED construction." *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 484 (D.D.C. 2021). Indeed, the perpetrator of an EFP must conceal the explosive device (often within a boulder, roadside curb, or debris), maintain remote surveillance of the target, and detonate the explosive device at the moment the target approaches. *See id.* at 484–85.

This Court finds—and takes notice of previous findings—that deploying an EFP is a "deliberated" attempt to kill someone, even when no fatalities result. *See Lee*, 518 F. Supp. 3d at 492 ("[C]ausing or attempting to cause death by detonating an EFP constitutes a deliberated killing."); *Karcher*, 396 F. Supp. 3d at 56 ("By virtue of this deadly weapon's design, its delivery to Shi'a militia proxies, and its effective deployment against U.S. military vehicles, the Court finds that the intended extrajudicial killings were deliberate."). Further, the evidence suggests that the Islamic Revolutionary Guard Corps (the "IRGC"), an Iranian military entity and designated terrorist organization,[7] specifically directed its proxies to use their weapons and training against

---

[7] On April 15, 2019, the U.S. Secretary of State designated the IRGC as a Foreign Terrorist Organization. *See* Foreign Terrorist Organizations, U.S. DEP'T OF STATE, https://www.state.gov/foreign-terrorist-organizations/ (last visited June 22, 2023).

Americans.—*See* Pregent Report at 13–14; *see also Roth v. Islamic Republic of Iran*, 19-cv-2179, 2023 WL 196577, at *4 (D.D.C. Jan. 17, 2023) ("EFPs are a signature weapon of Iran and have devasted American forces."). That "EFPs were specifically for use against American up-armored vehicles" further evidences the deliberate nature of these EFP attacks. Pregent Report at 13–14.

Each of the claims arising out of the fifty-five EFP attacks meets the definition of a "deliberated killing." *See, e.g.*, *Karcher*, 396 F. Supp. 3d at 58.

### b.     Non-EFP Attacks

Plaintiffs allege that the eight remaining attacks used IEDs and rocket fire. "Plaintiffs' expert examined each [of the eight attacks] to decide whether he could determine the likely perpetrators with a reasonable degree of professional confidence." *Roth*, 2023 WL 196577, at *6; *see* Pregent Report at 20. For each attack, "Pregent studied where it took place, the time, the weapons system used, the complexity of the attack, and what group had primacy in the relevant region." *Roth*, 2023 WL 196577, at *6; *see* Pregent Report at 20. Pregent then compared that data with any official military reports of "significant events or significant activities in the vicinity, called 'SIGACTs.'" *Roth*, 2023 WL 196577, at *6; *see* Pregent Report at 10. In each instance, Pregent concluded that the attacks were attributable to Iran and its proxies. *See* Pregent Report at 21–36. As explained below, Plaintiffs have established by satisfactory evidence that the remaining attacks are traceable to Iran and its proxies.

### i.     July 27, 2005 Attack

On July 27, 2005, an IED planted along Route Dover in Baghdad, Iraq killed U.S. Army Specialists ("SPCs") Adrian Butler and John Tollefson. *See* Proposed Findings ¶¶ 77–93. At the time of the explosion, SPCs Butler and Tollefson were riding in an M1114 HUMVEE vehicle. *See*

*id.* ¶¶ 78, 86. SPC Butler's autopsy report concluded that the July 27, 2005, attack was instigated by an IED detonation. *See* Ex. 4, PX-258 Adrian Butler Autopsy Report, ECF No. 37-4.

Pregent determined that "the attack that killed Adrian Butler and John Tollefson was committed by al-Qaeda or an al-Qaeda affiliate with material support and resources from the Islamic Republic of Iran, its [IRGC-Quds Force[8]], and Lebanese Hezbollah." Pregent Report at 21; *see* Ex. 3, PX-257 Adrian Butler SIGACT Report, ECF No. 37-3; Ex. 5, PX-260 John Tollefson SIGACT Report, ECF No. 37-5; Ex. 2, PX-471 John Tollefson and Adrian Butler SIGACT Report, ECF No. 39-2. Moreover, this Court takes judicial notice of another court's finding that the July 27, 2005, attack was "traceable to Iran and its proxies[.]" *Karcher*, No. 16-cv-232, 2021 WL 133507, at *14 (D.D.C. Jan. 14, 2021). That court was persuaded by the "clear photographic evidence of the catastrophic damage to and the incineration of [the] up-armored vehicle." *Id.* And "the presence of a copper slug in the explosion and . . . active reports of Shi'a proxy groups using EFPs in the region at the time of the July 27, 2005 attack" further demonstrated that this was a deliberate extrajudicial killing. *Id.* Therefore, Plaintiffs have established by satisfactory evidence that the explosive device responsible for SPCs Butler and Tollefson's deaths was an IED traceable to Iran and its proxies.

ii.    February 7, 2007 Attack

On February 7, 2007, an IED detonated under a vehicle carrying Staff Sergeant Travis Vendela. *See* Proposed Findings ¶ 333; Ex. 2, PX-572 Travis Vendela WIT Report, ECF No. 39-3. At the time, Staff Sergeant Vendela was acting as a Scout Sniper within a unit tasked with tracking down insurgents known to be distributing and planting IEDs. *See* Proposed Findings

---

[8] The IRGC-Quds Force (the "IRGC-QF") is an elite division responsible for the IRGC's extraterritorial covert and military operations. *See* Pregent Report at 2.

¶ 333. Staff Sergeant Vendela was gravely wounded as a result of the attack. He "lost both of [his] legs due to amputation, broke [his] neck[,]" and "experienced hemorrhagic shock[,]" among other injuries. Ex. 1, PX-144, Decl. of Travis Stockton Vendela 2, ECF No. 37-1. According to the SIGACT Report, the IED that injured Staff Sergeant Vendela consisted of two 130mm high explosive rounds with a saw blade pressure plate. *See* Ex. 1, PX-324 Vendela SIGACT Report 1, ECF No. 38-1. Pregent concluded that the attack "was committed by al-Qaeda or an al-Qaeda affiliate with material support and resources from the Islamic Republic of Iran, its IRGC-QF, and Lebanese Hezbollah." Pregent Report at 26. Plaintiffs have established by satisfactory evidence that the explosive device responsible for Staff Sergeant Vendela's injuries was an IED traceable to Iran and its proxies. *See Roth*, 2023 WL 196577, at *10–13.

"[A]n attack cannot be a 'killing,' much less an extrajudicial one, if nobody dies"; however, "a foreign state's support with the object or purpose of an extrajudicial killing constitutes support 'for such an act'" within the meaning of the FSIA. *Roth*, 2023 WL 196577, at *15–16 (citing *Force*, 464 F. Supp. 3d at 360–61). For example, IED attacks by Iranian proxies resulting in injuries to servicemembers fell within the ambit of providing "material support *for* []extrajudicial killing[s.]" *Roth*, 2023 WL 196577, at *16 (cleaned up). Accordingly, Plaintiffs have established that the IED attack on Staff Sergeant Vendela constituted an attempted extrajudicial killing.

### iii.    March 5, 2007 Attack

On March 5, 2007, an IED detonated under a military vehicle killing three of its passengers: Sergeant Blake Harris, Private First Class ("PFC") Barry Mayo, and SPC Ryan Russell. *See* Proposed Findings ¶¶ 349–370. According to the SIGACT report, "[t]he IED was buried in the center of the road with cement barriers on each side to funnel traffic over the IED." Ex. 6, PX-328 Harris, Blake, Mayo, Barry, Russell, and Ryan SIGACT Report 1, ECF No. 37-6. In addition, the

U.S. military recovered a video camera, tripod, and audio cassettes related to the explosion from an adjacent building. *See id.* The configuration of the roadway and the recovered evidence are indicative of "careful consideration[,]" demonstrating that this attack was a deliberated, extrajudicial killing. *Schwartz*, 2020 WL 7042842, at *12. Based on the SIGACT report, Pregent concluded that "the attack that killed Barry Mayo, Ryan Russell, and Blake Harris was committed by al-Qaeda or an al-Qaeda affiliate with material support and resources from the Islamic Republic of Iran, its IRGC-QF, and Lebanese Hezbollah." Pregent Report at 27. Again, Plaintiffs have established by satisfactory evidence that the explosive device responsible for Sergeant Harris, PFC Mayo, and SPC Russell's deaths in the March 5, 2007, attack was an IED traceable to Iran and its proxies.

### iv.     June 19, 2007 Attack

On June 19, 2007, an IED detonated, killing PFC Joshua S. Modgling and Sergeant First Class ("SFC") William Zapfe. *See* Proposed Findings ¶¶ 443–460. At the time, PFC Modgling and SFC Zapfe were conducting a mounted patrol in a military vehicle. *See id.*; Ex. 4, PX-630 Joshua Modgling and William Zapfe AR 10, ECF No. 39-4. According to the SIGACT report, approximately "400 pounds of homemade explosives" were used for the IED. Proposed Findings ¶ 456; *see* Ex. 7, PX-349 Modgling, Joshua and Zapfe, William SIGACT Report 2, ECF No. 37-7. Pregent concluded that the attack "was committed and perpetrated by IRGC-QF Proxies receiving direct material and resources from Iran and Hezbollah." Pregent Report at 28. The careful planning involved in manufacturing, placing, and detonating the IED indicates that the June 19, 2007, attack was a deliberated, extrajudicial killing traceable to Iran and its proxies. *See* Pls.' 2d Suppl. Br. at 9–10; *Schwartz*, 2020 WL 7042842, at *12.

14

v.    August 4, 2007 Attack

On August 4, 2007, an IED detonated under a military vehicle killing Sergeant Dustin Wakeman and two other passengers. *See* Proposed Findings ¶ 533; Ex. 369 at 1. According to the SIGACT Report, "the vehicle was completely destroyed" by the IED explosion. Ex. 1, PX-369 Dustin Wakeman SIGACT Report 1, ECF No. 39-1. Pregent concluded that the attack "was committed by al-Qaeda or an al-Qaeda affiliate with material support and resources from the Islamic Republic of Iran, its IRGC-QF, and Lebanese Hezbollah." Pregent Report at 30. The hidden nature and sheer power of the IED device indicate that this attack was a deliberate, extrajudicial killing traceable to Iran and its proxies. *See* Pls.' 2d Suppl. Br. at 12; *Schwartz*, 2020 WL 7042842, at *12.

vi.    August 13, 2007 Attack

On August 13, 2007, an IED detonated under a military vehicle, causing a massive explosion. *See* Proposed Findings ¶ 541. According to the SIGACT Report, the vehicle was "completely destroyed" and three passengers—including Staff Sergeant Eric Cottrell—were killed in action. Ex. 9, PX-371 Eric Cottrell SIGACT Report 1, ECF No. 37-8. The IED "consisted of 3 to 4 propane tanks filled with a total of 150–200 pound of [explosive]" and the "device was triggered by a command wire[.]" *Id.* Pregent concluded that the attack "was committed by al-Qaeda or an al-Qaeda affiliate with material support and resources from the Islamic Republic of Iran, its IRGC-QF, and Lebanese Hezbollah." Pregent Report at 30. "[T]he manufacturing, hidden placement, and command wiring to and from the IED clearly point[] to a . . . deliberate extrajudicial killing[.]" Pls.' 2d Suppl. Br. at 12–13; *see Schwartz*, 2020 WL 7042842, at *12. Accordingly, Plaintiffs have established by satisfactory evidence that the IED attack on Staff Sergeant Cottrell constituted an extrajudicial killing traceable to Iran and its proxies.

vii.     September 20, 2007 Attack

On September 20, 2007, SPC Luigi Marciante was riding in a military vehicle. *See* Proposed Findings ¶ 569. At approximately 15:30, a deep-buried IED detonated as the vehicle maneuvered around an "already IED-damaged vehicle situated in the roadway[,]" killing SPC Marciante and wounding another soldier. Pls.' 2d Suppl. Br. at 13; *see* Ex. 1, PX-380 Luigi Marciante SIGACT Report 1, ECF No. 40-1. According to the SIGACT Report, the vehicle was "catastrophically destroyed." Ex. 10 at 1. Pregent determined that the attack "was committed and perpetrated by IRGC-QF Proxies receiving direct material and resources from Iran and Hezbollah." Pregent Report at 31. The duplicity in burying a deadly IED device just adjacent to another deep-buried IED leads to the inescapable conclusion that the attack was a deliberated extrajudicial killing. *See* Pls.' 2d Suppl. Br. at 14; *Schwartz*, 2020 WL 7042842, at *12. Therefore, Plaintiffs have established by satisfactory evidence that the IED responsible for SPC Marciante's death was traceable to Iran and its proxies.

viii.     July 16, 2009 Attack

The final attack at issue was caused by an episode of rocket fire that killed Specialist Carlos Wilcox on a military base. *See* Proposed Findings ¶ 717. "Strategically targeting a [U.S.] military base" demonstrates intentional planning. *Lee v. Islamic Republic of Iran*, No. 19-cv-830, 2023 WL 1100711, at *29 (D.D.C. Jan. 30, 2023). Moreover, an attack by rocket fire requires intentional planning, and thus qualifies as a deliberated, extrajudicial killing. *See Force*, 464 F. Supp. 3d at 364 (finding rocket attack that was "part of coordinated rocket campaign during a particularly active period of conflict" to be deliberate). In *Force*, three plaintiffs respectively survived a stabbing attack, a shooting, and a rocket attack. *See id.* at 337. The court reasoned that "[c]ompensating the victims of such brutal attacks, which were designed to cause the victims'

16

deaths, to inflict suffering, and to inspire terror, directly furthers the purpose of the terrorism exception to the FSIA." *Id.* at 361. Pregent concluded that the attack "was committed by al-Qaeda or an al-Qaeda affiliate with material support and resources from the Islamic Republic of Iran, its IRGC-QF, and Lebanese Hezbollah." Pregent Report at 35. Therefore, Plaintiffs have established by satisfactory evidence that the attack responsible for Specialist Wilcox's death was traceable to Iran and its proxies.

### 2.   *Provision of Material Support or Resources*

The FSIA adopts the definition of "material support or resources" found in 18 U.S.C. § 2339A. *See* 28 U.S.C. § 1605A(h)(3). As applied here, material support or resources consist of:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

*Karcher*, 396 F. Supp. 3d at 54 (quoting 18 U.S.C. § 2339A(b)(1)). "In order to complete the link to Iran, the material support or resources must have been provided 'by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.'" *Id.* at 55 (quoting 28 U.S.C. § 1605A(a)(1)).

### a.   Background

Evidence of a foreign sovereign's material support of a terrorist organization may include the "motive to foment unrest in a particular area where the group is operating." *Est. of Parhamovich v. Syrian Arab Republic*, No. 17-cv-61, 2021 WL 6843587, at *8 (D.D.C. June 23, 2021) (citing *W.A.*, 427 F. Supp. 3d at 136). Central to this case is Iran's long-term geopolitical mission to spread its style of "Islamic" rule to the rest of the Muslim world, particularly in

neighboring Iraq. *See* Byman Report at 4. To fulfill this mission, Iran worked in coordination with like-minded groups in Iraq and Lebanon, including Hezbollah. *See id.* at 7.

> Beginning in the early 1980s, [the] IRGC shaped the development and military capabilities of Lebanese Hezbollah, a militant Shi'a political party that wanted to oust Israeli forces from Southern Lebanon. As the relationship between [the] IRGC and Hezbollah grew, Hezbollah reciprocated by executing terrorist missions against Israeli and American targets at Iran's request, offering Iran reasonable deniability after the fact.

*Karcher*, 396 F. Supp. 3d at 23 (cleaned up).

Together, the IRGC and Hezbollah provided material support and resources to terrorist groups trying to destabilize Iraq. *See* Pregent Report at 11–12. Specifically, they funneled financing, weapons, training, safe havens, and other assistance to Jaysh al-Mahdi ("JAM"), Asaib Ahl al-Haqq ("AAH"), and Kata'ib Hezbollah ("KH"). *See* Pregent Report at 12. "[W]orking with proxies rather than using its own military forces enabled Iran to minimize the chances of a direct confrontation with the United States." Byman Report at 13.

> Iran, through the Quds Force, sought to turn [these] extremists into a Hezbollah-like force to serve its interests and fight a proxy war against the Iraqi state and coalition forces in Iraq. This effort to use proxies in Iraq was part of a deliberate policy to inflict casualties on U.S. forces that was approved by the Supreme Leader of Iran and was executed very covertly by the Quds Force.

*Fritz*, 320 F. Supp. 3d at 58–59, 62 (cleaned up).

      b.    Support for Shia Militia Groups[9]

From 2005 to 2011, when the sixty-three subject attacks occurred, "Iran and its IRGC and QF relied upon and used Hezbollah as its non-state agent and proxy to effectuate its foreign policy

---

[9] The Court uses the terms "IRGC-QF proxy groups" and "Shia militias" synonymously with the military's preferred term, "Special Groups." Specials Groups is the designated term used by the United States military to refer to "a somewhat amorphous conglomeration of Iranian-backed Shia militias," *Fritz*, 320 F. Supp. 3d at 62, that splintered from the overall Sadr movement, *see* Byman

and paramilitary policies and goals, including in Iraq." Pregent Report at 11. Pregent concluded that fifty-nine of the sixty-three attacks took place in areas under the control, influence, and presence of IRGC-QF and Hezbollah-trained, equipped, and directed IRGC-QF proxy groups. *See id.* 10.

Iran provided "material support and resources" to the Shia militias in Iraq in the form of "financial services, lodging, training, expert advice, or assistance, safehouses, false documentation or identification, facilities, weapons, explosives, transportation, and personnel." *Id.* at 12; *see also Karcher*, 396 F. Supp. 3d at 24 (finding that Special Groups received funding, training, and weapons from the IRGC-QF and Hezbollah); *Lee*, 518 F. Supp 3d at 483. "Through Hezbollah, Iran brought operatives into Iran for training and smuggling weapons across the border into Iraq and sent IRGC and Qods Force operatives to Iraq." *Lee*, 2023 WL 1100711, at *4 (cleaned up). The IRGC-QF provided substantial financial and technical support to Shia militia groups through established attack networks, with Hezbollah serving as the premier IRGC-QF proxy to train and direct attacks against U.S. forces in Iraq. *See* Pregent Report at 16. First, the IRGC consistently supplied weapons and training to Shia militia groups in Iraq. *See id.* at 14. Specifically, the IRGC-QF provided weapons support in the form of "advanced weapons, including light and heavy mortars, 107-mm and 240-mm rockets, advanced large-caliber sniper rifles, and EFPs capable of penetrating up-armored U.S. vehicles." *Id.*; *see also Fritz*, 320 F. Supp. 3d at 63 (finding IRGC-QF provided Iraqi militants with Iranian-produced advanced weapons, including rockets, sniper rifles, automatic weapons, mortars, and EFPs); *Karcher*, 396 F. Supp. 3d at 25 (finding Iran supplied or bankrolled many types of weapons used by Shia militia groups in Iraq). Second,

---

Decl. 10. These groups included JAM, KH, AAH, the Shaybani Network, and the Promised Day Brigades. *See id.*

training was central to the IRGC and its agents' material support for Shia militia groups. *See, e.g.*, *Fritz*, 320 F. Supp. 3d at 63–64. The IRGC funneled lethal aid and training, including its own advisors and Hezbollah advisors, to Shia militia groups. *See* Pregent Report at 14. Finally, the IRGC prior to and throughout the relevant time period provided financial support to Hezbollah and the IRGC-QF Proxies—i.e., Shia militia groups—for their terror activities within Iraq. *See* Pregent Report at 12; *Karcher*, 396 F. Supp. 3d at 24; *Fritz*, 320 F. Supp. 3d at 63; *Lee*, 2021 WL 325958, at *4.

Ultimately, "Iranian support—in the form of funding, weapons, and training—was critical to the success of the Special Groups, which otherwise 'would have been unable to conduct their terrorist attacks in Iraq.'" *Fritz*, 320 F. Supp. 3d at 62 (quoting General David Petraeus, then-Commander, Multinational Force–Iraq). Considering the findings in *Karcher* and *Fritz* and the Plaintiffs' expert reports, this Court too finds that Iran was providing material support and resources to terrorist groups through the IRGC-QF and Hezbollah at the time of the attacks at issue. *See, e.g.*, *Lee*, 518 F. Supp. 3d at 480 (taking judicial notice of *Karcher* and *Fritz* pursuant to Federal Rule of Evidence 201(b)).

c.      Support for al-Qaeda in Iraq ("AQI")

Iran has provided material support and resources to al-Qaeda by providing weapons training and allowing al-Qaeda to funnel funds and operatives through Iran. *See* Pregent Report at 7 (citing U.S. Treasury Dep't, *Treasury Targets Key Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point* (July 28, 2011), https://home.treasury.gov/news/press-releases/tg1261). Courts have recognized this alliance between Iran and al-Qaeda:

> Both Iran and al Qaeda can be ruthlessly pragmatic, cutting deals with potential future adversaries to advance their causes in the short-term. Members of the Shiite and Sunni sects—particularly at the leadership level—often work together on terrorist operations. The

> religious differences, to the extent they retain any vitality at the
> leadership level, are trumped by the leaders' desire to confront and
> oppose common enemies, particularly the U.S.

*In re Terrorist Attacks on September 11, 2001*, No. 03-mdl-1570, 2011 WL 13244047, at *12

(S.D.N.Y. Dec. 22, 2011) (citations omitted); *see also Flanagan v. Islamic Republic of Iran*, 87 F.

Supp. 3d 93, 105–08 (D.D.C. 2015) (concluding that Iran provided financial support, training, and

safe passage to al-Qaeda); *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1100 (D.C. Cir.

2019) (explaining that Iran was linked to bombings executed by al-Qaeda). Post 9/11, the IRGC

and the IRGC-QF "funded and armed al-Qaeda operatives to strike American targets." Pregent

Report at 9. Subsequently, the IRGC-QF provided Abu Musab al-Zarqawi, founding member of

al-Qaeda in Iraq ("AQI"), funding, weapons, and transportation into Iraq to target U.S. troops. *Id.*

AQI and al-Qaeda perpetrated attacks against U.S. soldiers in Iraq during the time at issue. *Id.* at

12–13.

Thus, Iran used the IRGC-QF to provide funding, training, weapons, equipment, and

direction to various Shia militia groups and Sunni groups to target Americans in post-Saddam

Hussein Iraq. *See* Pregent Report at 9; *see also Neiberger v. Islamic Republic of Iran*, No. 16-cv-

2193, 2022 WL 17370239, at *5 (D.D.C. Sept. 8, 2022) (concluding that Iran materially supported

AQI through provision of weapons, financial support, and safe passage), *adopted by*, 2022 WL

17370160 (D.D.C. Sept. 30, 2022).

d.     Scope of Office

Plaintiffs must demonstrate that the IRGC-QF's provision of the material support as

described above was at the direction of Iranian officials or agents acting within the scope of their

"office, employment, or agency." 28 U.S.C. § 1605A(a)(1). "The [IRGC-QF] is part of the IRGC,

which is, in turn, an arm of the Islamic Republic of Iran. Those findings are sufficient to satisfy

the scope of office requirement." *Fritz*, 320 F. Supp. 3d at 85; *see also Karcher*, 396 F. Supp. 3d

21

at 55 (concluding the same); *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 60–61 (D.D.C. 2006) (finding that the IRGC is a governmental entity rather than a commercial agent).

> 3.   *Causation*

The final requirement for Plaintiffs is to establish that Iran's conduct was the proximate cause of their personal injuries or deaths. *See Fritz*, 320 F. Supp. 3d at 85. "[T]wo similar but distinct elements" are needed to establish proximate cause: (1) that "the defendant's actions [were] a 'substantial factor' in the sequence of events that led to the plaintiff's injury," and (2) that "the plaintiff's injury [was] 'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *Owens*, 864 F.3d at 794. "In assessing reasonable foreseeability, moreover, the Court must consider 'the broader context' of Iran's conduct." *Fritz*, 320 F. Supp. 3d at 86 (quoting *Owens*, 864 F.3d at 797). Thus, it is not required that Iran "intend[ed] that the victims sustain the specific injuries at issue[.]" *Id.* In the context of a defendant's provision of material support or resources, courts interpret causation broadly:

> Plaintiffs have not offered evidence that either Iran or Syria's support was tied to each of the attacks that caused their injuries. But such a "nexus" is not necessary because funds—and, in certain instances, arms and other support—are fungible, and the FSIA could hardly be interpreted to condition Plaintiffs' recovery on [terrorist groups'] "careful bookkeeping."

*Force*, 464 F. Supp. 3d at 368 (quoting *Kilburn*, 376 F.3d at 1130). A state sponsor of terrorism "may not avoid liability [under the FSIA] for supporting known terrorist groups by professing ignorance of their specific plans for attacks." *Owens*, 864 F.3d at 799.

> a.   EFP Attacks

Plaintiffs have established the requisite level of causation as to all attacks executed by EFPs. The IRGC-QF provided training to select militia groups regarding the use and manufacture of EFPs. *See* Pregent Report at 11. From 2005 through 2011, "there were no other manufacturers,

producers, distributors, or suppliers of [EFPs] other than the Islamic Republic of Iran and its non-state agent and proxy, Hezbollah, and/or IRGC-QF Proxies in Iraq." *Id.* at 11. The IRGC-QF and Hezbollah either supplied EFPs or the materials, direction, and training needed to manufacture EFPs. *See id.* "The IRGC-QF centralized its EFP supply operations to KH and AAH cells, to ensure their proper use against U.S. forces and the minimization of Iraqi casualties." *Id.* at 17.

Courts have previously made such findings, of which this Court will take judicial notice. *See, e.g.*, *Karcher*, 396 F. Supp. 3d at 30 ("[I]dentification of the weapon as an EFP *all but* necessitates the inference that Iran was responsible."); *Lee*, 518 F. Supp. 3d at 483. ("[O]ne of Iran's primary forms of material support to the Special Groups was financing, manufacturing and deploying EFPs."); *Pennington v. Islamic Republic of Iran*, No. 19-cv-796, 2021 WL 2592910, at *4 (D.D.C. June 24, 2021) (finding there was "zero question" that EFPs were coming from Iran); *Neiberger*, 2022 WL 17370239, at *3 (same).

"EFPs were constantly retooled to overcome U.S. defenses that attempted to make EFPs less deadly, indicating that EFPs were intentionally designed to inflict maximum harm on their targets." *Lee*, 518 F. Supp. 3d at 492. It follows that Plaintiffs' injuries were a reasonably foreseeable and intended consequence of Iran's provision of EFPs and EFP training. *See id.* at 494 ("It is clear from Iran's financial support and its provision of evolving and ever-more lethal weaponry to insurgents in Iraq that Iran reasonably anticipated—and indeed, intended—that its support would lead to the death and serious injury of U.S. soldiers."). "[T]he Court concludes that material support or resources to facilitate EFP attacks qualify as material support for attempted extrajudicial killings. Those attempts bring Iran within the terrorist exception to foreign sovereign immunity." *Karcher*, 396 F. Supp. 3d at 58.

b.     Non-EFP Attacks

The Court must assess whether Iran's material support and resources were the cause of the injuries and deaths from the eight non-EFP attacks. "Importantly, Plaintiffs need not demonstrate that [Iran] specifically intended to cause the [attack at issue]; they need only show proximate cause—that is, 'some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.'" *Doe v. Syrian Arab Republic*, No. 18-cv-66, 2020 WL 5422844, at *11 (D.D.C. Sept. 10, 2020) (quoting *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128–29 (D.C. Cir. 2004) (quoting Prosser & Keeton on the Law of Torts 263 (5th ed. 1984))). "[S]ufficient evidence of foreseeability include[s] backing the organization despite knowledge of their violent tactics and encouragement of an escalation of terrorist behavior." *Doe*, 2020 WL 5422844, at *12 (citing *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 394 (D.D.C. 2015)).

Iran provided material support and resources to each of the IRGC-QF proxy groups and al-Qaeda affiliates in Iraq that Iran knew to have carried out violent attacks during the time in question. *See* Pregent Report at 11–12. Specifically, Iran provided training to proxy groups on "particular tactics designed to cause great harm, such as ambushes, mortars, rockets, and IED emplacement." *Roth*, 2023 WL 196577, at *16; *see* Pregent Report at 12. Thus, Iran's support for these terrorist groups was a substantial factor in the sequence of events that resulted in the deaths of eleven servicemembers and injuries to one servicemember from IED and rocket fire attacks. *See Owens*, 864 F.3d at 796–97 (finding Sudan's past material support for al-Qaeda to be a substantial factor in al-Qaeda's embassy bombings, despite multi-year separation between support and bombing and in spite of Sudan's subsequent acts in opposition to al-Qaeda).

Plaintiffs' injuries by these terrorist groups were also a reasonably foreseeable consequence of Iran's conduct, especially considering the broader context of Iran's "comprehensive campaign to deter the United States from maintaining a presence in the Middle East by terrorizing and intimidating coalition forces." *Fritz*, 320 F. Supp. 3d at 86. *See id.* (finding causation where Iran provided material support to terrorist organization and had knowledge of the organization's intent to carry out attacks on coalition forces); *see also Stearns v. Islamic Republic of Iran*, No. 17-cv-131, 2022 WL 4764905, at *51 (D.D.C. Oct. 3, 2022) (finding the plaintiffs' harms "were a reasonably foreseeable consequence of Iran's material support for potentially lethal EFP and non-EFP attacks in Iraq."). Plaintiffs have thus established "some reasonable connection between" Iran's provision of material support and the IED and rocket fire attacks on the victims. *Lee*, 2023 WL 1100711, at *29 (cleaned up). Accordingly, Iran is not entitled to foreign sovereign immunity, and this Court possesses subject matter jurisdiction over Plaintiffs' claims pursuant to the terrorism exception. *See id.* at 28–29.

### B.   Personal Jurisdiction

Under the FSIA, a court has personal jurisdiction over a foreign state whenever service has been properly made. *See* 28 U.S.C. §1330(b). Section 1608(a) sets out the four methods by which service may be made, in ranked order. The first two methods could not be utilized here, given that (1) the parties lack a special service arrangement, and (2) the United States and Iran are not signatories to a service convention. *See Pennington*, 2021 WL 2592910, at *3 (citing 28 U.S.C. § 1608(a)(1)–(2)). Plaintiffs appropriately attempted foreign mailing to Iran pursuant to § 1608(a)(3). *See* Aff. Req. Foreign Mailing, ECF No. 6. However, the Clerk of Court subsequently concluded that service pursuant to § 1608(a)(3) was not possible. *See* Notice (May 14, 2020). Finally, Plaintiffs sought service through diplomatic channels pursuant to § 1608(a)(4).

25

*See* Aff. Req. Foreign Mailing 1, ECF No. 7. On October 27, 2020, the U.S. State Department attempted to deliver the package containing Plaintiffs' documents to the Iranian Ministry of Foreign Affairs by way of the Embassy of Switzerland but was "refused." Return of Service 6, ECF No. 14. Service is deemed to have been made on Iran as of the date of the delivery of the "Diplomatic Note" to the Iranian Ministry of Foreign Affairs. *Id.*; *see* 28 U.S.C. § 1608(c)(2). Plaintiffs have thus effected proper service of process on Iran pursuant to § 1608(a)(4), giving this Court personal jurisdiction over Defendant. *See e.g.*, *Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 108 (D.D.C. 2019) (finding proper service of process under § 1608(a)(4) where Embassy of Switzerland in Iran transmitted documents to the Iranian Ministry of Foreign Affairs despite refusal to accept service).

      C.      <u>Stating a Claim</u>

      Under the FSIA, state sponsors of terrorism "shall be liable . . . for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages." 28 U.S.C. § 1605A(c). "There is almost total 'overlap between the elements of § 1605A(c)'s cause of action and the terrorism exception to foreign sovereign immunity,' . . . and a plaintiff that offers proof sufficient to establish a waiver of sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of law." *Salzman v. Islamic Republic of Iran*, No. 17-cv-2475, 2019 WL 4673761, at *15 (D.D.C. 2019) (quoting *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017)) (cleaned up). However, § 1605A(c) requires plaintiffs to individually demonstrate that they "are themselves U.S. nationals, members of the armed services, or government employees." *Force*, 464 F. Supp. 3d at 369. Each Plaintiff here is a U.S. citizen, U.S. national, or federal government employee. *See*

Proposed Findings ¶¶ 69–743. Thus, Plaintiffs have sufficiently stated a claim. *See Salzman*, 2019 WL 4673761, at *15.

       D.    <u>Liability</u>

The Court has no occasion to calculate damages on this motion, which only seeks judgment as to liability.

## IV.    CONCLUSION

For the reasons stated above, the Court recommends GRANTING Plaintiffs' Motion for Default Judgment as to liability in accordance with the findings herein.

## V.    REVIEW BY THE DISTRICT COURT

Under the provisions of Local Rule 72.3(b) of the U.S. District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within fourteen days of the party's receipt of this Report and Recommendation. LCvR 72.3(b). The written objections must specifically identify the portion of the report and/or recommendation to which objection is made and the basis for such objections. The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140, 144–45 (1985).

Date: June 27, 2023

                                   _____
                                   ZIA M. FARUQUI
                                   UNITED STATES MAGISTRATE JUDGE