**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALL PLAINTIFFS REPRESENTED ) | |
| BY JOHN DRISCOLL ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | |
| v. ) | No. 1:20-cv-00622-EGS |
| ) | |
| ISLAMIC REPUBLIC OF IRAN ) | |
| ) | |
|     Defendant. ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT**
**OF FSIA DAMAGES AWARDS**

## I.      INTRODUCTION

In evaluating the Plaintiffs' proof of damages, the Court may "accept as true the plaintiffs' uncontroverted evidence." *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 100 (D.D.C. 2000); *Campuzano v. Islamic Republic of Iran*, 281 F.Supp.2d 258, 268 (D.D.C. 2003). Further, Plaintiffs may establish proof of damages by affidavit. *Weinstein v. Islamic Republic of Iran*, 184 F.Supp.2d 13, 19 (D.D.C. 2002). In this case, the Islamic Republic of Iran has not entered its appearance or otherwise defended. The Plaintiffs' damages submissions herein will be uncontroverted.

On August 11, 2023, this Court ordered the Plaintiffs to file their Motion for Default Judgment as to Damages in accordance with the FSIA damages framework established in *Estate of Heiser v. Islamic Republic of Iran,* 406 F. Supp. 2d 229 (D.D.C. 2006) (awarding $2.5 million for siblings of deceased victims, $5 million for parents, and $8 to $12 million for spouses), and applied in *Pennington v. Islamic Republic of Iran*, No. 19-cv-796, 2022 WL 168261 at *6 (D.D.C.

1

Jan. 19, 2022) (same, and halving these sums for the siblings, parents, and spouses of wounded victims). (Dkt. 44).

## II.  FOREIGN SOVEREIGN IMMUNITIES ACT DAMAGES

### A.  General Damages Overview

Damages available under the Foreign Sovereign Immunities Act ("FSIA") "include economic damages, solatium, pain and suffering, and punitive damages.  28 U.S.C. § 1605A(c). Surviving Soldiers can recover economic losses stemming from their injuries, along with damages for their pain, suffering, emotional injuries, and mental anguish. Deceased Soldiers' Estates can recover economic losses stemming from each Soldier's wrongful death. The Estates can also recover damages for pain and suffering if the Soldier experienced pain and suffering prior to succumbing.  *See Gates v. Syrian Arab Republic,* 580 F. Supp. 2d 53, 73-74 (D.D.C. 2008). Family Members of both surviving and deceased Soldiers can recover so-called "solatium" damages for their emotional injuries associated with their Soldier's severe personal injuries or death.  Finally, all plaintiffs can recover punitive damages.  *See Valore v. Islamic Republic of Iran,* 700 F. Supp. 2d 52, 83 (D.D.C 2010).

This Court has held that it must, to the extent practicable, take pains to "ensure that individuals with similar injuries receive similar awards."  *Neiberger v. Islamic Republic of Iran*, No. 1:16-cv-02193, 2022 WL 17370239, at *23-24 (D.D.C., Sept. 8, 2022); *Peterson v. Islamic Republic of Iran,* 515 F. Supp. 2d 25, 54 (D.D.C. 2007).  Courts in this district have established a "baseline" for damages awards for FSIA personal injury and wrongful death cases, which originated in the seminal *Estate of Heiser v. Islamic Republic of Iran* case, 466 F. Supp. 3d 229 (D.D.C. 2006) case.  *See also Neiberger*, 2022 WL 17370239, at *23-24 (D.D.C., Sept. 8, 2022),

*citing Schooley v. Islamic Republic of Iran*, No. 17-cv-1376, 2019 WL 2717888, at *74 (D.D.C. June 27, 2019).

This "baseline" for awards to injured Soldiers, their Estates, and/or the solatium Family Members can be adjusted above and below the "baselines" set by precedent in this district, depending on the circumstances of an individual claim. In fashioning damages awards under the FSIA, courts may look to expert testimony and prior awards for comparable injuries to determine the appropriate amount of compensatory damages. *Braun v. Islamic Republic of Iran,* 228 F. Supp. 3d 64, 82 (D.D.C. 2017). Plaintiffs may establish the necessary proof for damages through affidavits. *Kim v. Democratic People's Republic of Korea,* 87 F. Supp. 3d 286, 289 n.1 (D.D.C. 2015).

In this Memorandum with attachments, Plaintiffs will only specifically discuss individual arguments for "upward enhancements." In the absence of specific reference to individual Plaintiffs, and consistent with this Court's Order, Plaintiffs assume that the so-called "*Heiser* framework" will apply. (Dkt. 44). To this end, Plaintiffs attach hereto and incorporate herein by reference as Exhibit G their itemization of requested damages awards for All Plaintiffs Represented by John Driscoll. And because of the greater than 300 total Plaintiffs involved in this litigation, Plaintiffs attach hereto and incorporate herein by reference as Exhibit H the Exhibits for All Soldier and Estate Damages Claims, segregated by Soldier (and their family members) and Estates (and the family members).

### B. Expert Reports

#### 1. Dr. Francis McGuigan, Orthopedic Surgeon

For analyses of living Soldiers' physical injuries, pain and suffering, impairment, and disability, Plaintiffs submitted the medical and orthopedic reports of long-time board-certified

orthopedic surgeon, Dr. Francis McGuigan, who is currently a Professor of Orthopaedic Surgery at Georgetown University Hospital in Washington, D.C. Dr. McGuigan's curriculum vitae has been marked for identification as Exhibit A. In addition, attached to this Memorandum as Exhibit B is Dr. McGuigan's Report regarding the unprecedented nature of EFP injuries—which consistently create a spectrum of injuries unprecedented in the history of warfare---and cutting-edge science concerning "conscious pain and suffering" even for those Soldiers who ostensibly "died instantly," the latter part of which is intended to apply across-the-board to all deceased Soldiers' Estate claims.

Dr. McGuigan has had decades of experience in treating Military-related injuries, including but not limited to traumatic amputations and the complications associated with such extreme injuries. This experience includes being the Commander of the Medical Corps of the United States Navy from 1986 to 2006 and treating literally hundreds of extreme traumatic battlefield-related orthopedic injuries of all types and kinds.  Dr. McGuigan presently is a peer reviewer for two prestigious professional journals within his sphere and expertise, major traumatic injuries.  Dr. McGuigan has presented at orthopedic conventions amongst his peers worldwide on topics directly germane to injury issues in this case, including wartime injuries and infections.  [Exhibits A and B].

### 2.  Dr. Sarah Erb Kleiman, Clinical Psychologist

For analyses of living Soldiers' psychological and Post-Traumatic Stress Disorder ("PTSD") injuries, Plaintiffs submitted the reports of Drs. Jonathan Green and Sarah Kleiman, both of whom are clinical psychologists currently affiliated with the Boston V.A. Research Institute and, within that Institute, the PTSD Clinic for Veterans.  Dr. Kleiman is one of the leading and cutting-edge researchers concerning PTSD and soldiers returning from the post-Saddam

Hussein Iraqi theatre, the precise group of Plaintiff Soldiers in this case. Dr. Kleiman is a peer-reviewed author of many articles and studies that are directly pertinent and relevant to each surviving Soldier's PTSD and other emotional damages in this lawsuit, and how those diagnoses and conditions factor into gainful employment and thus into economic damages analyses. Dr. Kleiman's curriculum vitae has been marked for identification as Exhibit C.

### 3. Dr. Scott Beveridge, Vocational Rehabilitation

For analyses of how the living Soldiers' physical and psychological injuries affected their possible employment, Plaintiffs submitted the vocational rehabilitation reports of Dr. Scott Beveridge, currently an Assistant Professor and the Director of the Forensic Rehabilitation Program at George Washington University in Washington D.C. Dr. Beveridge also currently participates in the pro bono University Rehabilitation Services in Baltimore, Maryland, and assists veterans with rehabilitation and career counseling services. Dr. Beveridge's curriculum vitae has been marked for identification as Exhibit D. Dr. Beveridge's detailed Reports assess how each individual surviving Soldier's physical and emotional limitations, disabilities and restrictions affect his abilities to function in the current workplace in gainful employment.

### 4. Donald Frankenfeld, Forensic Economist

For analyses of all Soldiers' economic losses and losses of earnings capacity, Plaintiffs submitted the economic reports of Donald Frankenfeld, a Harvard- and Yale-trained forensic economist who has famously testified more than any other forensic economic expert before the September 11 Victim Compensation Fund. Frankenfeld's curriculum vitae has been marked for identification as Exhibit E. Frankenfeld's explanatory background Report has been marked for identification as Exhibit F.

### C. Wrongful Death and Surviving Soldier Economic Damages

The Estates of the Deceased Soldiers may seek economic damages for lost earnings and lost earnings capacity suffered because of the Soldier's death. *Neiberger*, 2022 WL 17370239, at *28; *See also Estate of Hirshfeld v. Islamic Republic of Iran,* No. 15-cv-1082, 2018 WL 4178163, at *22 (D.D.C., Aug. 30, 2018). Generally, calculations that rely upon reasonable and well-founded assumptions about the likely earnings of a Soldier throughout his anticipated lifetime are relevant to the inquiry. *Estate of Hirshfeld*, 2018 WL, at *22. Generally, loss of accretion damages is calculated by estimating a decedent's future earnings potential based on the individual's work and education and adjusting that amount to account for inflation, rise in productivity, job advancement, and personal consumption. *Id*. at *22, *citing Stethem v. Islamic Republic of Iran,* 201 F. Supp. 2d 78, 87 (D.D.C. 2002).

The report of an economist may "provide a reasonable basis" for determining the amount of economic damages due under §1605A(c). *Id.*, *citing Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *see also Neiberger*, 2022 WL 17370239, at *28. Lost earnings are not difficult to quantify, but they must be supported by competent evidence, or they will be denied. *Braun*, 228 F. Supp. 3d at 83. Likewise, a surviving Solder's economic loss and loss of earnings capacity can be calculated by a qualified economist utilizing sound assumptions and economic data, as described above.

Frankenfeld explained in Exhibit F that there are three aspects to each living Soldier's economic analysis: (1) earnings capacity; (2) present value of each Soldier's lifetime annual fringe benefits, including health care; and (3) present value of each Soldier's retirement benefits. To get to a present value for components (2) and (3), Frankenfeld used a national, credible assumed death age for each Soldier.

Regarding the deceased Soldiers, Frankenfeld used the same components as outlined above, but also took into consideration "personal consumption," that is, an assumed amount that the Soldier's family would spend on day-to-day life expenses in any event. Otherwise, Frankenfeld's analyses of the Estate claims for economic loss are very similar to the surviving Soldiers. [Exhibit F].

### D.  Survivor and Wrongful Death Pain and Suffering

Courts in this district determine pain and suffering awards for injured Soldiers based on factors including the severity of the pain immediately following the injury, the length of the hospitalization, and the extent of the impairment that will remain with the victim for the rest of his life. *Neiberger,* 2022 WL 17370239, at *23-24; *Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 259 (D.D.C. 2014); *Barry v. Islamic Republic of Iran*, 410 F. Supp. 3d 161, 180 (D.D.C. 2019). Surviving Soldiers who suffer serious physical injuries tend to receive a "baseline" award of $5 million, to be adjusted upward in circumstances, such as in the present case, where the Soldiers have suffered especially serious, unique, and egregious injuries due to the EFP (and IED) attacks and the mechanism of the explosions caused by an EFP (and IED) detonation. Those surviving Soldiers who suffer exceptionally serious injuries may receive $7 million or more. *See generally,* *Owens*, 71 F. Supp. 3d at 259.

For wrongful death claims for pain and suffering experienced before the death of a deceased Soldier, courts in this district analyze the nature and extent of a Soldier's proven or inferred conscious pain and suffering between the time of the terrorist act and his death. *Peterson*, 515 F. Supp. 2d at 53; *Owens,* 71 F. Supp. 3d at 259-60. Where the Soldier endured extreme pain and suffering for a period of several hours or less, courts in this District have rather uniformly awarded $1 million as a "baseline" for such damages. *Peterson,* 515 F. Supp. 3d at 53-54; *Owens,*

71 F. Supp. 3d at 260.  In fact, this Court has concluded that conscious pain and suffering lasting for even less than one minute before death is compensable under the FSIA. *Neiberger*, 2022 WL 17370239, at *26.

As referenced above, Dr. McGuigan's Report explains that even where a given Soldier ostensibly "died instantly," recent peer-reviewed studies indicate there still is a (relatively) short period of time of "conscious pain and suffering." On behalf of all wrongful death Estates where there is no specific record or eyewitness evidence of such, Plaintiffs seek a "conscious pain and suffering award" of $500,000.00.[1] [Exhibits B; G].

For the 23 surviving Soldiers, their declarations, family member declarations, the various exhibits and reports submitted on their behalf, and the reports of the Plaintiffs' retained experts noted above---Dr. McGuigan (orthopedic surgeon) and Drs. Green and Kleiman (clinical psychologists)---are submitted for the Court's consideration of their pain and suffering damages awards. [Dkt. 27-1; Second Amended Exhibit List (being filed contemporaneously with this Motion)].

### E.  Solatium Damages for Immediate Family Members

Solatium damages under the FSIA are functionally the equivalent of intentional infliction of emotional distress damages.  It is a form of damages intended to compensate persons, typically close and immediate Family Members in FSIA cases, for mental anguish, bereavement, and grief that those with a close relationship to a deceased Soldier experience, as well as the harm caused by the loss of the Soldier's society and comfort.  *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29 (D.D.C. 1998); *Roth v. Islamic Republic of Iran,* 76 F. Supp. 3d 379, 402 (D.D.C. 2017).

---

[1] In addition, there are additional, limited instances where there was record or eyewitness evidence of "conscious pain and suffering." Those Estate claims will be detailed, *infra*, in this Memorandum.

Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish. *Roth,* 76 F. Supp. 3d at 403.  This Court has defined "solatium" as "compensation; esp., damages allowed for hurt feelings or grief, as distinguished from damages for physical injuries." *Neiberger*, 2022 WL 17370239, at *23, *citing Solatium*, Black's Law Dictionary (11th ed. 2019).

Unlike traditional intentional infliction of emotional distress claims, "[o]ne . . . need not be present at the time of a terrorist attack upon a third person to recover [under § 1605A(c)] for severe emotional injuries suffered as a result." *Neiberger*, 2022 WL 17370239, at *30, *citing Valore*, 700 F. Supp. 2d at 80. This exception is unique to acts of terrorism because "the 'intent to create maximum emotional impact,' particularly on third parties, is terrorism's raison d'etre." *Heiser II*, 659 F. Supp. 2d at 27 (quoting *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 9 (D.D.C. 2000)). Indeed, "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8 (D.D.C. 2009), *citing Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)).

This Court has noted that upward departures in solatium damages are typically reserved for cases with aggravating circumstances and that it may consider evidence establishing an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief, or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing. *Neiberger*, 2022 WL 17370239, at *31, *citing Greenbaum v. Islamic Republic of Iran*, 451 F. Supp.  2d 90, 108 (D.D.C. 2006) and *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26-27 (D.D.C. 2011).

Finally, and because some of the Solatium Plaintiffs are not direct parents or siblings of the Soldiers involved in this case, it is noteworthy that this district has held that the "immediate family" requirement includes step- or half-siblings and those claimants who are the functional equivalents of immediate family members. *Valore*, 700 F. Supp. 2d 52, 79 (D.D.C. 2010).

### F.  All Plaintiffs Are Entitled to Punitive Damages Under the FSIA

Punitive damages are explicitly made available under § 1605A's cause of action to punish and deter foreign states from engaging in or materially supporting terrorism. *Roth v. Syrian Arab Republic*, No. 1:14-cv-01946, 2018 WL 4680270, at *16 (Sept. 28, 2018). This is so even for terror attacks which preceded the 2008 amendment to the FSIA providing for punitive damages. *Neiberger*, 2022 WL 17370239, at *37, *citing Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1608, 206 L. Ed. 2d 904 (2020). All Plaintiffs seek an award of punitive damages in this matter. In FSIA cases in this district, courts consider the following four factors in determining the appropriate amount of a punitive damages award: (1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Neiberger,* 2022 WL 17370239, at *37, *citing Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008).

As to the first two factors, this Court concluded that Iran "supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized" JAM and AQI—"known terrorist organization[s]"—in the form of weapons, training, safe haven, planning, and financing to JAM fighters, resulting in harm to innocent people in a nature that is "the most heinous." *Neiberger,* 2022 WL 17370239, at *37, *citing Valore*, 700 F.Supp.2d at 87-88. This Court also concluded that as to the third factor, given Iran's "longstanding pattern and policy" supporting terrorist organizations that aim to harm Americans, "the need for deterrence [is] clear." *Hekmati*

*v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 166 (D.D.C. 2017). Finally, this Court concluded that "Iran is a sovereign and has substantial wealth." *Neiberger,* 2022 WL 17370239, at *37-38, *citing Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 25 (D.D.C. 2016).

Plaintiffs are of course aware and respectful of this Court's determination in *Neiberger* that "the most sensible amount of punitive damages here is a sum equivalent to compensatory damages." *Neiberger,* 2022 WL 17370239, at *39.  Despite this awareness, Plaintiffs respectfully suggest that the Court should calculate the amount of punitive damages by multiplying the total compensatory damages (of all Plaintiffs) times a multiplier of three.  "The multiplier approach is especially appropriate when the defendants "did not directly carry out the attack, but funded [a proxy actor]…," as is the case here. *Taitt v. Islamic Republic of Iran*, 2023 WL 2536518, at *23 (Mar. 16, 2023).  Moreover, using total compensatory damages times a multiple of three is the "usual practice in state-sponsored terrorism cases." *Taitt*, 2023 WL 2536518, at *24*, citing Roth,* 2018 WL 4680270, at *17.

## III.   INDIVIDUAL SOLDIER, ESTATE, AND SOLATIUM PLAINTIFFS' REQUESTS FOR UPWARD ADJUSTMENTS AND/OR ESTATE CLAIMS FOR CONSCIOUS PAIN AND SUFFERING

### A.  Estate of Michael Anaya

On 4-12-2009, at approximately 1:00 a.m., Anaya was riding in the turret as the gunner in a Mine Resistant Ambush Protected ("MRAP") vehicle when an EFP detonated, thus causing his death hours later.   [Exhibits 245; 722]. At the blast scene, medics found Anaya stuck standing up in the turret.  They assessed Anaya as "coming to" and "aware" and that he was "relatively responsive to questions during this time period." He had suffered severe shrapnel wounds to the gluteus maximus and right hamstring. At approximately 2:15 a.m., Anaya was put into a helicopter

intending to transport him to an Army hospital.  Then the medics noticed that he had no pulse, no blood pressure, was not breathing, and his pupils were fixed and dilated.  [Exhibits 245; 722].

The Estate of Michael Anaya respectfully requests a conscious pain and suffering damages award in the amount of $5,000,000.00 for the 75 minutes of suffering between the time of the EFP attack and his death.

### B.  Bryan Anderson

On 10-23-2005, Anderson was driving a HUMVEE vehicle when an EFP detonated, thus causing him grievous personal injuries. Anderson sustained above-the-knee ("ATK") amputations of both of his legs, along with a left arm below-the-elbow ("BTE") amputation.  [Exhibits 266; 268; 429 (including photographic Exhibits therein)].

Anderson also had a "Bogota Bag" attached to close his abdominal wounds which had been caused by the exploding shrapnel fragments. He also had a significantly sized fragment in his liver.  Anderson also sustained a right lung collapse, or pneumothorax, because of the EFP attack, along with various fractures in his right (dominant) hand.  [Exhibits 267; 268; 429; 477; 478].

Anderson was admitted to Walter Reed Army Hospital for approximately one month recuperating from his injuries.  During this time, Anderson developed a sacral decubitus ulcer on his tailbone/sacrum region. He also had multiple "debridement" (or "cleaning out") procedures of his amputated stumps and repairs made to his multiple right-hand fractures, tendon and ligament damage in attempts made to salvage his right-hand function and usage. [Exhibits 267; 268; 429; 477; 478].

Another result of Anderson's BTK bilateral leg amputations was the painful development of heterotopic ossification, or the abnormal growth of bone in unlikely areas, in Anderson's case, in the soft tissue areas of his two leg stumps. [Exhibits 267; 268; 429; 477; 478].

A source of continuing pain and discomfort for Anderson is so-called bilateral "phantom pain." This phantom pain comes on approximately two times per week in the area where his lower legs and feet should be. Although most episodes are short-lived, the pain is intense. However, periodically, the phantom pain will come on in intense painful episodes every 20 minutes all day long, in which case Anderson does not get any sleep and endures a very bad period. He does not take medications for the phantom pain symptoms. [Exhibits 267; 268; 429; 477; 478].

Because of the extreme and grievous nature of Anderson's injuries, he respectfully requests a pain and suffering upward award of $15,000,000.

### C.  John Blickenstaff

On 8-4-2008, Blickenstaff was riding in a HUMVEE vehicle when an EFP detonated, thus causing him grievous personal and psychological injuries. All told, Blickenstaff underwent over 16 surgeries and was hospitalized for at least 65 days to treat his injuries. [Exhibits 109; 405; 711; 712; 713].

Blickenstaff has a permanent "foot drop" and other nerve damage in his right foot and leg which causes his right big toe to atrophy and his other toes to "claw." He does not have a right shin bone due to the extreme damage to the right calf caused by the incident. To this day, Blickenstaff experiences daily sudden onset of severe swelling of his right leg. When this happens, it becomes very difficult for Blickenstaff to bear weight and walk. [Exhibits 109; 405; 711; 712; 713].

Blickenstaff experienced blurred vision episodes after the attack. These episodes coincided with severe headaches accompanied by nausea, photophobia (light sensitivity) and phonophobia (fear of or aversion to loud sounds). The headaches developed twice per week. He also experienced tinnitus and left-sided hearing loss. These symptoms are all medically consistent

13

with Blickenstaff having suffered a Traumatic Brain Injury ("TBI").  [Exhibits 109; 405; 711; 712; 713].

To this day, Blickenstaff experiences cellulitis (potentially serious bacterial skin infection).  These episodes are very painful and require occasional hospital admissions or emergency room visits.  [Exhibits 109; 405; 711; 712; 713].

The orchiotomy (removal of his testicles) was a very physically and emotionally traumatic injury for Blickenstaff.  Not only can Blickenstaff not have any more children, but this procedure has resulted in a significant decrease in his testosterone levels and thus has detrimentally affected his sex life with his wife.  He takes daily testosterone to compensate for the loss of his testicles. [Exhibits 109; 405; 711; 712; 713].

Because of Blickenstaff's physical injuries, he takes 600 milligrams of Ibuprofen daily and Tramadol for his nerve-related pain. He chooses not to take narcotic pain medications as they make him feel weird and "off center."  Despite the levels of Ibuprofen constantly in his system, Blickenstaff rates his average daily pain level at a 6/10 (with 0 being no pain and 10 the most pain he has ever experienced) when he takes the Ibuprofen; and 8/10 when he does not.  Thus, Blickenstaff is in constant, daily pain.  Dr. McGuigan opined that Blickenstaff will require occasional narcotic pain medications and the Ibuprofen regimen of pain medications for the remainder of his life. [Exhibits 109; 405; 711; 712; 713].

Blickenstaff also developed a series of emotional/psychological injuries, including Post-Traumatic Stress Disorder ("PTSD") and adjustment disorder. His PTSD symptoms include anxiety, hypervigilance, agoraphobia, and hostility. He takes Seroquel nightly for chronic insomnia. He experiences anxiety and depression.  His TBI is manifested by tinnitus, a four-cranial nerve injury, and migraine headaches. He suffers from headaches approximately twice a

week.  Due to a fourth cranial nerve injury, he has a strabismus (a condition of the eyes resulting in a squint) which is corrected using contact lenses and eyeglasses. [Exhibits 109; 405; 711; 712; 713].

Because of the extreme and grievous nature of Blickenstaff's physical and psychological injuries, he respectfully requests a pain and suffering award of $10,000,000.

### D.  Mirtha Ponce, surviving spouse of Roland Calderon

Mirtha Ponce is still deeply in love with her departed husband, Roland Calderon.  The two formed an inseparable bond just as Roland was enlisting in the Army in the summer of 2003.  They were married by that December, and she quickly became pregnant with their twin boys, Allen and Adriel, who were born on June 30, 2005.  [Exhibit 6].

For Mirtha, little did she know that when she hugged and cried and said "goodbye" to her husband, best friend and confidant, Roland, when he got on the plane and deployed to Iraq on November 30, 2005, that would be the last time she would see him alive.  Between his deployment and the day of his death, Roland called her from Iraq on every Wednesday, but not Wednesday, April 12th, 2006.  On that day, something seemed "off" to Mirtha, not the least of which was the missing phone call from Roland.  It was at 10:00 p.m. that evening when the two Army Soldiers walked up to her front door, walked into her home, and announced that Roland had been killed. [Exhibit 6].

Mirtha passed out---lost consciousness---right there in her living room.  Then she had to call Roland's Mother, Rosa, and deliver the tragic news to her.  When Roland's funeral finally occurred, Mirtha insisted to the funeral director that he needed to open the casket momentarily, just so she could see for herself that it was in fact Roland, that this was in fact the reality of her life.  When he did so, she could not even recognize him by his face, as that had been blown to bits

by the EFP.  Instead, she had to identify her dead and blown-up husband by observing certain birth marks and markings on his body. [Exhibit 6].

Although it has been more than 16 years since Roland's murder, Mirtha is still very much affected by his loss.  Just preparing her Declaration for this legal proceeding was very difficult for her and brought back to the surface many emotions and memories.  But the first five years were the most difficult for her and the twins.  The twins needed a father figure, and it was heartbreaking for Mirtha to try and explain to her two dear children that their Daddy could not be with them physically. Mirtha and the twins have gone on in the years since the EFP attack as best they can under the circumstances dictated to them, but even to this day, Mirtha misses her husband, best friend, and confidant immensely. [Exhibit 6].

Because of the extreme nature of Mirtha Ponce's solatium injuries, she respectfully requests a solatium damages award of $10 million.

### E.  Joshua Cope

On 11-13-2006, Cope was riding in a HUMVEE vehicle when an EFP detonated, thus causing him grievous personal and psychological injuries. Cope sustained an above-the-knee amputation of his left leg and a through-the-knee amputation of his right leg. He also sustained a major injury to his right (dominant) hand, which almost had to be amputated in the field.  His right hand and wrist area sustained lacerations and fractures which resulted in severe peripheral nerve injuries and a permanent paralysis of his right hand.  His left hand sustained penetrating injuries to the palm and burn injuries to the ring and small fingers. All four extremities were contaminated with shrapnel.  He was resuscitated with various blood products with transfusions.  He underwent various "washout" (of wounds) procedures during the first several days after the attack.  He had various surgeries on both of his hands in attempts to piece them back together in a functional

manner.  In addition, Cope can no longer use his left thumb. [Exhibits 39; 40; 211; 310; 547; 548; and 549].

There were infectious complications as well.  He also experienced a pulmonary embolism and developed pneumonia, and had to be on Coumadin, a blood thinner, for six months. His extreme pain was controlled by a patient-controlled anesthesia pump and nerve catheters.  He used a wheelchair for ambulation due to the loss of function in both of his hands. Cope was finally discharged from Walter Reed Army Hospital on 1-3-2007. [Exhibits 39; 40; 211; 310; 547; 548; and 549].

Cope was transferred to Balboa Naval Hospital in San Diego for further rehabilitation in 2007.  He developed "phantom pain" in the areas where both of his legs would be were it not for the double amputations.  He also developed heterotopic ossification, or the abnormal growth of bone in areas where human tissue is, in the "stump" areas of what remained of both of his legs.  Throughout the 16+ years since the EFP attack, Cope has had to go to the emergency room on dozens of occasions for his always-present phantom and nerve pain. [Exhibits 39; 40; 310; 547; 548; and 549].

Cope also developed chronic low back and neck pain.  His present pain levels are a constant 6/10, with "10" being the worst pain he has ever experienced.  He has been seeing a chiropractor on a once-per-week basis.  Even though he takes Gabapentin for his phantom and nerve pain, he rates his high point of nerve- and phantom-related pain as a 9/10, with his average pain level being a constant 7/10.  [Exhibits 39; 40; 310; 547; 548; and 549].

Although Cope has been fitted multiple times with prosthetic devices for his legs in the years since the EFP attack, because of the above-the-knee nature of the left leg amputation and his multiple problems and disabilities associated with both of his hands, he cannot use prosthetic

17

devices to ambulate and is essentially 100% wheelchair bound. He requires a constant and permanent caregiver to provide for his activities of daily living ("ADLs"), including hygiene, going to the bathroom, dressing, grooming, eating, pain management, medications reminders, recreational activities, and transferring. [Exhibits 39; 40; 310; 547; 548; and 549].

Cope was diagnosed with Post-Traumatic Stress Disorder ("PTSD") with anxiety as a major feature, and Traumatic Brain Injury ("TBI") with insomnia, short-term memory loss, flashbacks, and depression as major features. He had no psychological issues or problems prior to the EFP attack. He experiences flashbacks to the EFP blast, nightmares, waking up with cold sweats, tinnitus (ringing of the ears) and trouble concentrating because of the EFP attack. He has developed a major drinking problem in the years after the attack and has required some in-patient treatment to address this problem. Years after the attack, he still feels uncomfortable in crowds or being in "close quarters." Loud sounds startle him and make him think he is going to be blown up. He is much more irritable than he used to be. He has for years been taking Venlafaxine, Gabapentin, and medical marijuana for PTSD and TBI symptoms. He currently is in counseling to address these issues. Cope's PTSD assessment was categorized at an "extreme level." [Exhibits 39; 40; 310; 547; 548; 549].

All in all, Cope sustained lifetime and permanent disabilities due to his original injuries sustained in the EFP attack and the various surgical measures taken to correct them. He has reached Maximum Medical Improvement. He has undergone at least 10 surgeries and has been hospitalized for at least 52 days for his physical injuries and at least 61 days for his substance abuse rehabilitation. He requires a permanent and constant caregiver for his ADLs. [Exhibits 39; 548].

Because of the extreme and grievous nature of Cope's physical and psychological injuries, he respectfully requests a pain and suffering award of $12,000,000.

### F.  Erica Cope, former spouse of Joshua Cope

Erica was married to Cope at the time of the 11-13-2006 EFP attack. They were married on 1-3-2003. They separated in 11-2014 and were divorced in 4-2015 because of the effects of Josh's physical and emotional injuries he sustained in the attack.  [Exhibit 40].

On 11-13-2006, Erica had just gotten ready for work when she heard a knock on the door.  Two Soldiers came into her house and told her that Josh had been involved in an explosive attack, that Josh's injuries were catastrophic, that he would never be the same, and that various limbs were lost.  [Exhibit 40].

The Army flew Erica and Josh from Germany to Walter Reed Medical Center for further medical treatment.  Josh went through many surgeries during the next several months. Erica and L.K.C. (minor child) stayed on the Walter Reed campus, although most of the time Erica ended up sleeping next to Josh in a chair.  Her parents and brothers took turns watching over L.K.C.  After several months, Josh was transferred to Balboa Naval Hospital in San Diego. They lived there for the next 18 months.  Erica drove Josh to various medical and therapy appointments daily.  At times, L.K.C. would have to come with them, as there was no daycare for wounded Soldiers at that time.  She had long since lost her job and income in Germany.  [Exhibit 40].

By the start of 2008, Josh was discharged from the Army. He was tired of hospitals, appointments, therapy sessions, and not being able to find a set of prosthetic devices with which he could comfortably walk. They moved into their new house in Florida.  Josh tried hard to get involved in hobbies, organizations, college, and other activities, but his PTSD and TBI symptoms, along with his sheer pain from his physical injuries, would constantly interfere with those

efforts.  He would get very frustrated and withdraw from everyone, including Erica. By this time,

they had had their second child, C.C., and their third child, B.C.  Although Josh loved his children,

he was never able to raise them or connect with them as well as he would have wanted because of

his physical and emotional injuries. [Exhibit 40].

Between the attack and their divorce in 4-2015, Erica had to raise the three children on her

own, take care of the family finances, and caretake for Josh.  Josh would constantly spend much

more money than they had, thus causing them to go into more debt than they as a family could

reasonably handle.  He tried to get help for this, but it did not work.  He began drinking even more

heavily, but the drinking then was accompanied by pure rage.  Josh had just given up hope after

years of intense physical and emotional pain, along with never being able to be fit with two

prosthetic devices with which he could comfortably walk.  She begged for him to get more help

and counseling, but he refused, saying that he had already tried "everything."  [Exhibit 40].

During these years, Erica tried to provide a normal household and life for the three children;

however, with Josh drinking, yelling, screaming, acting out, becoming situationally violent, and

the like, she knew that someone would be killed if she did not take the kids and leave the

household.  Josh would turn over furniture, break glass, and punch things in his path.  She left in

11-2014 and felt very guilty about doing so, thinking to herself that Josh might commit suicide if

she left.  But he once again refused to get help, and the two officially divorced in 4-2015.  [Exhibit

40].

Erica has changed markedly in the years since the EFP attack. Although she is grateful that

she was there to help Josh and be by his side when he needed it most, it breaks her heart that his

PTSD and TBI made it impossible for them to stay together as a married couple and therefore as

a family. [Exhibit 40].

Because of the extreme nature of Erica Cope's solatium injuries, she respectfully requests a solatium damages award of $12 million.

### G.  Duncan Crookston

Crookston was blown up in an EFP attack on 9-4-2007 in which he lost all four extremities and sustained severe burns over 70% of his body, including his face and head. His left arm had been amputated at his left bicep; his right arm, at the mid-forearm. Both of his legs were amputated just above the knees. Incrediby, he survived for almost five months before succumbing to his injuries and dying on 1-25-2008, over four and one-half months after the attack. The night prior to his passing, Crookston experienced a 108-degree fever due to severe sepsis and infection. [Exhibits 376; 377; 662]. During those five months, Crookston underwent multiple surgeries and experienced many infections, but through it all managed to communicate with family members and Army comrades. [Exhibits 376; 377; 662].

The Estate of Duncan Crookston respectfully requests a conscious pain and suffering damages award in the amount of $8,000,000.00 for the extreme pain and suffering between the time of the EFP attack and his death.

### H.  Leesha Crookston, mother of Duncan Crookston

Leesha Crookston is the mother of Duncan Crookston. The above comments concerning the conscious pain and suffering of Duncan Crookston are incorporated by reference here. Leesha took a leave of absence from her full-time employment to spend the last five months of Duncan's life with him at Brook Army Medical Center in San Antonio, Texas. [Exhibit 662].

Leesah described the sadness, anger, and depression she and other Crookston family members experienced during those five months before Duncan passed and then afterwards as well.

She had to experience another son's attempted suicide as well brought on by Duncan's extreme suffering and death.  Leesha is still reeling from these events to this day. [Exhibit 662].

Because of the extreme nature of Leesah Crookston's solatium injuries, she respectfully requests a solatium damages award of $10 million.

## I. Louis Dahlman

On 5-18-2007, Dahlman was riding in a HUMVEE vehicle when an EFP detonated, thus causing him grievous personal and psychological injuries.  Dahlman had his jawbone (mandible) almost completely blown off in the attack. All but one of his bottom teeth were blown away as well.  He had much of his facial skin blown up or burned up in the blast and had extensive shrapnel blown into what was left of his face, both of his arms, and both of his legs.  Eventually, the health care providers connected him to a percutaneous endoscopic gastrostomy tube ("PEG" tube) for feeding.  [Exhibits 62; 335; 605; 606].

Before returning stateside, Dahlman was given an emergency tracheotomy with irrigation and debridement of his many facial wounds.  He sustained a Traumatic Brain Injury ("TBI").  He was transported to Brooke Army Medical Center ("BAMC") in San Antonio, Texas, where in late 5-2007 he underwent his first of more than 17 surgical procedures which attempted to rebuild his jaw and face.  As many as five of these surgical procedures lasted greater than 12 hours.  [Exhibits 62; 335; 605; 606].

Several of these surgeries involved grafting attempts, with both the fibula bones (sometimes referred to as the "calf bones") and his pectoral muscles used as grafting sources.  In so doing, the surgeons broke Dahlman's clavicle ("collarbone") on at least three occasions.  The collarbone fractures necessitated reconstructive surgeries to put the clavicle back together again ("clavicle osteotomies").  The fibula grafting procedures caused complications and pain.  In 8-

2010, Dahlman had prosthetic teeth put into his mandibular reconstruction.  [Exhibits 62; 335; 605; 606].

Several of these reconstructions of the face and jaw procedures failed because of infection.  Others simply did not "hold" well because of "dehiscence."  Still others left defects in the grafting sites (in the collarbone and fibula areas of Dahlman's person).  [Exhibits 62; 335; 605; 606].  At the time of the attack and after each of the 17 or so surgical procedures, Dahlman experienced extreme pain and suffering.  [Exhibits 62; 335; 605; 606].

Dahlman has reached Maximum Medical Improvement ("MMI"); sustained a lifetime, permanent disability; has been hospitalized for at least 93 days due to these injuries; has experienced many complications and setbacks associated with the many jaw and face rebuilding attempts; will require ongoing medical support to manage his jawbone and facial areas, including future replacement of his prosthetic teeth; sustained a major injury to his left ankle---a "syndesmosis," or ligament injury---which will require a future fusion surgical procedure; will likely suffer infection-related setbacks in his mandibular region; sustained a permanent TBI, a concussion, and cognitive and attention deficits, and an adjustment disorder; and sustained sleep apnea and thus has the need for a so-called "CPAP" ("continuous positive airway pressure") machine for the rest of his life. [Exhibits 62; 335; 605; 606; 607].

Because of the extreme and grievous nature and extent of Dahlman's physical and psychological injuries, he respectfully requests a pain and suffering award in the amount of $8 million.

**J.  James Donaldson**

On 7-14-2005, Donaldson was riding in a HUMVEE when an EFP detonated, thus causing him grievous personal and psychological injuries. Donaldson remained conscious throughout the

entire blast scenario. He noticed that both of his lower legs had been almost completely blown off in the explosion. The right leg traumatic amputation was below-the-knee. So, too, was the left leg traumatic amputation at first; however, because of subsequent infection and abnormal growth ("heterotopic ossification") issues, and after his health care providers performed as many as 30 operative procedures on his left leg, the left leg amputation had to go above-the-knee. This second left leg amputation procedure was 18 months after the traumatic left leg amputation. [Exhibits 422; 255; 466; 256; 467].

Donaldson had to undergo two operations to have shrapnel fragments removed from his right leg. He endured another operation on the right leg to have an artificial bone inserted between his femur (thigh bone) and tibia (lower leg bone). Donaldson also suffers from permanent nerve damage from a point just above his right knee all the way down to the right stub. Donaldson has also experienced a skin graft procedure, with his right thigh area being the "host" site, to his right stub site area to address infection issues. [Exhibits 422; 255; 466; 256; 467].

Donaldson typically uses a prosthetic device for ambulation with his right leg. This device has been changed and revised on at least 10 occasions since 2005. As for Donaldson's left [now] above-the-knee amputation, he typically does not use a prosthetic device. He typically uses a wheelchair for his eight-hour work shift. [Exhibits 422; 255; 466; 256; 467].

The left leg presents Donaldson with considerable pain when he attempts to bear weight on it and with activity. He has a free-floating piece of bone in the left stub area which is also very painful. Donaldson experiences "phantom pain" in the area where his lower left leg is supposed to be. He also experiences "nerve pain" in the left leg. Donaldson has never been effectively fitted for a left leg prosthetic device which does not hurt him to wear and to use. [Exhibits 422; 255; 466; 256; 467].

Donaldson had his right ring finger blown off in the attack. He is right-hand dominant. His right thumb and middle finger were also fractured in the attack and were almost blown off as well. He has permanent nerve damage in his right middle finger area. His handwriting has predictably suffered, and he experiences tiredness with any significant attempted uses of his right hand. The permanent injuries to his right hand make crutch bearing impossible. He was determined by the U.S. Army to completely and permanently disabled. [Exhibits 422; 255; 466; 256; 467].

Donaldson experienced very serious blood-clotting issues, including a major pulmonary embolism, immediately after the attack and had to have a stent ("IVC filter") implanted into this chest. One of the original blood clots burst into one of his lungs and almost went to his heart. [Exhibits 422; 255; 466; 256; 467].

Some additional physical issues Donaldson has had to deal with include internal bruising; problems with defecation; frequent migraine-like headaches; sleep apnea; sleep deprivation; and excessive daytime sleepiness. [Exhibits 422; 466; 467; and 256].

Donaldson was diagnosed with traumatic brain injury ("TBI") because of the EFP attack. He suffers from short-term memory loss and deficit issues. He feels anxious, "fidgety," and "antsy" around crowds, and takes Prozac for this daily. He was diagnosed with severe depression and Post-Traumatic Stress Disorder ("PTSD"). He incurred a severely limiting lifetime disability due to multiple grave traumatic injuries and the surgical measures taken to correct them. He has reached Maximal Medical Improvement. This is despite Donaldson's engagement in psychological and pharmacological treatment for the past 13+ years. [Exhibits 422; 255; 466; 256; 467].

Because of the extreme and grievous nature of Donaldson's physical and psychological injuries, he respectfully requests a pain and suffering award in the amount of $12 million.

### K.  Jerral Hancock

On 5-29-2007, Hancock was driving an M-1 Abrams Main Battle Tank when an EFP detonated, thus causing him grievous personal and psychological injuries. At the blast scene, Hancock remained stuck within the burning vehicle for almost 40 minutes, literally burning alive, going into and out of consciousness.  When comrades grabbed his left arm to extract him from the burning tank, they pulled off Hancock's left arm at the elbow. What was left of Hancock's left arm was badly burned.  He experienced at least three operative procedures in efforts to save what was left of the left arm; however, these efforts proved unsuccessful, and the left arm was amputated all the way up to the left shoulder. He cannot have a prosthetic device fitted because there is no "stub" left onto which to attach it.  [Exhibits 340; 452; 617; 618].

Multiple shrapnel fragments exploded into Hancock's neck area and lodged against his cervical spinal cord, thus paralyzing him at the C-6 level.  Hancock has no feeling in his body from the chest level of his body on down.  Hancock has been told by his health care providers that his paralysis is permanent and that it would be much too risky to attempt surgery to remove the lodged shrapnel from his spine.  He also had broken cervical facets at the C-5 and C-6 levels of his cervical spine.  And it was only after extensive effort on the part of Hancock's health care team, physical therapists and Hancock is able to move his right arm and hand. [Exhibits 340; 452; 617; 618].

During the first years after the attack, Hancock experienced considerable "phantom pain" in the area where his entire left arm used to be.  He took Lyrica and Gabapentin for this phantom pain, which is nerve-related pain. This phantom pain has diminished somewhat, but not near totally so, and he still takes Lyrica daily. [Exhibits 340; 452; 617; 618].

From the date of the attack to the present, Hancock has been able to ambulate only with the assistance of a mechanized wheelchair. Although he can move his right arm and hand in a very limited fashion, he cannot propel himself in a manual wheelchair or use silverware to eat and feed himself. Instead, he needs to be fed and bathed by others on a day-in, day-out basis. He has to have family members extract bowel movements from him on a routine basis and move him on a regular basis. He is totally dependent on others for most of his daily needs and activities of Life. [Exhibits 340; 452; 617; 618].

Because of shrapnel fragments blown into his abdominal area, Hancock has experienced severe infections and even sepsis in his bloodstream. In multiple operations, doctors removed 16 inches of Hancock's intestine and bowel because they were necrotic. He has had a permanent suprapubic catheter surgically inserted into his lower abdominal area (bladder) into which he urinates. [Exhibits 340; 452; 617; 618].

Hancock had severe second and third degree burns to his face, neck, head, upper limbs, trunk, and left thigh. 28% of his total body surface area was severely burned, and he had a large open wound in his neck where the shrapnel blew up against his spinal cord. Even his eyelids were severely burned. Over the next weeks and months after eventually being transferred stateside, Hancock underwent numerous grafting procedures to address the multiple second and third degree burns throughout his body. [Exhibits 340; 452; 617; 618; 619].

Hancock also had severe lacerations throughout his entire body. He also had an inferior vena cava ("IVC") filter implanted to help prevent potentially life-threatening pulmonary emboli and/or deep vein thrombosis from developing. He also had an intracranial pressure monitor ("ICP" monitor) implanted within the ventricle in his brain to monitor the increasing pressure on his brain. [Exhibits 340; 452; 617; 618].

Shortly after the attack, Hancock developed very serious pressure ulcers on his sacrum, scapular area, and other areas on his body, all of which became infected. These wounds have redeveloped throughout the years and have become infected on numerous occasions. Hancock has even developed osteomyelitis from the infections from these wounds. [Exhibits 340; 452; 617; 618; 619].

Shortly after the attack and to the present, Hancock experienced severe nerve pain. He was on every possible narcotic pain medication and developed an addiction to opioids. The pain medications included: Fentanyl, MS Contin, Methadone, Oxycontin, Oxycodone, Dilaudid, Toradol and Tramadol. Despite all the pain, phantom pain, and peripheral neuropathy medications which he has taken since the attack, Hancock still experiences severe pain and discomfort on a daily basis in his body above the chest level, and in the area where his left arm and hand would be. Hancock rates his pain levels on a daily, regular basis at a 6/10 level. [Exhibits 340; 452; 617; 618; 619].

Hancock was diagnosed with a traumatic brain injury ("TBI") and severe Post-Traumatic Stress Disorder ("PTSD"). He had no prior history of emotional injuries prior to the attack. The TBI and PTSD have had major and devastating effects on Hancock's life, his personal relationships, his mood, and his attitude towards life. He still has nightmares, insomnia, feelings of hopelessness and anger, sudden sweats, anxiety/panic attacks with shortness of breath, distrust of people, even those very close to him, and avoidance of going out into public at all. Hancock has been on various medications, including Citalopram and Lorazepam, for anxiety; Amitriptyline for depression; Prazosin for nightmares; Propranolol; and Ativan; Clonidine and Trazodone. [Exhibits 339; 340; 452; 617; 618; 619].

Throughout the years, Hancock has had periodic bouts with opioid addiction and has at times turned to illegal drugs to self-medicate, both physically and emotionally. He also had periods where he weeps uncontrollably, not knowing why and not being able to control it.  There have been many occasions where Hancock has just felt like giving up.  [Exhibits 340; 452 617; 618; 619].

During recent years, Hancock has been on Clonazepam (1/2 milligram tablet once per day, a reduced dosage because it was making him too tired) for depression and anxiety; Diazepam (5 milligram tablet four times per day) for anxiety and PTSD. He has chosen not to engage in counseling or therapy as he gets so mad and angry at his situation in life and does not want to start talking about these issues with someone he does not even know.  Despite these medications, he still has periods of time where he feels worthless, overwhelmingly depressed, very angry, and very hopeless.  [Exhibits 340; 452 617; 618; 619].

Because of the extreme and grievous nature of Hancock's physical and psychological injuries, he respectfully requests a pain and suffering award in the amount of $18 million.

### L.  Stacie Tscherny, mother of Jerral Hancock

Stacie Tscherny is the mother of severely injured Jerral Hancock.  She also had to become the legal guardian of Hancock's two minor children, A.H. and J.H., because of Jerral's severe physical and psychological injuries. [Exhibits 453; 622].

Jerral arrived at Brooke Army Medical Center ("BAMC") in San Antonia on 6-3-2007, in a medically induced coma.  Stacie was there when they took him off the plane but would never have recognized him had they not told her it was him.  His hair was totally singed and black, his eyebrows and lashes were burned off, and his face was totally flash burned.  He had a huge stitched-up scar on his forehead, a wrapped bandage where his left arm had been, and his overall

body appearance looked very "swollen."  It was not until Stacie had been there for approximately

three months that Jerral's health care providers told her he was going to make it. [Exhibit 453].

After several months at BAMC, Jerral was transferred to the Palo Alto Polytrauma

Rehabilitation Center in California, where Jerral and the family received training and instruction

on how to care for and live with a paralyzed person.  [Exhibits 453; 622].

Stacie lost her job during this time as her boss told her she would need to be back within

two weeks. Forced by circumstances to quit her corporate job, Stacie received the equivalent of a

few hundred dollars' worth of food stamps and $1500 a month from Jerral's pay to live.  She went

from a working salary of $65,000.00 per year to $18,000.00 per year and food stamps.  [Exhibits

453; 622].

The first years after Jerral came home were the hardest. Trying to adjust to his total

dependence, nightmares, sleeplessness, PTSD, and having to take care of a paralyzed person---

including all toileting and hygiene issues---was very difficult in the first few years.  She and her

husband, Dirrick Benjamin, and others pulled together as a family to make it work.  [Exhibits 453;

622].

Jerral was blessed with a home which the Gary Sinise Foundation built for him and his

family in Palmdale.  While Stacie is blessed to have a nice home, she no longer has her name to

any property and what she worked hard for is gone. If she were to have a falling out with Jerral,

she has nothing and nowhere to go.  In addition, she has now been out of the job market for almost

17 years and is in her late-50s.  [Exhibits 453; 622].

Although she is grateful to be able to care for Jerral, his injuries have very much changed

the plans she had for being a middle-aged woman.  She and Dirrick are literally "on call"

24/7/365.  It is a full-time job caring for Jerral, one they do with much love, but with the realization

that this is a permanent assignment.  There are no paid holidays, vacations, leaving town to go to the beach, or taking a day off.  They are always there for him. Stacie is blessed in that her husband, Dirrick, stuck around and deals with all of this.  They have not left town together for years. The biggest outing they have is an occasional dinner for a couple of hours.  [Exhibits 453; 622].

Stacie has not worked for almost 17 years.  She is not sure how her Social Security benefits will be calculated when she is eligible for such benefits, as she has not been able to generate any positive income flow to put away such future benefits in the past 17 years.  She is very concerned that this will make a big cut in what she would have received had she continued her corporate career.  [Exhibits 453; 622].

Given the extreme nature and extent of her multiple psychological and financial hardships endured in having to perform around-the-clock dependent care for her son, Jerral Hancock, Stacie Tscherny respectfully requests a solatium damages award in the amount of $7.5 million.

## M. Saul Martinez

On May 8, 2007, Martinez was riding in a HUMVEE vehicle when an EFP detonated, thus causing him grievous personal and psychological injuries. Martinez was in and out of consciousness after the blast because of massive blood loss. He vividly recalls the sound of his squad leader and the medics cutting what remained of his two legs loose from where they were twisted, badly mangled, bleeding profusely, and melted on to parts of the vehicle itself.  He also recalls thinking he was going to die and insisting that his squad leader give his bracelet to his wife.  During the first few days after the blast incident, Martinez "flat-lined" twice, meaning he was essentially dead.  He was placed into a medically induced coma for nine days.  [Exhibits 50; 51; 590; 332; 591; 592].

Martinez has an above-the-knee amputation on his right leg, and a below-the-knee amputation on his left leg. Since shortly after the attack, Martinez has been fitted with prosthetic devices for both of his legs. He has had the right prosthetic devices changed on his right leg approximately 35 times (or more) in the 10-plus years which have elapsed since then, and probably a few less times on his left leg. He has been told by his healthcare providers: that he will have this regularity of replacements and adjustments going forward; that he will always have issues and complications with his prosthetic devices and components for the rest of his life; and that he must have the major shrapnel fragments embedded in his two leg stumps removed surgically at some point in time. [Exhibits 50; 51; 590; 332; 591; 592].

Martinez also sustained a significant traumatic brain injury ("TBI") in the blast which produces both physical and cognitive symptoms to this day, including considerable fatigue and forgetfulness, even including simple words and phrases, which gets him very frustrated. He has tried everything within his control to address these TBI physical symptoms, but with no success. [Exhibits 50; 51; 590; 332; 591; 592].

Martinez also sustained a significant shrapnel injury to his right gluteal ("butt cheek") area which had a major hole. This gaping wound took a long time after the blast incident to heal. There is also so-called "hypertrophic ossification" in this right gluteal area, or abnormal bone growth at an abnormal anatomical site. This abnormal bone growth produces regular pain symptoms in that area of his body to this day. He also has this abnormal bone growth on the outside area of his right leg stub and at the bottom area of his left leg stub. [Exhibits 50; 51; 590; 332; 591; 592].

Martinez was on major narcotic pain medications for a long period of time after the attack. He was in excruciating physical pain all over his body, but especially in his "legs" (so-called "phantom pain" in the areas where his legs were supposed to be) and his right gluteal

area.  Martinez does not like taking narcotic pain medications, but to this day he has a hydrocodone prescription for pain which he uses three times per week.  The pain levels vary over time.  His average daily pain level is a 4/10 (with 10 being the worst pain level he has ever experienced).  Most of the time, he will just take over-the-counter Motrin for this average daily pain.  [Exhibits 50; 51; 590; 332; 591; 592].

Martinez has a serious case of PTSD.  This really did not manifest itself until the 2010- or 2011-time frame because, he was told, he was in total denial about what had happened to him and his three fallen comrades in the attack.  He had "survivor's guilt" and remorse and did not want to come to terms with the fact that three of his comrades had been killed in the attack and that he had survived.  He did not want to address the fact that he did not have legs anymore.  Finally, when he accepted these realities, he began to have severe symptoms of PTSD, symptoms which remain with him to this day.  He still receives regular mental health treatment through the VA. However, due to his aversion to medications, he chooses not to take any medications for PTSD. [Exhibits 50; 51; 590; 332; 591; 592].

In 2012 and 2013, Martinez's PTSD worsened.  He was self-destructive and cared about nothing but his kids.  From 2014 through the present, it has been very hard work for him and his mental health providers to work on the PTSD and its symptoms of depression and anxiety.  The PTSD has most certainly negatively affected his marriage with his wife, Sarah.  [Exhibits 50; 51; 590; 332; 591; 592].

Because of the extreme and grievous nature of Martinez's physical and psychological injuries, he respectfully requests a pain and suffering award in the amount of $10 million.

**N.  Nicholas Paupore**

On 7-2-2006, Paupore was riding in a HUMVEE vehicle when an EFP detonated, thus causing him grievous personal and psychological injuries. Paupore sustained an above-the-knee traumatic amputation of his right leg, and also experienced infection-related issues associated with the stump area of his right leg long after the attack.  He was fitted for a prosthetic device later in 2006.  The device has had to be replaced on numerous four occasions since the attack. Paupore experienced a major setback in 2007 when shrapnel fragments in the stump site necessitated surgery.  [Exhibits 14; 498; 280; 499; 500].

Even to the present, Paupore's right stump is short, and it remains difficult to fit with a prosthetic device which he can regularly use without consistent pain and discomfort.  His gait is difficult because he must swing his right leg in an arc to his right side to move forward.  This puts lots of pressure on his right hip socket, leading to osteoarthritis and a possible need for a future total hip replacement. All told, Paupore experienced at least eight surgeries and has been hospitalized for more than 25 days for injuries and procedures associated with the attack injuries. [Exhibits 14; 498; 280; 499; 500].

To this day, Paupore's experiences the phantom pain and periodic, activity-based pain in his right stump area.  When this pain comes on, Paupore takes over-the-counter medications, opting not to take narcotic pain medications.  Although his pain was unremitting for the years after the attack, even to this day Paupore experiences pain daily and will experience such pain for the rest of his life.  This pain includes electric shock-like pain with ambulation, and even at night when he is prone and at rest.  [Exhibits 14; 498; 280; 499; 500].

Paupore also had many shrapnel fragments blown into various parts of his body, most notably in his right (dominant) arm and forearm and into his left thigh.  He has permanent nerve damage in his right hand and arm and a permanent cubital tunnel syndrome diagnosis, both of

which have been confirmed in objective diagnostic studies.  This has resulted in decreased grip strength in his right hand.  Paupore experiences electric shock-like pain in his right (dominant) shoulder, arm, forearm, and hand.  Finally, Paupore also experiences significant periodic pain in his lower back, left (non-amputated) leg, and right hip.  He has osteoporosis in his right hip and osteopenia in his left hip from being bedridden for so long. [Exhibits 14; 498; 280; 499; 500].

Paupore was also diagnosed with a mild traumatic brain injury ("TBI").  Follow-up testing demonstrated ongoing cognitive difficulties with symptoms of irritability and mood swings, sleep impairment, and memory impairment, all of which are consistent with post-concussion syndrome.  Subsequent testing evidenced obstructive sleep apnea and the need for him to use a CPAP machine for life.  Paupore's early TBI was much worse than anyone knew. He could not remember short-term like appointments, what he had eaten that morning, and/or where his keys were.  [Exhibits 14; 498; 280; 499; 500].

Long after the attack, Paupore experienced nightmares about his experience and could not sleep, for which he had to take sedative medications.  Things tended to upset him more after the attack, especially when the pain levels were high.  He had a much shorter fuse.  Although the TBI has continued to affect Paupore's concentration levels and attention spans, the use of the Strattera medication over the years has helped control the symptoms.  [Exhibits 14; 498; 280; 499; 500].

Because of the extreme and grievous nature of Paupore's physical and psychological injuries, he respectfully requests a pain and suffering award in the amount of $6 million.

### O.  Brian Saaristo

On 7-2-2006, Saaristo was riding in a HUMVEE vehicle when an EFP detonated, thus causing him grievous personal and psychological injuries. Saaristo's initial shock and pain from

the EFP blast was extreme.  Both of his legs were literally sheared off in. He was wide awake and even applied tourniquets to both of his legs.  He was later told that he had gone into total shock. Saaristo was placed in a medical coma to help him cope with the extreme pain.  [Exhibits 21; 503; 504; 505].

After the medical coma, the health care providers started wound cleaning procedures which were so painful that Saaristo had nightmares about the experience.  He was put on Oxycontin and other strong narcotic pain medications to try to stem the intense pain he was experiencing.  These medications made him feel like he was in another world.  During the short-term period after the attack, Saaristo's pain levels would fluctuate from a 7 through a 10 (with a "10" being the worst pain he had ever experienced).  [Exhibits 21; 503; 504; 505].

Saaristo also had shrapnel blow into both of his legs and both of his lungs.  Even through the present time, shrapnel fragments in his legs create intense pain problems by rubbing up against his prosthetic devices which he uses for ambulation. Saaristo also experienced very serious tailbone area pressure sores early on after the attack from which he has scars to this day.  Shrapnel fragments also blew into his left hand, left thigh, right forearm and right elbow. Saaristo was found to have neuropathies in his right (dominant) hand and forearm which have affected his grip strength.  [Exhibits 21; 503; 504; 505].

Saaristo experienced two below-the-knee traumatic amputations as a result of the attack.  He was fitted for prosthetic devices to assist him in ambulating by year's end 2006.  He has had to have the prosthetic devices replaced on at least three occasions for each leg.  Saaristo also has experienced heterotopic ossification, or an unnatural formation or growth of bone on the stubs of what is left of his legs.  The ossification presents him with considerable pain symptoms

on a regular basis and cuts down sharply on the time frames that he can stand on and walk on his prosthetic devices.  [Exhibits 21; 503; 504; 505].

In addition, Saaristo has experienced "phantom pain" in the area where his legs would otherwise be had they not been amputated.  Saaristo first received steroid injections in 2-2007 to address this phantom pain.  Then, he received Botox injections in 3-2007 to address the same problem.  This phantom pain occurs approximately twice per week currently.  When it comes on, Saaristo's pain levels are an 8/10.  The phantom pain is much worse presently than it was soon after the attack. [Exhibits 21; 503; 504; 505].

Saaristo had to use an antibiotic cream throughout 2007 to address continuing infection problems associated with his stub areas.  In 5-2007, Saaristo underwent a revision surgical procedure to remove ossification near the end of the stub areas in both of his legs.  [Exhibits 21; 503; 504; 505].

Saaristo also experienced a significant permanent hearing loss because of the attack which exists to the present time.  He also cannot pick up and hear high-pitched sounds.  [Exhibits 21; 503; 504; 505].

Saaristo was diagnosed with an anxiety disorder because of the attack as well.  Although he prefers not to take any narcotic or psychotropic medications, Saaristo does take medications for his anxiety disorder as his wife, Cheryl, insists that he does so.  [Exhibits 21; 503; 504; 505].

In 3-2007, Saaristo was diagnosed with a cognitive disorder secondary to a traumatic brain injury ("TBI").  Memory impairment, sleep impairment, and increased irritability were noted.  The degree of psychiatric impairment was noted to be "marked."  It was then determined that his cognitive impairment and continued sleep disturbance secondary to a post-concussion syndrome made it unlikely that Saaristo could return to the Army as an active Soldier. Formal testing done

in 11-2007 further confirmed the noted findings but found that the symptoms improved with the use of Stratera. Nevertheless, Saaristo was then noted to have ongoing symptoms including anxiety, irritability, headaches, and disrupted sleep. As recently as 2-2014, Saaristo was seen in the V.A. Mental Clinic for then-recent episodes of anger, mood swings, depression and insomnia. [Exhibits 21; 503; 504; 505].

On 6-26-2018, Saaristo was psychologically assessed by Drs. Jonathan Green and Sarah Kleiman. Their diagnostic testing revealed a clear diagnosis of Post-Traumatic Stress Disorder ("PTSD") which had been in effect since the EFP attack. Testing revealed that he has a severe level of PTSD-related psychosocial impairment which affects his interpersonal relationships and his ability to complete daily tasks. [Exhibit 505].

Because of the extreme and grievous nature of Saaristo's physical and psychological injuries, he respectfully requests a pain and suffering award in the amount of $10 million.

### P.  John Takai

On 6-29-2007, Takai was riding in a HUMVEE vehicle when an EFP detonated, thus causing him grievous personal and psychological injuries. Takai's left arm and shoulder were severely injured in the attack. His entire left arm experienced what is known as a "degloving injury", where the skin and tissues and muscles are mangled or ripped from the underlying muscle, connective tissue, or bones. His left humerus bone was severely fractured, as were the radial and ulnar bones of his left arm. Takai has no range of motion in his left hand and arm, and he cannot pronate or supinate (*e.g.,* cannot hold his left hand out in front of him and rotate it to the left or right). He also has experienced considerable heterotopic ossification (abnormal bone growth) in his various arm bones, but especially so in his left elbow bone, which has caused him to suffer

major pain in that area since the attack and through the present.  In addition, these fractures have not healed in proper alignment.  [Exhibit 70; 356; 641; 644; 646].

Takai sustained third degree burns to his left arm and hand areas, thus necessitating grafting procedures with the donor site coming from his right arm.  Takai is presently severely restricted in what he can lift or carry with his left hand and arm.  To this day, he experiences considerable nerve pain in his left hand and arm.  Finally, Takai also sustained a left shoulder separation as a result of the blast.  [Exhibit 70; 356; 641; 644; 646].

Soon after the attack, Takai underwent surgical procedures for irrigation of his wounds; a left femoral artery repair; a fasciotomy of the left arm (a surgical procedure where the fascia (connective tissue) is cut to relieve tension or pressure in a particular area of the body where there is loss of circulation), which is usually considered a limb-saving procedure; a left carpal tunnel release; and an application of an external fixator to the left humerus and forearm. [Exhibit 70; 356; 641; 644; 646].

Takai was transported stateside to the Brooke Army Medical Center ("BAMC") where he was admitted from July 4 through August 6, 2007.  While at BAMC, Takai underwent various irrigation and draining procedures on the left arm and left leg injuries he had sustained; had open reduction and internal fixation procedures performed on the humerus and ulna bones in his left arm; the external fixator was removed; antibiotic beads were placed in the upper left arm and hand wounds to address infection; and skin grafting procedures were done for the third degree burns of the left arm and hand. [Exhibit 70; 356; 641; 644; 646].

Eventually, the non-union of the various fractures in the left forearm and left hand resulted in a significant loss of motion in Takai's left elbow and forearm areas.  With this limited range of motion and pain with use of the left arm came a right shoulder impingement diagnosis due to

overuse with the right hand and arm.  Takai also experienced right carpal tunnel symptoms on the right.  [Exhibit 70; 356; 641; 644; 646].

After discharge from BAMC, Takai underwent extensive rehab programs, including physical therapy; behavioral health; orthopedic; infectious disease; physical medicine; TBI; psychiatry; social work; sleep disorders; urology; and pain management.  During these rehab programs, Takai developed sleep apnea for which he needed a Continuous Positive Airway Pressure ("CPAP") machine.  He also complained of cervical and lumbar pain and stiffness, and CAT scanning in those areas evidenced degenerative changes to both his cervical and lumbar spine areas.  [Exhibit 70; 356; 641; 644; 646].

Takai also sustained a very deep and serious left quadriceps and thigh injury in the attack.  There was a gaping hole approximately the width of a nickel coin which penetrated his left leg all the way down to the femur bone.  The femoral artery in his left leg was severely damaged as a result as well, for which he had to undergo major surgery. Many of the muscles and tendons in his left leg were mangled as well.  Takai also fractured the outermost left foot bone in his left foot. Finally, Takai had shrapnel injuries in his right thigh area that have left scarring.  [Exhibit 70; 356; 641; 644; 646].

Takai sustained a severe, permanent lifetime disability due to his original blast injuries and the surgical measures taken to address them.  He has reached Maximum Medical Improvement.  All told, Takai underwent at least eight surgeries and has been hospitalized for at least 42 days for blast-related physical injuries and four days for his psychological injuries. [Exhibit 70; 356; 641; 644; 646].

Takai will need future surgeries on his left elbow and wrist, including an ulnar nerve release, artificial elbow replacement, and wrist fusion.  He will need right-sided surgery for his

right shoulder impingement symptoms and a right carpal tunnel release.  In addition, Takai will require future cervical and lumbar spine surgeries to decompress the nerves and fuse the degenerative areas.  He will need a total left knee replacement.  As a result of all these future procedures and the conditions giving rise to them, Takai will need to take Gabapentin; oxycodone; ibuprofen; and medical marijuana for the rest of his life.  He is at high risk for addiction and subsequent need for drug rehabilitation.  [Exhibit 70; 356; 641; 644; 646].

Takai lost his helmet in the EFP detonation, lost consciousness, and suffered what he described as a major concussion.  He was diagnosed with post-concussive syndrome; a traumatic brain injury ("TBI"); and tinnitus (ringing in the ears). He experiences daily moderate to severe headaches with associated dizziness.  He has noted a deterioration in his cognitive abilities and functions in the almost 13 years since the EFP attack. Takai was diagnosed with PTSD as a result of the attack.  His PTSD and TBI symptoms are severe.  His TBI symptoms cause loss of memory, impaired concentration, tinnitus, and regular, painful headaches. [Exhibit 70; 356; 641; 644; 646].

Given the extreme and grievous nature of Takai's physical and psychological injuries, he respectfully requests a pain and suffering award in the amount of $8 million.

### Q.  Andrew Tong

On 8-18-2007, Tong was riding in a Medium Tactical Vehicle when an EFP detonated, thus causing him grievous personal and psychological injuries. He knew something was very wrong with his right leg, feeling the worst pain he could ever imagine. Most of his right lower leg was completely gone. He could see his own flesh and blood all over the inside of the vehicle. Soon thereafter, he lost consciousness. He was soon transported to Brooke Army Medical Center in San Antonio, Texas, where his right leg was amputated below the knee. In 11-2007, Tong was fitted for a prosthetic device to assist his ambulation. [Exhibits 459; 657; 375; 658; 659].

Since 2008, Tong has had approximately 50 replacement prosthetic devices for his right leg. The stump or end of what is left of his right lower leg opens from time to time, causing neuromas, or painful conditions usually associated with growths of nerve tissue. This has been a constant source of considerable pain and discomfort for the last 10 years or so. The situation got so bad that he could not even work or walk in 2017. Finally, a plastic surgeon had to operate on this stump area in 12-2017. [Exhibits 459; 657; 375; 658; 659].

Tong also had shrapnel blown into his left ankle area. Since the attack, he has received approximately 100 injections in the area to relieve the constant pain. To this day, and despite the injections, it hurts to bear weight on his left foot. [Exhibits 459; 657; 375; 658; 659].

Tong also sustained a traumatic brain injury ("TBI") and concussion in the attack. He had no prior history of TBI or concussion prior. He experiences daily migraine headaches. His only history of migraine headaches prior to the EFP attack was experiencing one in December of 2006, nine months or before the attack. He was diagnosed with Post-Traumatic Stress Disorder ("PTSD"), which has gotten worse, not better, over the years since the attack. He has experienced symptoms of both TBI and PTSD on almost a constant basis since the EFP attack. [Exhibits 459; 657; 375; 658; 659].

Since the attack and through the present, Tong has symptoms including night sweats, lack of restful sleep (with the need to take Ambien to get to sleep and remain sleeping), forgetfulness, memory lapses, and poor concentration. He is claustrophobic and feels the need to avoid crowds. He feels isolated and remains for the most part isolated when he can be. He always feels anxious and depressed. He knows that he is much more argumentative and short-tempered than he has ever been in his life, and that all the above symptoms very likely resulted in the breaking of an engagement to be married when he got back from Iraq. [Exhibits 459; 657; 375; 658; 659].

Tong takes various medications for these symptoms and conditions, including: (1) Venlafaxine, an antidepressant (one 150 mg pill twice per day); (2) Buspirone, an anti-anxiety medication (five mg pill taken twice per day); and (3) Lorazepam, an anti-anxiety medication (twice per day). He has seen a therapist but finds it difficult to find a therapist with whom he feels comfortable. As for his physical pain, Tong takes Percocet every day. This is a combination of Oxycodone and Acetaminophen. His dosage is eight "3-525" pills per day. He also takes Topiramate as a preventative for his migraine headaches (three 50 mg pills taken twice per day). He takes Verapamil as well for migraine headaches (one 180 mg pill taken twice per day). He also takes Eletriptan as needed for migraines. Finally, he takes an injection medicine, Sumatriptan, when he suffers migraines. [Exhibits 459; 657; 375; 658; 659].

When he woke up after the attack, Tong had double vision and has had it ever since. His healthcare providers related that the double vision is related to the TBI. He has been prescribed prism glasses to try to address the issue, but that does not alleviate the problem, although it does allow him to drive. Since 2008, Tong has gone to a specialized blind rehabilitation facility in Chicago known as the V.A.'s Central Blind Rehabilitation Center at the Edward Hines, Jr. V.A. Hospital on at least an annual basis. Some of the admissions there are for seven days, while some have lasted as long as three months. Only through training and rehabilitation has Tong learned how to "bring the [double] images together…" [Exhibits 459; 657; 375; 658; 659].

Tong has also been told by his healthcare providers that his daily migraine headache issues are related to the double vision situation and that the double vision is a permanent condition for which there is no possible surgical fix. He is considered "legally blind" by the V.A. He also sustained a permanent hearing loss because of the attack. He has tinnitus or ringing in both of his ears. He cannot hear either high-pitched or low sounds at all. He does not receive any treatment

for the hearing conditions, but rather accepts the permanent condition that it is. His healthcare providers also found fragments of shrapnel in his right arm a couple of years back which was pinching on a nerve there and thus causing significant pain. He had to undergo a surgical procedure to have those fragments removed. [Exhibits 459; 657; 375; 658; 659].

Given the extreme and grievous nature of Tong's physical and psychological injuries, he respectfully requests a pain and suffering award in the amount of $7.5 million.

### R.  Travis Vendela

On 2-7-2007, Vendela was riding in a HUMVEE when an Improvised Explosive Device ("IED") detonated, thus causing him grievous personal and psychological injuries.  Vendela lost consciousness, had to be intubated for breathing, and sustained massive blood loss at the scene. This resulted in hemorrhagic shock, and he had to be administered various blood products to keep him alive.  He was told by medics who were at the scene that he literally died three times there.  [Exhibit 144; 573; 325; 574; 575].

He sustained bilateral leg amputations---on the left, above the knee; and on the right, a through-the-knee---because of the IED attack.  He also sustained various cervical and lumbar spine fractures, including a C3-C4 fracture which required a cervical fusion operative procedure, along with a pelvic fracture which also required surgery (plates and screws were inserted for stabilization) and which resulted in an abnormal separation of his abdominal muscles.  There were also spinal transverse fractures at the L2-L3 level.  Vendela also fractured his right jawbone, which required surgery to wire it together for healing.  He also sustained a fracture just above his left elbow joint, a comminuted fracture of his left humerus (long bone in the upper arm), and a compartment syndrome, or excessive pressure building up in the muscles of the left forearm, all which conditions required surgeries. He also sustained a left wrist fracture. He developed serious

44

infection-related problems in his left elbow area, including osteomyelitis so severe that a pathological fracture resulted, along with heterotopic ossification (abnormal growth of bone in soft tissue areas), both of which conditions also required surgery.  [Exhibit 144; 573; 325; 574; 575].

For all the above major injuries, Vendela experienced approximately 30 surgeries and has been hospitalized for approximately 100 days.  There were numerous bilateral amputation revisions, "washout" or "clean outs" of the shrapnel wounds throughout his body, along with multiple surgeries to his right jawbone area, left elbow area, and hip area.  He has had major infection-related problems associated with his various injury areas. [Exhibit 144; 573; 325; 574; 575].

Since the IED attack, Vendela has developed debilitating phantom pain in the areas where his lower legs and feet would be but for the bilateral amputations.  This bilateral phantom pain presents him with severe pain on a daily, constant basis.  He also has developed heterotopic ossification, or the abnormal growth of bone in soft tissue areas, in his bilateral "stump" areas, which also causes him severe, constant pain.  Various advanced therapies, an implanted pain stimulator in his mid-back, and major narcotic medications have not reduced or controlled Vendela's major pain symptoms. The pain and nerve pain medications included: Fentanyl patches; Hydromorphone; Oxycontin; Amitriptyline, Norflex, Lyrica, Gabapentin, Buprenex, and Clonidine. Despite all the above, Vendela's average pain levels presently are 6/10, with "10" being the worst pain he has ever experienced, and this self-assessment is with the pain medications being taken.  He also has developed a chronic state of constipation from his taking all these medications.  [Exhibit 144; 573; 325; 574; 575].

Vendela has been fitted with various prosthetic devices for both of his legs; however, he has yet to be able to stand and/or walk for any considerable length of time without experiencing

considerable pain which, he is told, is due to the heterotopic ossification. The combined pain from his "stumps," the phantom pain, and the pain he still feels in his pelvic and low back areas result in Vendela using his wheelchair in the overwhelming percentage of his daily life, perhaps greater than 95% of the time.  [Exhibit 144; 573; 325; 574; 575].

The IED attack, the resulting catastrophic injuries, and his post-attack medical course have left Vendela depressed, sleep deprived, tearful, with nightmares, anxiety, and feeling inadequate.  Back in 2011, Vendela was diagnosed with a chronic Post-Traumatic Stress Disorder ("PTSD"), with poor sleep, and with chronic nightmares.  Worsening pain, an irregular sleep pattern, and altered mood were noted at that time.  Even to this day, Vendela's PTSD and Traumatic Brain Injury ("TBI") are considered moderate to severe.  He still experiences a constellation of symptoms typically seen in PTSD-diagnosed patients: excessive guilt, poor sleep, intrusive thoughts, and nightmares.  His TBI causes difficulty with memory and anxiety.  When PTSD episodes come on, they last for long periods of time.  [Exhibit 144; 573; 325; 574; 575].

Given the extreme and grievous nature of Vendela's physical and psychological injuries, he respectfully requests a pain and suffering award in the amount of $10 million.

### S.  Michelle Wager

On 1-22-2007, Wager was riding in a HUMVEE when an EFP detonated, thus causing her grievous personal and psychological injuries. Two fellow U.S. Soldiers were killed instantly, while another was very seriously injured. Wager was in and out of consciousness; in unbearable pain, the worst pain she could ever imagine; and thinking about her family. She lost consciousness for about 30 minutes or so at the scene due to significant blood loss and was essentially dead at the scene. She was in a state of hemorrhagic shock, meaning that she had lost more than 20% of her

blood supply and her heart could not pump enough blood throughout her body. [Exhibit 448; 568; 322; 323; 569; 570].

Wager experienced an above-the-knee guillotine amputation of her left leg on the same day of the blast incident. She sustained a major fracture of her right femur and was told that it literally was shattered into powder. She had very limited sensation in her entire right leg, foot, and. She had a major chunk of her right upper leg and part of her right buttocks blown away in the blast. She also had a significant chunk of the area above her right ankle blown away. Finally, she had shrapnel fragments blown into both of her legs as well. [Exhibit 448; 568; 322; 323; 569; 570].

Since the blast incident, Wager has experienced eight surgeries on her left leg and stump area above what was her left knee. She has experienced very painful heterotopic ossification, or abnormal bone growth in the soft tissue of her left stub area.  She has undergone radiation treatment and one surgery in that area to try to stop the abnormal bone growth. In addition to these symptoms, Wager also experienced a distinctly different "phantom pain" in what would have been her left leg. [Exhibit 448; 568; 322; 323; 569; 570].

By 4-2007, Wager was fitted with her first prosthetic device for her left stump. All told, she has had four or five prosthetic devices for her stub since the blast incident. Throughout these years, she experienced many complications and difficulties with her left stub and the prosthetic devices, including issues of non-fitting, altered and painful gait issues, needed adjustment issues, sores and cellulitis developing on the stub, and the like. [Exhibit 448; 568; 322; 323; 569; 570].

Wager's right leg was supposed to be amputated as well; however, the health care providers were able to put it back together again with internally placed hardware. Wager also has arthritis and bursitis in her right hip. She experienced the very same severe pain and discomfort from heterotopic ossification on the right femur and right hip areas. She has a titanium rod in her right

leg where her fibula bone would be, and a pin drilled into her right hip. She has lost almost one inch of her height in the process of going through the left below-the-knee amputation and the placement of the metallic hardware into her right leg and hip. [Exhibit 448; 568; 322; 323; 569; 570].

Wager had an incomplete paralysis of the right leg with posterior tibial nerve damage and burning pain. This was neuropathic pain, a residual of a peroneal nerve injury in her right foot area. Prior to the blast incident, she had no prior medical history of low back pain or bilateral hip pain. In 11-2008, she was determined to have a gait disorder. She experiences very severe low back pain and bilateral hip pain issues. For years, the Veterans' Administration ("VA") would only recommend physical therapy and other conservative treatment for the above symptoms. This was even though for almost nine years after the blast incident, she experienced lumbar spasms so intense nature that her body would seize up, including her fingers. [Exhibit 448; 568; 322; 323; 569; 570].

In 8-2016, Wager had another surgery for herniated discs at the L4-L5 levels of her lumbar spine. The surgeon related that perhaps she had sustained back fractures at those levels at the time of the blast incident, but for whatever reasons they were not addressed at that time. Since being fitted for her first prosthetic in 4-2007, Wager uses it approximately 50% of the time and uses a wheelchair 50% of the time to get around daily. She has used the wheelchair because of her constant low back pain and bilateral hip pain symptoms. [Exhibit 448; 568; 322; 323; 569; 570].

For almost four-and-a-half years after the blast incident, Wager was on approximately 23 medications for her pain symptoms and psychological injuries. Over time, her body built up an immunity to the many medications she took. Finally, in approximately 2011, she decided she could no longer live with the effects these many medications were having on her thoughts, mood, and

behaviors. She cut down considerably on the number of pills and medications she was taking per day. [Exhibit 448; 568; 322; 323; 569; 570].

Due to the blast attack, Wager has struggled with infertility. The shock from the blood loss caused her then 34-year-old body to go into a menopausal state. In 2011, she was told her menopausal state was "corrected," yet she still had irregular cycles, if any at all. In 2012 a fertility doctor determined her egg supply had diminished to such an extent that any eggs left were not healthy or viable. Her only chance of getting pregnant was through in vitro fertilization with donor eggs. She had her first child, Wesley, in September 2017. [Exhibit 448; 568; 322; 323; 569; 570].

Even with her regular Norco medication being taken, which she resumed after nursing her child, her pain level is approximately 9/10 on a constant basis. In addition to Norco, she takes Tramadol 300 mg daily. Constant pain and discomfort have been a part of her life since the incident. [Exhibit 448; 568; 322; 323; 569; 570].

In addition to her major bilateral orthopedic injuries, Wager was diagnosed with a traumatic brain injury ("TBI"); post-concussive disorder; major depression, post-traumatic stress disorder ("PTSD"); cognitive disorder; adjustment disorder; anxiety; sleep disturbance; easy agitation; and irritability. When these symptoms and diagnoses were combined with the effects of the many medications, Wager was a lost soul and became homeless for a period. By late 2009, she had suicidal ideations and spent seven days in a suicide ward. With counseling, the passage of time, and hard work on her part, Wager has been weaned off anti-depressant medications. [Exhibit 448; 568; 322; 323; 569; 570].

Given the extreme and grievous nature of Wager's physical and psychological injuries, she respectfully requests a pain and suffering award in the amount of $12 million.

**T.  Bryan Wagner**

On 12-17-2007, Wagner was riding in a HUMVEE when an EFP detonated, thus causing him grievous personal and psychological injuries. He looked down to see his right leg and foot turned all the way around and pointed behind him. He reached down and literally twisted it back facing the appropriate and normal way. He was put into a medically induced coma. He had a comminuted fracture of the right tibia and fibula with approximately 22 centimeters (about 8.66 in) of bone missing. Subsequent efforts to save the right leg were unsuccessful and his right leg was amputated just below the knee at the end of 2007. [Exhibit 461; 678; 384; 679; 680].

Before the amputation, Wagner underwent several debridement ("cleaning out") and fasciotomy ("pressure-relieving") procedures. He almost lost his left leg as well, but it was ultimately saved. He sustained a "through and through injury" from a shrapnel fragment blowing all the way through his left calf. He had pieces of shrapnel explode into his body above his torso area which remain inside of his body to this day. [Exhibit 461; 678; 384; 679; 680].

Wagner's immediate post-blast medical treatment was complicated by an acute kidney (renal) failure due to antibiotic treatment for a multi-drug resistant infection in what was left of his right leg. This kidney failure, in turn, led to his electrolytes becoming out-of-balance for months after the attack. He sustained a concussion and a traumatic brain injury ("TBI"). He experienced various burn injuries throughout his body, including his head, face, fingers, and left leg and foot. He experienced a shrapnel fragment wound to his left ankle. He had very significant left hip and thigh pain because of the attack. He was very depressed after being told that his right leg would have to be amputated. [Exhibit 461; 678; 384; 679; 680].

In the short term after the attack, Wagner was on many kinds of opioid pain medications, including morphine, Dilaudid, Oxycontin, and Percocet. He preferred to avoid prescription opiates and narcotic pain medications of any kind, so he insisted that he get off them quickly after the

attack. Presently, he is not taking any prescription pain medications at all despite still experiencing considerable pain and discomfort due to overuse of and excessive activity with his right stub and prosthetic device. He has had the prosthetic device changed approximately 20 times since early 2008. [Exhibit 461; 678; 384; 679; 680].

Given the extreme and grievous nature of Wagner's physical and psychological injuries, he respectfully requests a pain and suffering award in the amount of $7.5million.

### U.  Joshua Wells

On 11-2-2007, Wells was riding in a Stryker vehicle when an EFP detonated, thus causing him grievous personal and psychological injuries. Wells sustained bilateral above-the-knee leg amputations because of the attack. He has worn prosthetic devices on both of his stubs since shortly after the bilateral amputations. Wells is regularly seen by a prosthetist and has had his bilateral prosthetic devices replaced at least 20 times since 7-2008. [Exhibit 460; 674; 382; 675; 673]. Wells also sustained very significant and permanent nerve damage to his left shoulder because of the attack. To this day, he still has considerable difficulty lifting any significant weight above his head or in carrying basically anything with his left arm and shoulder. The left shoulder will just "give out" at times if he is carrying or lifting anything with his left hand, arm and shoulder. He has lost feeling in the bottom of his left thumb. Wells has had periodic pain shots for the left shoulder situation. He also has had Lidocaine patches prescribed for left shoulder pain. He has been offered a surgical procedure for the left shoulder; however, he has thus far declined that opportunity. [Exhibit 460; 674; 382; 675; 673].

Wells has constant low back pain associated with his daily use of the two prosthetic devices which he uses to walk and live. To this day, he has constant ringing in his ears caused by the blast, and he has partial hearing loss in his left ear. To this day, he still has copper (the fragments from

the EFP devices) and concrete fragments embedded throughout areas of his body. The combined effect of his various physical injuries causes him constant extreme pain and discomfort to this day. His average daily pain level is 5/10 (with 10 being the worst pain he has ever experienced). This average pain level is present despite the daily pain medications he takes. [Exhibit 460; 674; 382; 675; 673].

Wells was on constant narcotic pain medications during the first full year after the attack. Presently, he still takes Methocarbamol for the daily low back pain; Diclofenac for the nerve pain, which is directed at the so-called "phantom pain," where he feels "pain" in the areas where the bottom part of his legs and feet would be had they not been blown off; and Naproxen for daily pain as well. Wells does have a current prescription for Hydrocodone; however, due to his aversion to taking narcotic medications, he rarely takes it. Periodically, however, his wife will insist that he take some Hydrocodone if she and other family members can see that he is in dire pain or that he has become irritable and short of temper. [Exhibits 460; 674; 382; 675; 673].

Wells experienced severe emotional injuries because of the attack as well. He was diagnosed with post-traumatic stress disorder ("PTSD"). He had no prior history of depression, anxiety, PTSD, panic attacks or the like prior to the EFP incident. For a long period of time after the attack, Wells slept with a loaded pistol next to his head just be able to fall asleep and feel secure. Even through the present, he finds himself more anxious, more depressed, and having more nightmares. To this day, he takes various medications to address PTSD and associated symptoms. These include Duloxetine (for mood, anxiety, and depression) and Adderol (to get started and to help him focus). Wells can feel the PTSD symptoms even getting worse, not better, as time goes by. He has been told by mental health professionals that this is because he was so utterly numb and not feeling anything after the blast incident, not letting himself acknowledge the reality of

what had happened to him and his comrades. They tell him that now that he is confronting what actually happened to him, he now feels the emotional scars associated with seeing and experiencing that hell. [Exhibits 460; 674; 382; 675; 673].

Given the extreme and grievous nature of Wells's physical and psychological injuries, he respectfully requests a pain and suffering award in the amount of $12 million.

Dated this 8ᵗʰ day of September, 2023      Respectfully Submitted,

THE DRISCOLL FIRM, P.C.

*/s/ Paul W. Johnson*
Paul W. Johnson MO34554
Christopher J. Quinn
211 N. Broadway, 40ᵗʰ Floor
St. Louis, MO 63102
(314) 932-3232 telephone
(314) 932-3233 facsimile
paul@thedriscollfirm.com
chris@thedriscollfirm.com

John J. Driscoll, DC# MO0003
1311 Ave Juan Ponce de Leon
6th Floor
San Juan, PR 00907
(618) 444-6049 telephone
(314) 932-3233 facsimile
john@jjlegal.com

*Attorneys for Plaintiffs*